# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| STEVE SILVERMAN, derivatively on behalf of Nominal Defendant APA CORP., <br><br> Plaintiff, <br><br> vs. <br><br> JOHN J. CHRISTMANN IV, TIMOTHY J. SULLIVAN, and STEPHEN J. RINEY, <br><br> Defendants, <br><br> and <br><br> APA CORP., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Steve Silverman ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative complaint for the benefit of nominal defendant, APA Corp. ("APA" or the "Company"), against John J. Christmann IV ("Christmann"), Timothy J. Sullivan ("Sullivan"), and Stephen J. Riney ("Riney") (together, the "Individual Defendants"), seeking to remedy the Individual Defendants' breaches of fiduciary duties.   Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as filings by APA with the U.S. Securities and Exchange Commission (the "SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including the sustained federal securities fraud class action against the Company and the Individual Defendants captioned *Plymouth Cty. Ret. Sys. v. Apache Corp. et al.*, Case No. 21-cv-00575 (S.D. Tex.) (the "Securities Action"), and other matters of public record.

## I.    INTRODUCTION

1.      This is a stockholder derivative action brought for the benefit of nominal defendant APA against the Individual Defendants, all of whom are current or former officers and/or directors of APA, based on their non-exculpable breaches of fiduciary duty and other serious misconduct from September 2016 to the present (the "Relevant Period"), as alleged in detail herein.

2.      Nominal defendant APA, a Delaware corporation headquartered in Houston, Texas, is an oil exploration and production company whose single most important asset during the Relevant Period was an oil and gas field in the Texas panhandle called "Alpine High."

3.      For years, the Individual Defendants touted Alpine High as a "***transformational discovery***" and "***world class resource play***" with immense production capabilities, including "conservative" estimates of over 3 billion barrels of oil and significant amounts of "really rich gas."

1

The Individual Defendants supported these claims by highlighting examples of "strong well results" and "successful oil tests" that were purportedly representative of Alpine High's "2,000 to more than 3,000 future drilling locations," which would "deliver incredible value to Apache and its shareholders for many, many years to come."[1] Analysts and industry media lauded this "***massive shale discovery***," emphasizing that Alpine High's "compelling economics" represented APA's "largest catalyst opportunity" for the coming years and put APA "back in the game" after a "rough time keeping up with competitors."

4.      Fueled by the Individual Defendants' repeated public assurances, APA's stock price soared, reaching a Relevant Period high of $69 per share on December 12, 2016. And, as alleged further herein, the Individual Defendants took full advantage, collectively reaping approximately ***$78 million*** in Alpine High-linked executive compensation from 2016 through 2019.

5.      Unbeknownst to stockholders, however, the Individual Defendants' public statements were false. In truth, internal production data and analyses of the Alpine High play ***never*** supported the Individual Defendants' representations to stockholders. As the Individual Defendants would ultimately be forced to admit, Alpine High was virtually barren. Indeed, after three years of relentlessly touting Alpine High to stockholders, the "world class resource play" that was supposedly going to "transform" the Company produced ***less than 1%*** of the oil and gas the Individual Defendants had represented to stockholders was recoverable.

6.      Alpine High was in fact so devoid of oil and gas that the Company was forced to cease all drilling at the field in 2020, take a ***$3 billion write-down***, and slash its dividend by a staggering ***90%***. When the truth regarding the Individual Defendants' scheme finally emerged,

---

[1]      Until March 1, 2021, APA was known as Apache Corporation.  References in quotations herein to "Apache" should be read to mean the Company/APA.

analysts and the nation's leading financial publications excoriated the Individual Defendants, noting that the revelations "*were in stark contrast to [the Individual Defendants'] past defense of Alpine High*," and the Company's stock price was decimated, closing at a mere $4.46 per share on March 17, 2020 -- an astonishing decline of *93%* from its Relevant Period high.

7.      Significantly, the allegations raised by the lead plaintiffs in the sustained Securities Action, which were based in part on a forensic analysis of certain data that had been misrepresented and concealed by the Individual Defendants, as well as the accounts of two dozen confidential witnesses (all former Company employees), confirm that the Individual Defendants knew full well even before the Relevant Period began that the true data concerning Alpine High never supported the Individual Defendants' public pronouncements about the economic viability of the play. Without support, and often flying in the face of internal contrary analyses and production numbers, the Individual Defendants recklessly gambled on Alpine High and lied to stockholders about both the quality of the resources in the play and the Company's ability to profitably extract them.

8.      *First*, as alleged in the lead plaintiffs' operative complaint in the Securities Action, filed on December 17, 2021, numerous confidential witnesses have confirmed that APA's President and Chief Executive Officer ("CEO"), defendant Christmann, and other senior officers were explicitly warned on *three separate occasions* prior to the start of the Relevant Period that the composition of the Alpine High area made it virtually impossible for the field to ever be a commercial success. For example, the Securities Action alleges that the leaders of Company teams that conducted two thorough geologic studies of the Alpine High area in 2012 and 2014 independently corroborated that, after reviewing the data from these studies, defendant Christmann, who at the time was serving as the Company's North American Chief Operating

3

Officer ("COO"), concluded the Alpine High area was "too gassy" to ever be viable -- *i.e.*, too heavy on unprofitable "dry" gas and too light on valuable oil and "wet" gas. Similarly, it is alleged in the Securities Action that in numerous meetings, presentations, and emails in the weeks and months leading up to the start of the Relevant Period in September 2016, senior Company geologists analyzing Alpine High made crystal clear to defendant Christmann and other officers that they should not make any public representations concerning Alpine High's production capabilities because the Company did not have the data to back them up. Specifically, it is alleged that senior management was explicitly warned that the Company lacked months, if not years, of critical testing, basic analyses, and fundamental well production data necessary to support any projections for Alpine High's supposed capacity for oil and gas production -- warnings which the Individual Defendants consciously disregarded while trumpeting the so-called "transformational discovery" of Alpine High to stockholders at the start of the Relevant Period.

9.      *Second*, in the Securities Action, the accounts of numerous confidential witnesses independently corroborate that the Individual Defendants took extraordinary steps to conceal Alpine High's true, dismal results from stockholders, regulators, and even other executives at the Company. Indeed, defendant Christmann is alleged to have implemented a "***cone of silence***" in which Alpine High data was segregated from the Company's normal data storage and internal peer review practices, with only defendant Christmann and a select few other insiders having access to critical Alpine High production and projections data.  In addition, it has been alleged that public information about Alpine High was intentionally obscured, including by deliberately misrepresenting and serially delaying regulatory documents. Compliance personnel at APA were allegedly "***instructed***" not to file well completion reports with the State of Texas, which would have triggered an obligation to report monthly production on standardized forms in a public

database. Remarkably, ***during the first two years*** after the announcement of Alpine High, the Company did not file ***a single well completion report*** for any of the ***over 150*** wells drilled at Alpine High in that period, and thus even the most basic information was not provided to stockholders about the performance of Alpine High wells. Former senior Company employees, including the former Director of Petrophysics and Chief of Staff to the COO, explained in the operative complaint in the Securities Action that the Individual Defendants were so "***worried about an objective assessment of Alpine High***" that they refused to subject Alpine High to standard internal peer reviews and risk analyses that applied to every other oil or gas play of the Company, thereby "***violat[ing] every step of the scientific method***."  It is also alleged based on confidential witness accounts that if and when executives spoke out, they were silenced or terminated, with over a ***dozen*** Vice Presidents who raised concerns about Alpine High either run-off or terminated within the first 18 months of the project's commencement. As a result, per the accounts of multiple confidential witnesses in the Securities Action, the message at APA regarding Alpine High was clear: "***you either lined up or you are off the team***."

10. *Third*, it was recognized internally at the Company that the Alpine High play was not, and had never been, economically viable, and that the Individual Defendants' wholly positive public statements touting the play were inaccurate. As alleged in the Securities Action based on confidential witness accounts, these conclusions were definitively confirmed by the results of a remarkable, secret internal review of Alpine High, code named "Project Neptune." Specifically, it is alleged that in the summer of 2019, certain executives grew so concerned that negative information about Alpine High was being concealed that they pushed to finally subject the play's data to the Company's standard review and evaluation procedures. The review team analyzed all production data from the entire life of Alpine High and completed its review in September 2019.

5

The findings from this review, which were allegedly presented to senior management, including defendant Christmann, at an in-person meeting in mid-October 2019, unequivocally concluded that there was never any basis for the Individual Defendants' public pronouncements and projections about the purportedly economically recoverable oil and gas at Alpine High. Indeed, as alleged in the Securities Action, the actual data was abysmal and completely contradicted the Individual Defendants' public representations regarding thousands of drillable sites and copious amounts of oil and wet gas -- and had been since drilling at Alpine High had begun. Moreover, it is alleged that the review team's formal report showed that, given the limited and poor quality of the oil and gas resources at the field, it was an extraordinarily dubious proposition for Alpine High to ever be economically viable. Accordingly, Project Neptune confirmed that internal data ***did not support, had never supported, and in fact contradicted*** the Individual Defendants' repeated representations to stockholders concerning the number and viability of Alpine High's drilling locations and the amount of oil and gas the field could yield.

11.     Although the Individual Defendants never disclosed the existence or results of Project Neptune to stockholders, the Alpine High house of cards soon began to collapse. In October 2019, just weeks after the Project Neptune results were allegedly shared with defendant Christmann and other members of senior management, Steven Keenan ("Mr. Keenan"), the Company's "star" geologist credited with discovering Alpine High as a viable play, abruptly "resigned," sending the Company's stock price down by 5%. Shortly thereafter, the Individual Defendants announced a massive ***$3 billion write-down*** attributed to Alpine High, with defendant Christmann acknowledging that "further testing [at Alpine High] is not warranted" and that the field would "receive minimal to no funding" going forward. Analysts and the financial media explicitly criticized the Individual Defendants for their prior public misrepresentations concerning

Alpine High, specifically highlighting that "***Christmann's comments were in stark contrast to his past defense of Alpine High***" in which he "***vehemently defend[ed] the play's prospects for about three years***." In March 2020, the Individual Defendants announced that the Company was forced to slash its vaunted dividend by a staggering ***90%***. Days later, with its balance sheet in tatters and facing crushing levels of debt, the Company's stock price was cut nearly in half after analysts reported that APA had the highest debt-to-equity ratio "***among all large-cap independent oil producers***."

12.     By March 17, 2020, the Company's stock price had declined by ***over 93%*** from its Relevant Period high, wiping out ***$24 billion*** in stockholder value.  Accordingly, APA investors subsequently initiated the Securities Action against APA and each of the Individual Defendants. The Securities Action was filed on February 23, 2021, and alleged the defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act in a systemic fraud during the "Class Period" (defined as September 7, 2016 through March 13, 2020) via the Company's SEC filings and other public statements concerning Alpine High.

13.     Following the lead plaintiffs' filing of the operative consolidated complaint in the Securities Action, the Company and the Individual Defendants filed a motion to dismiss the operative Securities Action complaint. As discussed herein, the operative Securities Action complaint was based in part on the confidential witness accounts of 24 former employees of APA who possessed first-hand information regarding the Alpine High oilfield, senior management's knowledge of its shortcomings, and the financial fraud alleged in the Securities Action.

14.     On September 15, 2022, U.S. Magistrate Judge Andrew M. Edison ("Judge Edison") issued a Report and Recommendation ("R&R") concluding that the defendants' motion

to dismiss the Securities Action should be ***denied***. Notably, Judge Edison's R&R contains an explanation of just how extraordinary the allegations of fraud at APA were. As Judge Edison stated:

> Over my career, both as a lawyer and as a judge, I have had the opportunity to review a vast number of securities class action lawsuits. Despite their usual length, many of those filings are cut-and-paste jobs that unquestionably fail to properly allege a false or misleading statement. ***This is not one of those complaints. The Consolidated Class Action Complaint provides a detailed discussion of the alleged misrepresentations at issue and explains the reasons why Defendants allegedly knew at the time they spoke publicly that those statements were materially false.*** For that reason, I conclude that Lead Plaintiffs have sufficiently alleged that Defendants made materially false or misleading statements, a necessary prerequisite to stating a § 10(b) and Rule 10b–5 claim.

15.     With respect to scienter, Judge Edison's R&R stated: "[v]iewing Lead Plaintiffs' allegations as true and evaluating the facts as a whole, I conclude that Consolidated Class Action Complaint's allegations are sufficient to support ***a strong inference of scienter*** by Defendants." Given his findings of falsity and scienter – both required elements of securities fraud – Judge Edison concluded that the Securities Action defendants' motion to dismiss should be denied in its entirety.

16.     Very shortly after Judge Edison issued the R&R, Plaintiff made a formal, written pre-suit litigation demand dated September 23, 2022 (the "Demand") on APA's Board of Directors (the "Board") pursuant to Delaware law, a true and correct copy of which is attached hereto at Exhibit A.  Therein, Plaintiff demanded that the Board initiate an independent, reasonable, good faith investigation regarding the allegations therein and take all necessary actions, including filing a lawsuit on the Company's behalf against its wayward "fiduciaries," in order to protect the Company's interests and recover the serious damages caused to APA by their misconduct.

17.     In addition, Plaintiff's Demand noted that the three year statute of limitations for breach of fiduciary duty claims under Delaware law arguably would expire on February 26, 2023

(based on the February 26, 2020 announcement that APA would be forced take a $3 billion write-down on its Alpine High assets). To the extent that the Board might not have been able to complete an investigation regarding the allegations raised in the Demand prior to the expiration of the applicable statute of limitations, Plaintiff demanded that the Board timely secure tolling agreements from each of the individuals that were implicated or potentially could be implicated in the alleged wrongdoing, including but not limited to the Individual Defendants.

18.     On November 1, 2022, Samuel Cooper, Esq. ("Mr. Cooper") of the law firm Shearman & Sterling LLP ("S&S"), counsel for a purportedly "independent committee" of the Board, sent a letter to Plaintiff's counsel, a true and correct copy of which is attached at Exhibit B. The letter from S&S represented that an "investigation in this matter is already underway" but did not indicate whether any tolling agreements had been secured by the Board or its "independent committee" or whether the Board or its "independent committee" intended to secure such tolling agreements prior to the expiration of the statute of limitations.

19.     On November 29, 2022, U.S. District Judge George C. Hanks, Jr. ("Judge Hanks") issued an Order in the Securities Action approving and adopting Judge Edison's R&R *in full* as the holding of the Southern District of Texas and denying the defendants' motion to dismiss the Securities Action *in its entirety*. Notably, after objections to the R&R were filed by the Securities Action defendants on October 13, 2022, Judge Hanks entered this Order following a *de novo* reviewing of Judge Edison's R&R. Accordingly, the fully sustained Securities Action is currently proceeding towards trial.

20.     Having not heard from S&S since receiving its letter dated November 1, 2022, on January 27, 2023, counsel for Plaintiff sent an email to Mr. Cooper, a true and correct copy of which is attached hereto at Exhibit C. Therein, Plaintiff's counsel specifically referenced the

upcoming expiration of the statute of limitations for Delaware breach of fiduciary claims, as previously stated in the Demand, and requested confirmation as to whether tolling agreements had been secured with all directors and senior officers identified as wrongdoers or potential wrongdoers in the Demand.

21.     On January 30, 2023, Mr. Cooper sent a letter to counsel for Plaintiff in response to the January 27, 2023 email, a true and correct copy of which is attached hereto at Exhibit D. Therein, Mr. Cooper represented that an investigation was being conducted by a so-called "Special Committee" which purportedly "is currently completing its work and plans to report to the Board of Directors in due course."  While Mr. Cooper's letter stated that "[t]he Board of Directors and Special Committee will consider all appropriate actions in light of the findings of the investigation", Mr. Cooper conspicuously ignored Plaintiff's inquiry as to whether tolling agreements had been timely secured or would be timely secured.  Indeed, Mr. Cooper's January 30, 2023 letter to Plaintiff's counsel, like his earlier November 1, 2022 letter, did not even mention tolling agreements or the applicable statute of limitations for breach of fiduciary duty claims under Delaware law.

22.     Upon receipt of a pre-suit demand from a shareholder, directors of Delaware corporations are duty-bound to investigate independently and in good faith and to evaluate the charges in order to discharge their fiduciary duties to stockholders and manage corporate affairs responsibly.  Directors of Delaware corporations are likewise obligated to take steps to reasonably inform themselves of all material information available to them for purposes of determining how to proceed in response to a stockholder demand.  Of course, any reasonable, good faith evaluation of the charges in the Demand in this instance by APA's directors, and any reasonable effort to inform themselves as to how to proceed, would necessarily include (among other things) an

assessment of the applicable statute of limitations for the Company's claims.

23.     Claims for relief belonging to the Company are, of course, valuable corporate assets.   Directors of Delaware corporations are duty-bound to protect and preserve the corporation's assets.

24.     Inexplicably, the Special Committee and the Board have ignored the Demand to the extent that it states that securing tolling agreements is a necessary, fundamental step based on the expiration date of the statute of limitations for breach of fiduciary duty claims under Delaware law, as well as subsequent correspondence from counsel for Plaintiff regarding this same issue. Based on the record, especially Mr. Cooper's January 30, 2023 letter ignoring Plaintiff's Counsel's January 27, 2023 inquiry as to the status of tolling agreements, there is no indication that the Special Committee and/or the Board have taken action to secure tolling agreements with the Individual Defendants.  Accordingly, it is now readily apparent that the Special Committee and/or the Board either acted recklessly by failing to take reasonable, basic steps to ensure that APA can timely assert its valuable claims, or worse, that the Special Committee and/or the Board deliberately chose to "run out the clock."

25.     In either case, by this late point in time, the Special Committee's and/or Board's failure to secure tolling agreements despite Plaintiff's explicit demands for tolling agreements -- as the statute of limitations for APA's breach of fiduciary duty claims is at least arguably set to expire shortly -- amounts to functionally ignoring and wrongfully refusing the Demand and failing to protect and preserve APA's corporate assets, in violation of the Board's fiduciary duties to APA and its stockholders.

26.     The Board's clear and wrongful derelictions of duty have left Plaintiff with no choice but to initiate this derivative action at this time on behalf of the Company against the

Individual Defendants, to ensure that the Company's valuable claims for relief based on the allegations in the Demand are properly and timely asserted.  Accordingly, this derivative action should proceed.

## II.    JURISDICTION AND VENUE

27.    This Court has jurisdiction under 28 U.S.C. § 1331 because certain of the claims asserted herein arise under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court also has jurisdiction over all claims under 28 U.S.C. § 1332(a) because Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

28.    This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

29.    In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

30.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because nominal defendant APA is headquartered in this District and conducts business in this District.

## III.    THE PARTIES

### A.    Plaintiff

31.    Plaintiff is a current shareholder of APA and has continuously held shares of APA common stock since at least January 2016.  Plaintiff is a citizen of Pennsylvania.

### B.    Nominal Defendant

32.    Nominal defendant APA is a Delaware corporation with its principal executive

offices located in Houston, Texas.  APA is a publicly traded oil and gas exploration and production ("E&P") company. The Company's common stock currently trades on the NASDAQ exchange under the symbol "APA."

### C.      The Individual Defendants

33.      Defendant Christmann has served as President and CEO of APA and as a director of the Company since 2015.  Defendant Christmann joined the Company in 2003 and has served APA in a number of different roles since then, including Executive Vice President ("EVP") and COO North America from 2014 to 2015, when he was named President and CEO.  Defendant Christmann is named as an individual defendant in the fully sustained Securities Action.  Upon information and belief, defendant Christmann is a citizen of Texas.

34.      Defendant Sullivan served as the Company's EVP, Operations Support from January 2016 through his retirement, which became effective in the second quarter of 2020. Defendant Sullivan joined the Company in 1986 and served APA in various positions, include as Senior Vice President, Operations Support from June 2015 to January 2016.  Defendant Sullivan is named as an individual defendant in the fully sustained Securities Action.  Upon information and belief, defendant Sullivan is a citizen of Texas.

35.      Defendant Riney has served as the Company's EVP since February 2015 and as Chief Financial Officer ("CFO") of the Company since March 2015.  Defendant Riney is named as an individual defendant in the sustained Securities Action.  Upon information and belief, defendant Riney is a citizen of Texas.

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

36.      By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust,

loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

38.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

39.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the Individual Defendants were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.     establish and maintain systematic and accurate records and reports of the

business and affairs of the Company and procedures for the reporting of the business and affairs

to the Board and to periodically investigate, or cause independent investigation to be made of, said

reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or

employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and

requirements, including acting only within the scope of its legal authority and disseminating

truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting

the Company's assets, and to maximize the value of the Company's stock;

g.      ensuring that the Company maintained an adequate system of financial

controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and,

upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices

and make such disclosures as necessary to comply with applicable laws.

40.     Each Individual Defendant, by virtue of his or her position as a director and/or

officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the

exercise of due care and diligence in the management and administration of the affairs of the

Company, as well as in the use and preservation of its property and assets. The conduct of the

Individual Defendants alleged herein involves a violation of their obligations as directors and/or

officers of the Company, the absence of good faith on their part, and a reckless disregard for their

duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

V.     **FACTUAL ALLEGATIONS**

      A.     **Background of the Company, Its Struggles After Missing the U.S. Shale Boom, and the Desperate Need For a Major North American Oil Play**

41.     Nominal defendant APA was founded in 1954, and over the next several decades grew to become a global oil E&P company with operations in the U.S., Canada, the U.K. (North Sea), and Egypt. However, as the shale oil boom took off, the Company -- despite being the sixth largest U.S. oil producer -- was slow to adopt critical new hydraulic fracturing ("fracking") technologies and failed to discover or acquire new substantial oil producing acreage in North American shale regions.

42.     Hydraulic fracturing involves high-pressure injection of "fracking fluid" into rock formations in order to create small openings in the rock, which are then held open by particles from the fracking fluid. If oil or gas is present and accessible, this causes the oil or gas to flow from the resulting fissures into a drilled well, whereupon underground pressure causes the oil or gas to flow up the well to the surface so that it can be extracted. By the early 2010s, high oil prices, technological innovations, and new drilling techniques made fracking for oil increasingly economical for E&P companies. Between 2011 and 2014, U.S. oil production skyrocketed and by 2015, U.S production had effectively caught up with Russia and Saudi Arabia, propelling the U.S. into one of the world's leading oil producers.

43.     Consequently, leading up to the start of the Relevant Period, the Company's performance and stock price lagged significantly relative to its peers. Between 2010 and 2014, the

Company's growth stagnated, with total energy production growing by just 15% while the Company's stock price plummeted by more than 30%. Thus, as the *Houston Chronicle* put it, once the U.S. fracking boom hit, APA "found itself on the outside looking in." As a result, as the *Houston Chronicle* reported on December 30, 2016, the Company's then-CEO Steve Farris "knew Apache had to get back its swagger if it was to reverse its fortunes. It had to return to the business of risk, and it had to make a headline-grabbing find."

44.     Thus, in 2014, under the Individual Defendants' direction, the Company embarked on a plan to reverse its fortunes and boost its stock price by refocusing efforts on North America, with the intention of announcing a major U.S. shale oil play. In furtherance of this effort, in April 2014, Mr. Keenan was hired and appointed as the Company's head geologist. In that role, Mr. Keenan was put in charge of the Company's "Unconventional Resources" team, and the Company opened a corporate office for Mr. Keenan and six of his colleagues (dubbed by numerous former employees as the "Keenan Six Pack") in San Antonio, Texas.

45.     Just after the announcement of the opening of the Company's San Antonio office, a severe downturn hit the oil market, with U.S. oil prices declining from approximately $107/barrel in June 2014 to just $45/ barrel by January 2015. Under the Individual Defendants' direction, the Company sought to weather the downturn through massive divestments of assets, selling off billions of dollars' worth of APA's most productive assets. Specifically, between May 2014 and August 2016, the Company sold off more than $7 billion of its producing assets, and consequently APA's total worldwide energy production declined by at least 30%.

46.     In the wake of this fire sale, the Company came under even more pressure to announce a major North American shale discovery. Mr. Keenan himself later admitted that he was under immense pressure from senior management to discover a major new play, and that if he

failed to do so, he would be terminated. As Mr. Keenan told the *Houston Chronicle* in December 2016, "I knew I had the lifespan of a monarch butterfly," adding that the sentiment at the Company was "[i]f we didn't find something soon, we'd just be swatted and kicked out."

47.     Accordingly, between 2014 and 2016, under the Individual Defendants' direction the Company surreptitiously acquired almost 300,000 acres in a remote area of West Texas in a desperate attempt to announce a prospective new oil play. This land was in a sub-region of the Permian Basin known as the Delaware Basin, located primarily in the Texas panhandle in Reeves County, Texas. This area -- later dubbed by the Individual Defendants as "the Alpine High" -- had been repeatedly drilled by APA's competitors dating back to the 1950s without success, causing those competitors to reject the area as "a place where oilmen go to die." As a result, the Company was able to acquire extensive acreage at very low prices, approximately 1/30th or less than the price of acreage in the surrounding areas of the Permian Basin that were known to hold large quantities of oil and were proven shale plays.

48.     Significantly, defendant Christmann was strongly incentivized to announce a major North American shale oil play by his lucrative executive compensation package, which largely hinged on making such an announcement. For example, according to the Company's 2017 annual proxy statement filed with the SEC and disseminated to stockholders, defendant Christmann's overall 2016 executive compensation amounted to $13.4 million, a substantial portion of which was directly tied to "shift[ing] the focus of Apache's portfolio to North America" and developing a significant U.S. oil play. As confirmed by the Company's own proxy statements, defendant Christmann's compensation -- which averaged over $14 million annually during the "Class Period" and included lucrative annual cash bonuses reaching as high as $2.5 million -- totaled a staggering ***$57 million*** by the end of the "Class Period" in March 2020, and was largely

tied to announcing and developing a major North American shale oil play and boosting the Company's stock price. Defendants Sullivan and Riney also had similar financial incentives to announce and develop the Alpine High play under the Company's incentive compensation structure.

       **B.**    **At the Outset of the Relevant Period, the Individual Defendants Announce the "Transformational Discovery" of a Purportedly <u>Immense Oil Field at Alpine High</u>**

    49.    On the morning of September 7, 2016, the Individual Defendants caused the Company to announce Alpine High as a major oil discovery in Texas. Specifically, the Individual Defendants caused the Company to issue a press release entitled "Apache Corporation Discovers Significant New Resource Play in Southern Delaware Basin." The September 7, 2016 press release declared that "after more than two years of extensive geologic and geophysical work, methodical acreage accumulation, and strategic testing and delineation drilling, the company can confirm the discovery of a significant new resource play, the 'Alpine High,'" which defendant Christmann hailed as "an immense resource that we believe will deliver significant value for our shareholders for many years." Defendant Christmann touted the play's supposed "large inventory of repeatable, high-value drilling opportunities" and "oil-prone locations." The press release further asserted that Alpine High held an estimated "3 billion barrels of oil" and "75 trillion cubic feet (Tcf) of rich gas" in the Barnett and Woodford formations (two of the play's five geological formations) alone, as well as "significant oil potential in the shallower Pennsylvanian, Bone Springs and Wolfcamp formations." The Individual Defendants also claimed there was a huge number of economically viable drilling sites at Alpine High, stating "2,000 to more than 3,000 future drilling locations have been identified in the Woodford and Barnett formations alone."

    50.    That same morning, a presentation was made on behalf of the Company at the Barclays CEO Energy-Power Conference (the "Barclays Conference"), one of the energy

industry's most important annual conferences. The focus of the presentation was Alpine High, which defendant Christmann hyped as a "world class resource play" that would not only yield enormous quantities of natural gas liquids and natural gas, but copious amounts of oil -- reiterating a "conservative" estimate of "75 tcf [trillion cubic feet] of really rich gas, over 1,300 BTU [British thermal units] and 3 billion barrels of oil." Defendant Christmann favorably compared Alpine High to some of the largest shale oil and gas discoveries in U.S. history: "I've said it's world class. This would compare it versus three -- what other people would view as world-class resources, the Woodford SCOOP, the Marcellus and the Eagle Ford."

51.      The Individual Defendants bolstered their claims that the acreage held massive amounts of oil with specific evidence purportedly derived from a series of "strong well results," including multiple "successful oil tests." These test wells were highlighted during the Barclays Conference presentation, with accompanying large-print graphic slides as representative of the production APA would be able to exploit as it drilled additional wells in those areas. In the Woodford and Barnett formations, seven wells were touted in the presentation as having produced "strong well results" based on the initial flow of oil and wet gas, also known as their "initial production" rates or "IP rates." This impressive early testing was portrayed as just the floor, as the presentation claimed APA would be able to recover much larger quantities of oil as its development of Alpine High continued through additional testing as well as optimizing well construction, spacing, location, and depth.

52.      Defendant Christmann raved about many of these wells and the promise of "very high-quality oil" and "very, very, rich NGLs [natural gas liquids, aka 'wet gas']" that they showed for Alpine High. The supposed fact that the oil and gas the Company could extract was "very high quality" and "very rich" was critical in the value proposition of the play, as high-quality resources

are far more economical and less complicated to produce and refine than low quality resources:

> The Spanish Trail 1H, the discovery wells in the Woodford, 4,100-foot lateral, 6.5 million, 108 barrels of oil.  I'll tell you this is a very high-quality oil. The follow-on wells, Weissmies, the Ortler, the Mont Blanc, the Cheyenne, you see the results. The Ortler is actually on an area where [] we knew it was on a fault because we wanted to test this. 1.7 million and 16 oil. The Mont Blanc is in a little deeper section. That's not a misprint, 17 million [cubic feet of gas] a day… If you look at -- the only thing I'll tell you is this gas is very rich. It's 1,300 BTU gas…[T]his is going to be very, very rich NGLs as well as the oil.  The Cheyenne, 6.5 million a day, 227 oil. We move down, the only Barnett test, the Mont Blanc 3H, 11.4 million a day, 508 oil. You could see the NGL yield. I'll tell you this well was a lot higher, but it cut all the chokes out. So this I[nitial] P[roduction] is likely much higher than this.

53.     In addition to touting the putatively extraordinary volume of high-quality oil and NGLs across the Alpine High acreage, including evidently strong production from specific exemplar wells, the Individual Defendants also emphasized that it would be "highly economic" to extract and sell the resources at Alpine High even if oil or gas prices fell substantially. For example, defendant Christmann stated that "if you look at the oil, NGLs and gas, very, very rich and tremendous economics," and claimed that this would be true even with oil as low as $40/barrel and natural gas at $2.50. As a result, defendant Christmann said "the rates of return" for the play "go off the charts." Indeed, defendant Christmann told stockholders Alpine High would yield such volumes of easily extractable, high quality wet gas and oil, that the Company wouldn't even need the dry gas in order for Alpine High to be profitable -- such that "you're virtually going to get the [dry] gas for free." Defendant Christmann further told stockholders that "just one" landing zone in Alpine High would give "2,000 to 3,000 plus locations [at a] very low cost," and that "[w]hat's going to make this play really stand out is the quality, the thickness and the cost structure, a very, very highly economic wet gas play."

54.     The Individual Defendants also specifically sought to assuage stockholders' concerns that Alpine High was in an area of the Delaware Basin that had previously been either

overlooked or rejected by competitors as too difficult to drill and overabundant in undesirable dry gas. To dispel such skepticism, defendant Christmann portrayed Alpine High as a hidden jewel that had required special expertise and extensive work to uncover. In this regard, defendant Christmann claimed the discovery of Alpine High had resulted from the greater knowhow of the Company's "star" geologist, Mr. Keenan, and APA's "Unconventional Resources" team, which had allowed APA to discover something other E&P companies had missed. For example, defendant Christmann told stockholders that other E&P companies had focused on the wrong part of the Delaware Basin, as "very few wells were drilled down in Southern Reeves [County]," where Alpine High had been found. The reason for this, defendant Christmann claimed, was that the area was "geologically complex" and thus had been misperceived by the industry as difficult to drill and high in clay content, requiring the exceptional expertise of Mr. Keenan and the Company's San Antonio team to uncover "[t]he reality":

> [T]he real answer was it is just geologically complex, and it took some unraveling and a lot of good unconventional technical work. You had to test perceptions. The perception was that this was uplifted and complex. *The reality* is it's a stable Paleo high, *and it was always in the oil and wet gas window. It's not dry gas. So it's just a fantastic story, and it took a very unique team doing some very detailed work over a long time to uncover this prize.*

55.     Further, in response to direct questions from analysts, defendant Christmann stressed that the reason APA's competitors had not sought to drill Alpine High was that they knew "very little" about it and their "perception was wrong." For example, when a Barclays Bank analyst asked defendant Christmann a question that "a lot of us are curious about," namely "[h]ow much do your peers know about this play?", defendant Christmann responded, "[t]hey know very little…the perception was wrong about this area geologically. And it took some very, very strong individuals working very detailed work over a couple of years to unravel what is *a hidden diamond in the rough*."

56.     The Company's stock price immediately rallied on the Individual Defendants' announcement of the purported "world class" Alpine High discovery, soaring 14% in the first two days after the announcement, reaching $59.33 per share on September 8, 2016 -- its highest price in over a year.

57.     Analysts and the financial media credited the Individual Defendants' positive statements and celebrated the discovery. For example, Credit Suisse issued a report on September 8, 2016 headlined "Alpine High Has Potential To Be A World Class Resource," underlining that "the economics look so compelling" and what "makes this play exciting" included "the oil and NGL content of the wet gas" and "[t]he large column of charged hydrocarbon source rock." RBC Capital Markets raised its price target on APA's shares, stating that the "discovery appears to be a significant resource," and calling it the Company's "largest catalyst opportunity over the next couple of years." Societe Generale's September 8, 2016 report praised the "solid geologic and petrophysical work by APA's G&G team" that "essentially flew in the face of industry convention or school of thought with respect to this part of the basin." A September 11, 2016 *Houston Chronicle* article quoted an analyst from Wood MacKenzie hailing the claim of resources totaling 15 billion barrels of oil equivalent as "certainly the boldest statement in the past year from an onshore player."

58.     The financial press, industry press, and mainstream media also praised the Alpine High discovery. For example, a September 28, 2016 *Forbes* article hailed the Company as emblematic of the "thorn that America's oil frackers have stuck in OPEC's side," and noted the ideal economics of Alpine High that the Individual Defendants had touted, which would result in "a princely 30% rate of return" even at lower oil and gas prices -- what *Forbes* called "***a high and extremely rare margin in the oil and gas business***."

23

59.     The *Houston Chronicle* similarly reported in a September 11, 2016 article that the Alpine High discovery had put APA "back in the game," after prior "missed opportunities" and a "rough time keeping up with competitors." The *Houston Chronicle* reported that the discovery showed defendant Christmann's "contrarian move" to invest in exploration and land acquisition during the oil and gas price downturn had "pa[id] off," citing the Individual Defendants' impressive estimate that 13% of the resources in the field were recoverable, whereas "[t]ypically" companies recover only 6% to 12%.

60.     Further, although the Individual Defendants promoted Alpine High as an oil, wet gas, and dry gas play, the Individual Defendants had taken pains to emphasize the site's oil potential in particular, as stockholders knew that oil -- the highest value resource -- was essential to the "world class" nature of the play, and the Company's ability to economically exploit it. Accordingly, media and analyst reports on the Alpine High announcement focused primarily on the discovery of massive amounts of oil the Individual Defendants had touted. For example, the *Wall Street Journal* headlined a September 7, 2016 article "Apache Has High Hopes for New Oil-Field Discovery in Texas," *Business Insider* headlined on September 8, 2016 that "Apache discovered a giant oil field in Texas and its shares are leaping," and, most pointedly, on September 8, 2016, *CNN* ran the headline "Oil! Massive shale discovery in Texas," highlighting the Individual Defendants' claims of "billions of barrels of newly-discovered shale oil." Credit Suisse similarly showed special interest in oil, reporting on October 26, 2016 that "an oil play would be a key catalyst for [Apache] shares."

**C.     First in 2012 and Again in 2014, Defendant Christmann Evaluated and Rejected the Alpine High Region as Having "Way Too Much Gas" and Lacking in Oil**

61.     The Company's foray into Alpine High, led by Mr. Keenan, was actually the third exploration of the area APA had performed since 2012. Unbeknownst to stockholders, in the few

years before the Individual Defendants announced Alpine High as a purported "transformational" and "world class" oil and wet gas play, under the Individual Defendants' direction, APA had engaged in two wide-ranging explorations of the region. As alleged in the Securities Action, according to confidential witness accounts provided by the former senior employees directly responsible for those explorations, defendant Christmann himself reviewed the resulting data and outright rejected the play each time as "***too gassy***," -- *i.e.*, too heavy on abundant and unprofitable dry gas -- telling employees, "***why don't you find me some oil***."

62.     Specifically, in 2012 and 2014, respectively, two different "New Ventures Teams" from APA prospected the Alpine High region and determined it was not a viable play, and presented their conclusions to defendant Christmann, who himself rejected Alpine High based on those conclusions.  According to the operative complaint in the Securities Action, the confidential witness referred to as "CW 1"[2] led the first New Venture Team to explore the Alpine High region in approximately 2012.

63.     The Securities Action alleges that after evaluating existing wells on the 25,000-acre Madera Ranch near Balmorhea, Texas immediately adjacent to Alpine High and the source rock found there, CW 1 and CW 1's team found the "numbers were lean." According to the account of CW 1, who is alleged to have previously scouted Alpine High itself, CW 1 and CW 1's team knew there were already "100 wells there and we knew it was all gas," and "we all knew it wasn't an oil play."  The Securities Action alleges that CW 1 determined the Madera Ranch land -- located in southwest Reeves County -- would produce a mere 20 barrels of oil per 1 million cubic feet of

---

[2]     According to the operative complaint in the Securities Action, "CW 1" was employed by the Company for 23 years. It is alleged that when the Company opened its Midland, Texas office in 2010, CW 1 served as Exploration Manager and oversaw the New Ventures Team, which included reservoir engineers, geologists, and petrophysicists. CW 1 allegedly remained in this role until quitting at the end of the third quarter of 2014.

gas, a ratio far too low to be considered oil-prone. CW 1 is alleged to have presented maps, logs, and numbers showing these results to defendant Christmann, along with an APA Land Manager, a Reservoir Manager, and a Geosciences Manager.  According to the Securities Action, following the meeting, defendant "[Christmann] decided this wasn't the play for us" and instructed CW 1 "*I don't want gas, why don't you go and find us some oil*."

64.     It is alleged in the Securities Action that in 2014, under the leadership of the confidential witness referred to as "CW 2",[3] that the Alpine High region was explored again by the Company.  According to the Securities Action, CW 2 explored Alpine High in 2014 along with the confidential witness referred to as "CW 3"[4] and former Reservoir Engineer Colin Kiernan.

65.     The Securities Action alleges that in their 2014 exploration of Alpine High, the focus of CWs 2 and 3 was the southern portion of the Delaware Basin in western Reeves County. The operative complaint in the Securities Action states that CW 2 explained APA already had an acreage position in Alpine High that previously had been "written off" by the Company. The results of APA's 2014 Alpine High exploration, according to the account of CW 2, produced "two independent pieces of data" -- the rock depth and the maturity data -- which confirmed the Wolfcamp and Barnett formations in this area were mostly dry gas.

66.     Multiple other confidential witness accounts of former APA employees in the

---

[3]     According to the operative complaint in the Securities Action, "CW 2" was employed by the Company for several years until the summer of 2015.  In 2013, CW 2 is alleged to have been appointed Manager of North American New Ventures, reporting to defendant Christmann (then an executive in Midland). In this position, CW 2 is alleged to have evaluated the Southern Delaware Basin, a section of what was later known as Alpine High, in 2013 and 2014.

[4]     According to the operative complaint in the Securities Action, "CW 3" was employed by the Company from mid-2011 until the late summer of 2015.  CW 3 is alleged to have been based in APA's Midland office until late 2012, and then in APA's Houston headquarters for the rest of CW 3's employment with the Company. It is further alleged that CW 3 was a member of the New Ventures Team and reported to CW 2.

Securities Action confirm the accounts of CW 1 and CW 2, including the account of CW 3 who is also alleged to have been a member of the New Venture Team. The confidential witness referred to as "CW 4" is alleged to have seen the New Venture Team's maps of Alpine High.[5] According to the account of CW 4, the New Ventures Team's maps of Alpine High depicted potential areas for oil exploration in green and gas exploration in red, and Alpine High was all red. The operative complaint in the Securities Action quotes CW 4 as follows: "we had that data, we had those maps and Christmann was aware as well as his Landman [then Vice President of North American Land], Tim Custer."

67.    According to the Securities Action, the confidential witness referred to as "CW 5"[6] similarly described how the New Ventures Team evaluated and rejected Alpine High in 2014. Regarding the 2014 evaluation of Alpine High, the operative complaint in the Securities Action alleges that CW 5 recalled being in the fourth-floor conference room at the Company's Midland office when the New Venture Team presented its Alpine High findings to defendant Christmann, to which defendant Christmann replied, "*I don't want to see this again, this is way too much gas*."

68.    According to the confidential witness accounts of multiple former Company employees in the Securities Action, notwithstanding these uniform conclusions by the New Ventures Team rejecting an Alpine High play as too heavily weighted toward gas and lacking in

---

[5]    According to the operative complaint in the Securities Action, "CW 4" was employed by the Company as a geologist from prior to the Relevant Period through the first quarter of 2019. In this role, CW 4 is alleged to have been responsible for evaluating the Woodford formation, other than the Woodford formation in Alpine High. CW 4 is alleged to have worked in APA's Midland office.

[6]    According to the operative complaint in the Securities Action, "CW 5" was employed by APA as a geologist from July 2012 until July 2017 and worked in the Midland office. CW 5 is alleged to have quit in 2017 because CW 5 was unhappy with the Company's direction, specifically, money being thrown at Alpine High, which CW 5 described as a "dumpster fire on a sinking ship."

oil, Mr. Keenan was still given "carte blanche" to review all of APA's Permian exploration research, including the Alpine High data from the New Ventures Team, and reach his own (third) conclusion.  CW 4 allegedly explained that at defendant Christmann's request, CW 4 and others sat down with Mr. Keenan and his team and went through all the previous exploration projects that the Midland office had put together. Per the account of CW 1, when Mr. Keenan arrived, "he took all our projects, evaluated them with his staff, and started drilling wells." According to the account of CW 1, all the data accumulated by the New Ventures Team for Alpine High confirmed Alpine High was "too gassy" with "not enough yield and not enough infrastructure."  It is alleged that CW 2's team's data corroborated CW 1's team's findings. However, as the accounts of both former Company employees confirmed in the Securities Action, Mr. Keenan deliberately avoided seeking input from the two teams that concluded the Alpine High region was too gassy and not worth developing. Instead, Mr. Keenan suggested that prior exploration teams drilled a certain well wrong, landing the well 30 feet too high in the source rock.

69.     The confidential witness referred to in the Securities Action as "CW 6"[7] was also allegedly involved in Mr. Keenan's review of the Company's prior Alpine High explorations. According to the Securities Action account of CW 6, Mr. Keenan put together a presentation suggesting he could find different results in a different landing zone.  CW 6 is quoted as recalling that "[Mr.] Keenan did exactly that and guess what, *the well was still sh\*\**. This went on for so long and I was waiting for something to give."

---

[7]     According to the operative complaint in the Securities Action, "CW 6" was employed as a Reservoir Stimulation Lead at APA from January 2012 until December 2020. CW 6 is alleged to have worked in the Company's Houston office from 2012 until July 2014, when CW 6 was reassigned to the San Antonio office and made responsible for evaluating and designing stimulations. It is alleged that during CW 6's tenure at APA, CW 6 reported to several different people, including the confidential witness referred to in the Securities Action as "CW 7" and Mr. Keenan.

70.     According to the account of CW 2 in the Securities Action, Mr. Keenan and his team "willfully ignored" the data accumulated by the New Ventures Team on the area that would become Alpine High and CW 2 is quoted as calling Mr. Keenan's Alpine High foray a "***Hail Mary to the end zone***."

> D.     **Before the Start of the Relevant Period, the Company's Senior Geologists in San Antonio Warned Defendant Christmann Not to Move Forward With Announcing Alpine High**

71.     It is alleged in the Securities Action that leading up to the start of the Relevant Period, defendant Christmann was expressly warned by the Company's San Antonio technical team that APA lacked sufficient data to show Alpine High was a viable oil and wet gas play, and expressly advised defendant Christmann not to announce the play in 2016. Yet, in their desperation to announce a major shale play, the Individual Defendants recklessly pressed forward with Alpine High.

72.     Specifically, for example, it is alleged that throughout 2015 and 2016, the Company's technical team in San Antonio, including an engineer and senior member of Mr. Keenan's San Antonio technical team, Chester Pieprzica ("Mr. Pieprzica"), and other team members, made regular presentations to APA's upper management approximately every five to seven business days on the status of the development of the Alpine High play. According to the Securities Action, in multiple such presentations, the technical team specifically reported to senior management, including defendant Christmann, that, among other data, at least nine months of consistent production from numerous wells within the play was required to generate the threshold amount of production and well data necessary to support reliable analyses and projections about the commercial viability of Alpine High as a whole.

73.     Moreover, in addition to multiple months of production data, Mr. Pieprzica and the technical team allegedly informed defendant Christmann and other senior executives that, to

support reliable play-wide projections, the Company would need numerous additional, fundamental analyses of Alpine High that had not yet been undertaken, including: (i) drilling offset wells to provide a basic understanding of the fracture structure around the well sites; and (ii) capturing and analyzing 3D seismic data. In 2016, it is alleged that the San Antonio team informed defendant Christmann and other members of senior management that because APA did not have the requisite data, the Company was blind on these basic analyses. Without a bare minimum of the foregoing data, the Company could not reasonably extrapolate out to how the broader play would perform, nor reasonably project the economic viability of extracting valuable liquids from the play -- oil, wet gas, condensate and NGLs -- that were necessary to render Alpine High profitable and worth exploiting.

74.     It is alleged in the Securities Action that in presentations and email communications in 2016, the San Antonio technical team repeatedly advised defendant Christmann and senior management that the Company lacked fundamental testing, analyses, and data necessary to support reliable projections about Alpine High. The technical team made crystal clear to senior management that the Alpine High data was so incomplete that the Company essentially had only the tip of the iceberg and had no idea what the iceberg looked like. In other words, the technical team informed defendant Christmann and senior management that it was in the dark and ignorant as to vast amounts of critical information about the play.

75.     Therefore, the Company's technical team was shocked when, late in the summer of 2016, defendant Christmann allegedly informed them the Alpine High play and related projections would be announced on September 7, 2016. It is alleged in the Securities Action that in response, the technical team, including Mr. Pieprzica, repeatedly advised defendant Christmann not to go public with Alpine High, stressing that the Company simply did not have the basic

technical data and testing necessary to support projections about the play.

76.     Significantly, per the operative complaint in the Securities Action, employees across the Company specifically questioned the timing of the Individual Defendants' September 7, 2016 announcement of Alpine High. For example, according to the account of CW 5, the announcement "should have waited until they had proven production before announcing something to Wall Street" and the "premature" announcement was made to inflate the Company's stock price.  CW 5's account is corroborated by the account of the confidential witness referred to in the Securities Action as "CW 8,"[8] who is alleged to have reported that, based on conversations with other APA employees, Mr. Keenan himself was not ready to announce Alpine High in September 2016 because Mr. Keenan did not know what APA had with Alpine High and there was no infrastructure in place, but the announcement was nevertheless made to shore up the Company's stock price.

77.     CW 4 is alleged to have explained that Company executives determined they could "go to Wall Street and tell them we are drilling Permian Basin wells," and that the Individual Defendants "knew exactly" that the result would be a premium on APA's stock price.

78.     Similarly, the Securities Action alleges that many former APA employees questioned the information the Individual Defendants provided to stockholders in announcing the Alpine High discovery. For example, according to the account of the confidential witness referred to as "CW 9"[9], the Redwood 1P well -- one of the two "Successful Oil Tests" the Individual

---

[8]     According to the operative complaint in the Securities Action, "CW 8" worked for APA as an outside consultant for approximately one year before being hired in December 2017 as a Production Technology Manager, a position CW 8 held until being laid off in March 2019. As a Production Technology Manager, CW 8 is alleged to have worked with San Antonio's Adviset system to track well production, which data was input into Spotfire software, a tool used for reporting.

[9]     According to the operative complaint in the Securities Action, "CW 9" was employed by

Defendants touted in their September 7, 2016 Alpine High announcement as demonstrating the play's massive oil prospects -- produced 900 barrels of oil initially, *and then stopped producing any oil within a few days*. The Individual Defendants, according to the account of CW 9 in the Securities Action, "labeled it as a down-hole test, to see how much production was going to come out of it, and that's when [Defendant] Christmann said 'oh yeah - this is the play we got.' That's what they based everything off of, but *we never hit much oil after that*."

79.     It is alleged that this lack of oil production at Alpine High caused CW 9 to inquire with Mr. Keenan's "six pack" member Navneet Behl ("Mr. Behl"), then-VP of Operations, about how Alpine High was portrayed to stockholders. According to the Securities Action, CW 9 recalled that Mr. Behl responded, "*I don't know how they made that Alpine play look like it was*" and that when probed further, Mr. Behl stated, "*We were saying to Reservoir that it was only a 7 to 8% profit on that stuff, but they made it sound like 15 to 18%*."

80.     According to the Securities Action, other former employees questioned the gas to oil ratios provided to stockholders in September 2016 which depicted Alpine High as an oil play. The confidential witness referred to in the Securities Action as "CW 10"[10] is alleged to have specifically identified slide 25 in the Company's September 2016 investor presentation, which CW

---

the Company as a Drilling Engineer from prior to the start of the Relevant Period until the middle of the second quarter of 2019. CW 9 is alleged to have drilled a number of Alpine High wells, including the Redwood 1H, Blackhawk, and Ortler wells.

[10]     According to the operative complaint in the Securities Action, "CW 10" was a thirty-plus-year energy industry veteran, employed by APA from 2004 until August 2015 in a variety of positions, including Global Director of Petrophysics beginning in 2011, and Chief of Staff - Geosciences from 2011 to 2015, where CW 10 reported to the Company's then-COO Rod Eichler ("Mr. Eichler"). As Chief of Staff - Geosciences, it is alleged that CW 10 participated in several internal assessments of each of the Company's ten business units, conducted quarterly peer reviews, and participated in Rose Risk Analyses. It is further alleged that approximately 160 Company employees reported to CW 10.

10 explained was a chromatograph slide, as misleading. Per the account of CW 10, the slide was manipulated to make Alpine High appear to be an oil play, when in reality it was a gas play or at best a wet gas play. In describing the same slide, CW 2 is alleged to have stated there was no other way to put it, it was "misleading at best." Meanwhile, according to the confidential witness referred to in the Securities Action as "CW 11"[11], CW 11 and fellow geologists at the Company always wondered what the true gas chromatographs were showing because CW 11 heard these charts had been manipulated for Alpine High to make it appear there was more oil than the data actually showed.

81.     In sum, prior to the start of the Relevant Period, it is alleged that the Company's technical experts advised defendant Christmann and other members of senior management not to go public about Alpine High on three separate occasions because, as they repeatedly warned, the Company either: (i) lacked the technical data and analyses necessary to make reasonable statements or projections about production from Alpine High, or its commercial viability and expected profitability; or (ii) had in fact concluded it was "too gassy" and lacked any significant amounts of oil or wet gas. The Individual Defendants disregarded those facts, flouted warnings, and knowingly made a series of public representations starting on September 7, 2016 that lacked any reasonable basis.

> ### E.     The Individual Defendants Claim That Additional Testing and Well Data Confirm Enormous Amounts of Oil and "Highly Economic Wet Gas" Across the Entire Alpine High Play

82.     Although defendant Christmann previously rejected Alpine High and his own San Antonio technical team warned him against announcing the play, as alleged in the Securities

---

[11]     According to the operative complaint in the Securities Action, "CW 11" was employed by the Company as a geologist from February 2011 until March 2020, and worked in Houston as part of APA's Corporate Reservoir Engineering Group.

Action, the Individual Defendants pressed onward with their publicity blitz promoting Alpine High as a purported "world class" and "transformational" resource. Throughout the remainder of 2016 and into 2017, during dozens of earnings conference calls, stockholder presentations, and press interviews, the Individual Defendants continued promoting Alpine High as an "immense resource and a transformational discovery for Apache." The Individual Defendants underscored that data from newly drilled wells confirmed their initial claims about Alpine High, and also indicated the play was even "bigger" and more "predictable" than initially announced, not only in the Woodford and Barnett formations, but across other geologic formations and in a host of drilling locations across the Alpine High "fairway."

83.     For example, on November 3, 2016, during the Company's 3Q 2016 earnings conference call, defendant Sullivan assured stockholders that "Alpine High is becoming more predictable," claiming "[e]very well we've drilled has confirmed our model," and the Company "continue[d] to see excellent production performance across this play." And on February 14, 2017, at the Credit Suisse Annual Energy Summit, defendant Christmann promised the Company was "still just scratching the surface," and that additional data was showing Alpine High's capacity as an economic play: "[l]ike most major discoveries, *it's getting bigger with more data*, which is a big thing and a great thing."

84.     The Individual Defendants provided frequent public updates on Alpine High, and by March 2017, they represented to stockholders that critical aspects of Alpine High were "confirmed." Specifically, at the March 27, 2017 Scotia Howard Weil 2017 Energy Conference, defendant Christmann represented it had been "confirmed" that: (a) Alpine High was "over-pressured", meaning high amounts of underground pressure would make it easier to extract the oil and gas; (b) it was a "highly economic wet gas play" with over 3,000 economically viable drilling

locations; and (c) it had "excellent fully-burdened economics," *i.e.*, it was profitable even when factoring in all infrastructure costs, including both drilling and transport costs, as set forth on the slide below:



85.     On May 4, 2017, during the Company's first quarter 2017 earnings call, defendant Christmann rolled out more examples of new well test results, based on data which purportedly demonstrated Alpine High's performance "was on par with or better than longer lateral, fully optimized wells in analogous shale resource plays, such as the SCOOP and the Marcellus," two of the most successful plays in the U.S. Consequently, defendant Christmann portrayed Alpine High as turning out to be as good as promised, as "[t]he test wells drilled to date have proven much of what we anticipated for Alpine High."

86.     The Individual Defendants also provided purported specific details and production statistics for certain of these wells, which produced ostensibly impressive results that were

supposedly representative of the overall Alpine High play. Defendant Christmann said these data and results were only the beginning, *i.e.*, "representative of our testing program," and the best was yet to come. Defendant Christmann emphasized that "while we believe [these wells] are economic as drilled, the rates do not represent the capability of optimized Alpine High in development wells" and that investors could expect even better well results as the Company "optimized [well] completions." Defendant Christmann also assured stockholders that the productivity of the earlier Alpine High wells continued to be strong after initial tests. For example, when asked by an analyst during the May 4, 2017 conference call to provide "color on some of the productivity post the initial test rates," defendant Christmann responded "they look good. We're very excited about them," and further stated that as drilling had moved further up in the source rock, the liquids produced had become "more oily." Analysts were encouraged by this early data and continued to credit the Individual Defendants' statements. Credit Suisse headlined its May 4, 2017 report "Alpine High is Getting Closer," and wrote the "signs are encouraging," and "test data from the Alpine High play can match recent Midland wells." Credit Suisse further wrote that while stockholders awaited oil production, "the wet gas zone will deliver an economic return."[12]

87.     During the Company's August 3, 2017 earnings conference call, the Individual Defendants continued to trot out an ever-increasing number of purportedly successful new well results, and continued to tout oil production in particular at Alpine High. For example, defendant Christmann announced results from four new appraisal wells in the oil window of the Wolfcamp and Bone Springs formations of Alpine High. One of these (unspecified) wells, according to defendant Christmann, produced "an approximate 4,500-foot lateral drilled in the Wolfcamp

---

[12]     The Midland Basin was a highly productive field which had been drilled by APA prior to Alpine High. For example, in a May 2017 presentation to stockholders, the Individual Defendants caused the Company to describe the Midland Basin as "premium drilling inventory" that produced "~77 Mboe/d, consisting of 47% oil."

formation, recorded a 30-day average rate in excess of 1,000 barrels of oil equivalent per day," of which 70% was reportedly oil, resulting in an impressive 37,000 barrels of oil produced in 75 days. Asked whether the rates from this well were "in line with your type curve and what rates you're kind of looking for from the next batch of wells," defendant Christmann responded unequivocally that these would be "very typical characteristics and very, very strong profile. And performing very, very well." Moreover, defendant Christmann said he was "very confident now that we have hundreds of locations in the Wolfcamp so -- that will be oil locations."

88.     However, as stockholders would subsequently discover, all these statements were false. In truth, many of the wells the Individual Defendants initially touted were no longer producing any meaningful amounts of oil as of September 2016 -- causing the Individual Defendants to engage in a deceptive campaign in which they continuously shifted stockholders' focus to new and different wells that were headed down the same path as the other wells that, unbeknownst to stockholders, had abruptly stopped producing. According to the Securities Action, as internal Company data from Alpine High showed (as found by Project Neptune), the actual quality and amount of oil could support economically viable extraction in, at most, a tiny fraction of the drilling sites the Individual Defendants touted. Moreover, there were ***dozens*** of wells drilled across Alpine High which the Individual Defendants did not disclose to stockholders or regulators which had yet to produce any oil or rich gas at all -- in other words, their production numbers were ***zero***. Thus, unbeknownst to stockholders, just as defendant Christmann had first determined in 2012 and concluded again in 2014, Alpine High was "too gassy" and devoid of viable oil prospects, and just as Mr. Keenan's team had internally warned, there was no data to support the "hundreds" of "oil locations" the Individual Defendants were touting to stockholders. In fact, the data the Individual Defendants were receiving increasingly and starkly indicated that there were not many

lucrative wells at all.

> **F.** **While Stockholders Await Alpine High's Production, the Individual Defendants Reiterate Claims of "Tremendous Volumes" of Oil and Wet Gas and Warn That Competitors Are Swarming the Region**

89.     On October 9, 2017, via a webcast, the Individual Defendants provided stockholders with the most significant update since first announcing Alpine High over a year earlier. Despite the Individual Defendants' earlier statements that Alpine High was becoming "more predictable" and that the Woodford and Barnett formations in particular held an estimated "3 billion barrels of oil" -- a figure they called "conservative" -- the Individual Defendants disclosed for the first time that the Company had been experiencing problems extracting oil from those formations due to deep-seated faults within the source rock and excess water production, resulting in greater costs and complexities. During the webcast, defendant Christmann admitted that internally there had been awareness at APA regarding these complexities, but claimed that the Individual Defendants had "chose[n] not to share [them] due to competitive reasons." Following the webcast update, the Company's stock price declined by 7%. This incomplete, partial corrective disclosure was couched in language which comforted stockholders and allowed the Individual Defendants to further perpetrate their scheme.

90.     Significantly, while the Individual Defendants disclosed some challenges at Alpine High, they went to great lengths during the October 9, 2017 webcast to reassure stockholders about the purported long-term prospects and profitability of Alpine High. For example, defendant Sullivan emphasized that APA had "just scratched the surface in exploring this resource," and defendant Christmann asserted there would be "tremendous volumes" of both oil and NGLs, and that the play would be highly economical due to the "low cost" of extracting both the oil and the NGLs. Defendant Sullivan further touted the economics of the play, assuring stockholders that Alpine High's best wells would "generate positive returns even at 0 [dry] gas

price," and promised a "recoverable oil volume [of] 130,000 barrels per well and 455 million barrels of oil for the entire project based on 3,500 wet gas locations" -- enabling the Company to still recover over 13% of the promised 3 billion barrels of oil in place.

91.      Moreover, to further reassure stockholders that the Company truly made a remarkable discovery at Alpine High which its competitors had somehow missed, defendant Christmann also introduced a new story: that APA's competitors were increasingly encroaching on Alpine High -- even going so far as to display graphic maps that purported to show growing competitor activity around the play's periphery -- which defendant Christmann cited as "validation" of his prior claims. "One year ago, there was little activity in the vicinity of Alpine High outside of Apache," defendant Christmann noted. "What a difference a year makes," he continued, explaining that APA's competitors purportedly swarmed the area, "validat[ing]" the Individual Defendants' claims about Alpine High.

92.      Conveniently, defendant Christmann also claimed this increased competitor activity justified disclosing less information than the Individual Defendants otherwise would about the play, claiming again that, due to competitor interest, "we have been very cautious with the data we have chosen to disclose publicly," and that "[w]hile we have advanced our position to a point where we can now be more forthcoming with some disclosures, we will continue to be cautious with certain aspects of Alpine High that we believe to be competitively sensitive."

> **G.      The Individual Defendants Increasingly Tout Alpine High as a "Highly Economic Wet Gas Play," Double the Number of Drilling Locations to "5,000+", and Announce New "Emerging" Oil Plays**

93.      After the October 9, 2017 update, the Individual Defendants continued to reassure stockholders with overwhelmingly bullish statements concerning Alpine High, purportedly based on data and analyses of the play that were in hand. Consistent with their statements during the October 9, 2017 presentation that stockholders should now think of Alpine High as "three distinct

plays," the Individual Defendants doubled the number of purported economically viable drilling locations across Alpine High, from approximately 2,000 to 3,000 to over 5,000. As for oil specifically, the Individual Defendants promised that at least 500 viable drilling locations had been identified in the Wolfcamp and Bone Springs formations.

94.     Notwithstanding the centrality of oil to the Individual Defendants' initial Alpine High announcement, by October 2017, the Individual Defendants began to increasingly emphasize that Alpine High was also a "highly economic" wet gas play. While still promising "significant oil" at Alpine High, the Individual Defendants told stockholders "the wet gas play represents the largest portion of Alpine High and the majority of our current completions," and "[t]he significant potential of the wet gas play is the underpinning of our investment in infrastructure buildout." The Individual Defendants further assured stockholders that "the economics of the wet gas play…are very compelling and highly competitive," and they already had an "in-depth understanding" of the play based on "a tremendous amount of data."

95.     Analysts credited the Individual Defendants' strong public reassurances. For example, on October 10, 2017, RBC noted Alpine High was "developing meticulously," highlighting positive "wet gas economics," "encouraging" signs about the dry gas play, and calling the oil play "still early days." An October 11, 2017 Raymond James report credited the Individual Defendants' claims that Alpine High was "geologically analogous" to other nearby plays that "historically yielded exceptional oil and wet gas volumes," and stated that "Apache has its hands on a prolific wet gas play in its Alpine High acreage, with ~3,500 drilling locations based on 4,400-ft lateral lengths," and noted its low cost per well as the Company "transitions into development mode." And an October 18, 2017 Societe Generale report opined that, "[i]n the future, we believe that APA will add many more oil well site locations, and that the Street shouldn't dismiss an

'extensive and highly economic' wet gas, economic dry gas or early days of [geological and geophysical] work in the Wolfcamp & Bone Springs."

**H.    Alpine High's Production Ramp Takes Longer Than Expected, But the Individual Defendants Promise Alpine High Will Scale Up in 2019 and 2020, and Reiterate That Alpine High Will Be Profitable Even at Ultra-Low Energy Prices**

96.     In early 2018, the Individual Defendants again announced disappointing results at Alpine High, including a longer-than-expected production ramp, but continued to assuage stockholders' concerns by presenting Alpine High in an overwhelmingly favorable light with highly compelling economics even at very low energy prices.

97.     Specifically, on February 22, 2018, the Individual Defendants caused the Company to forecast a longer than expected ramp up of production at Alpine High, leading to production guidance of just 40-50 Mboe/d (thousands of barrels of oil equivalent per day-a measure of total daily energy production that incorporates both oil and gas) from Alpine High, and with a lower oil mix than previously expected. Analysts were surprised by this news, with a February 22, 2018 Credit Suisse report stating that the revised forecast was "driven by disappointing Alpine High growth" that was "underwhelming" with a "rapidly declining oil mix." A February 22, 2018 Wolfe Research report similarly commented on the surprisingly low oil production at Alpine High, stating that while at "[f]irst blush the [Company's] outlook reads impressively . . . [d]igging deeper though and cracks unfold." Following the February 22, 2018, disclosures, the Company's stock price fell by 6%. This was the second partial, incomplete, corrective disclosure of the Individual Defendants' scheme.

98.     However, the Individual Defendants continued to emphatically reassure stockholders with promises of a "world class resource play [at Alpine High] that will change the course of Apache." Defendant Christmann underscored that the play would "drive capital

41

investment, and very soon, free cash flow for decades to come." With prices low, defendant Christmann acknowledged that "funding a wet gas play is a bit contrarian," but said it was "justified by the long-term scale and return potential even at lower gas prices." Moreover, defendant Christmann told stockholders that while early production had been lower than expected, production would still meet expectations and simply be backloaded more toward 2020: "By 2020, average daily production is expected to be between 160,000 and 180,000 BOEs a day, which represents a compound annual growth rate in excess of 150%."

99.     In direct response to analysts who raised concerns about low commodity prices, defendant Christmann doubled down on his claim that Alpine High would be profitable even at ultra-low gas prices, insisting that downside scenarios had been extensively examined and that the play would "really hum below $2" gas prices while continuing to tout "the oil production" in the area:

> It – the beauty of it is, is with the wet gas, you don't need the gas…*[T]his thing's going to really hum below $2 on the gas side.* And it's that *combination with the liquid yields and the oil production is what makes it unique.* And quite frankly that's what we know makes it differential…[W]e've run many cases on the downside. We would not be making this type of investment on the midstream or the upstream side if we thought there was a sensitivity that was close to anything that would come into making it not work under *very, very low gas and NGL and oil prices*.

100.     Analysts continued to credit the Individual Defendants' favorable statements. On February 22, 2018, Natalliance Securities reported that "Permian Oil Growth Guidance in 2018 is Likely Conservative." Societe Generale wrote that market disappointment with Alpine High likely represented underestimation of the play, which was what made APA an "investment opportunity." Societe Generale also reported that "APA's gas exposure" was only "an issue for investors who still aren't familiar with the Alpine High," crediting the Individual Defendants' claims that the gas in Alpine High "will be cheap to produce," and therefore highly profitable. Societe Generale

credited defendant Christmann's representations that competitors were increasingly encroaching upon Alpine High, noting that "we like the fact that the industry is now drilling in APA's Alpine High neighborhood, with some 170 competitor wells planned nearby. We consider that a positive."

101.    Throughout the rest of 2018 and into 2019, the Individual Defendants continued to relentlessly promote Alpine High as a transformative discovery for the Company, while consistently waving off doubts about the play's oil or wet gas potential and profitability. For example, during a stockholder conference call on May 3, 2018, defendant Christmann stated -- in direct response to an analyst's question about "whether or not [the Company would] see more of a shift to oil" -- that the Company had "plan[ned] conservatively with Alpine High," such that "it will get more oily as time progresses." The Individual Defendants further reiterated the numbers they had touted at the outset of the Relevant Period in an August 8, 2018 earnings conference call, claiming that Alpine High was on a "tremendous growth path" due to its "estimated resource in place of 75 Tcf of gas and 3 billion barrels of oil in just 2 of the 5 proven hydrocarbon-bearing formations." Similarly, on September 21, 2018, defendant Christmann claimed in a *Bloomberg TV* interview that "[t]here is a very large wet gas play [at Alpine High] and there will be a lot of rich gas but there will also be a lot of oil," and that "[w]e've proven there's oil."

102.    As late as May 2019, the Individual Defendants continued making positive, purportedly data-driven statements about Alpine High, and asserting that stockholders or analysts who questioned Alpine High did not understand the economics of the "liquids" (*i.e.*, valuable wet gas, oil, NGLs) play. During the Company's May 2, 2019 earnings conference call, the Individual Defendants continued to claim that APA was "poised to deliver attractive oil growth in a substantial cash flow uplift at Alpine High in the second half of the year," and further asserted in a *Bloomberg* article published a few days later that "our view of 3 billion [barrels] of associated

oil in place in just the Woodford and Barnett [formations] remains unchanged." Further, on May 15, 2019, *Bloomberg* published a story quoting a Company spokesperson as stating that "[i]nvestors do not yet have an appreciation for the potential cash flow generation from the liquids play at Alpine High." Indeed, as late as August 1, 2019, defendant Christmann unequivocally asserted during an earnings conference call that Alpine High was "a large resource as we've proven" with "tremendous rich-gas potential."

I.     **As Alleged in the Securities Action, a Secret Investigation Commenced in Mid-2019 Confirmed There Was Never Any Basis for the Individual Defendants' Claims About Alpine High – Rather, Internal Company Data Directly Undermined the Individual Defendants' Assertions**

103.    Remarkably, at the same time the Individual Defendants were claiming outsiders simply "d[id] not yet have an appreciation" for Alpine High, internally, unknown to stockholders, certain senior executives were growing increasingly skeptical of the public claims made to stockholders, and finally forced those claims to become subject to a robust review. As detailed further below and as alleged in the Securities Action, with defendant Christmann's blessing, since 2016 Mr. Keenan and his San Antonio team sequestered all Alpine High data away from normal databases and review processes at the Company, and concealed it from all but a select few senior executives, including defendant Christmann. But by approximately June 2019, it is alleged that senior leaders within the Company became so concerned about whether the Individual Defendants' outsized public claims about Alpine High had any factual basis that defendant Christmann relented, and permitted a secret internal investigation -- dubbed "Project Neptune" -- to examine in-depth the data, analyses, and assumptions underlying those claims. That investigation, which was concluded in September 2019, hastened the end of the Alpine High sham. It is alleged that internal data unequivocally showed that from the very beginning, the Individual Defendants never had support for their public claims and projections about Alpine High. Indeed, the data that

defendant Christmann and Mr. Keenan kept hidden was squarely at odds with the Individual Defendants' public statements about the economic viability of the play. Following the internal investigation, Mr. Keenan abruptly "resigned."

104.    Specifically, it is alleged in the Securities Action that in 2019, actual top-line production from Alpine High continued to disappoint, as reflected in internal reports shared with the Board and other senior leaders. In a Board meeting in the summer of 2019, Mr. Keenan and members of his San Antonio team are alleged to have presented a supposed evaluation and review of the problem, and attributed it to various transient issues. APA professionals outside of Mr. Keenan's team who reviewed this presentation, however, found it implausible.

105.    As a result, it is alleged in the Securities Action that Project Neptune, an independent internal technical review of Alpine High data, was commenced. The review of Alpine High data at the heart of Project Neptune was to be kept to a core group, and secret from the rest of the Company, given its sensitivity and importance. Its code name allowed its participants to keep it obscured. Defendant Christmann is alleged to have been directly informed of the review, and this time, acquiesced to Alpine High data being shared more broadly within the Company.

106.    The operative complaint in the Securities Action alleges that the Project Neptune team requested data from the San Antonio team, specifically, Rate Transient Analysis ("RTA") data for the Alpine High wells. At a high level, the RTA data requested included all of the technical parameters and metrics that had been used to capture and assess well structure, flows and performance over the entire history of each well. It reflected not only geological and production metrics, but also data on the composition and quality of the oil and NGLs the wells tapped, which were critical to understanding the quality of the gas and liquids at the play -- and hence, the economics of extracting and processing them. RTA data was routinely used by APA in its standard

well and site evaluation practices for purposes of both quantifying and valuing the actual output of wells, and also for creating projections of future production and econometric analyses of the economic viability of wells, pads and sites, under different conditions.

107.    As alleged in the Securities Action, many former APA employees support this account.  Per the account of CW 6, after Mr. Keenan's team started to fall out of favor, some Alpine High production data started for the first time to be analyzed by other employees. For example, according to the account of CW 6, a team managed by Manager of Subsurface Integration, Lucas Martin, conducted an RTA evaluation focused on the deliverability of Alpine High rate reserves, which measured the amounts of resources that remained available at Alpine High based on the current rate of production.

108.    More specifically, it is alleged that the Reservoir Lead, Braden Bowie, conducted the RTA, which involved analysis of Alpine High production data and pressure data on a well-by-well basis, and that some of the data had been captured by the San Antonio team using its own custom tools.  Per the account in the Securities Action of the confidential witness referred to as "CW 12",[13] the San Antonio office had employed a "self-built tool for production decline analysis" which was used to analyze pressure and production flow rates to estimate the reserve potential and production performance for Alpine High wells. It is alleged that CW 12 found it "odd" San Antonio had built their own tool, as APA had available licenses for the Company-wide RTA software. CW 12 allegedly inquired about the tool with Mr. Pieprzica, but he never provided a demonstration.

109.    It is alleged in the Securities Action that the San Antonio team received the

---

[13]    According to the operative complaint in the Securities Action, "CW 12" was employed by the Company from 2010 until CW 12 was laid off in January 2020. During the Relevant Period until CW 12's departure, it is alleged that CW 12 served as Vice President of Resource Development for the Permian Basin. Prior to the Relevant Period, CW 12 is alleged to have served as a Reservoir Engineering Manager, on a team with Mr. Pieprzica.

detailed request for data in the summer of 2019. With defendant Christmann now no longer shielding it, Mr. Keenan's team allegedly shared the Alpine High data. As a result, in late summer 2019, the review team obtained, compiled, and analyzed the entire RTA data set for all the Alpine High wells ever drilled. The team took the standard analyses used by APA as a matter of course when analyzing well performance, projections and economic viability in all of its other wells, and applied them to the Alpine High data.

110.    According to the Securities Action, the comprehensive Alpine High RTA data that the San Antonio team provided spanned the life of each APA well in the play. It included data from all time periods post-drilling, not just cumulative or current data. In other words, if a well was first drilled and began producing in 2016, the RTA data is alleged to have included information from the inception of the well and each time period thereafter, up though the present. The RTA data could therefore be used to analyze what a well was producing currently and create projections based on current and recent performance, but also to analyze performance at any given point in the well's existence, or to analyze historical performance in prior periods.

111.    The Project Neptune team is alleged to have completed its analysis of the full Alpine High RTA data, applying APA's customary internal analytical tools, by September 2019. According to the Securities Action, the findings of this secret technical review were stark and unequivocal. The Company's own internal data showed that the vast majority of its Alpine High wells had never performed or produced anything like the Individual Defendants had represented publicly. Instead, the current, recent, and historical production and performance were far worse than what the Individual Defendants had told stockholders.

112.    Just as importantly, the Company's own data allegedly did not support, and had never supported, the Individual Defendants' repeated public projections about Alpine High's

performance and ability to economically support hundreds or thousands of additional gas and oil wells in the future. Instead, according to the Securities Action, the review team's standard analysis of the RTA data showed that given the poor quality of the oil and gas resources at the site, extracting NGLs and recovering oil from Alpine High in an economically viable fashion was an extraordinarily dubious proposition, and had been since drilling began. The economic viability went from remote to nonexistent if even moderately challenging oil and NGL pricing assumptions were applied.

113.     In key findings, Project Neptune is alleged to have determined that internal data showed that the oil and wet gas resources at Alpine High were low-quality. More valuable than dry gas, oil, condensate and NGLs were the resources APA needed to be able to produce in order to make Alpine High viable and profitable. But the Company's historical and current data reviewed by Project Neptune allegedly showed that the condensate potential of virtually all wells at the site was typically just 20%-25% of what the Individual Defendants had represented to stockholders in terms of overall well recovery and projections. Additionally, the Securities Action alleges that PVT (pressure volume temperature) lab tests on NGLs from the Alpine High wells showed that ethane comprised nearly 60% of the NGL barrel -- meaning that the composition of hydrocarbon constituents that could be produced from the wells was far less economic than the Individual Defendants were publicly portraying. The data also allegedly showed that the total "Estimated Ultimate Recovery" ("EUR") for the more than 100 wells APA had drilled by that time typically amounted to around 25% of the well development scenarios the Individual Defendants had repeated to stockholders from 2017 to 2019.

114.     Project Neptune's review, according to the Securities Action, concluded that: (i) APA's data did not support and had never supported public type curves and other representations

which had been touted as support for the Individual Defendants' representations about play-wide "well economics" and the value of Alpine High (instead, the quality of the wells and oil and gas APA had drilled was far worse than what the Individual Defendants had represented); (ii) only if several highly favorable assumptions were applied could even some of the Alpine High wells be minimally economically viable; and (iii) the substantial majority of the Alpine High wells were not and had never been economically viable, even with the beneficial assumptions.

115.     Specifically, it is alleged that Project Neptune found that of the supposed thousands of economic drilling locations the Individual Defendants had repeatedly touted, the vast majority were never economically viable, while the remainder could only theoretically be viable if both aggressive oil, gas and NGL prices and virtually infeasible changes to the Company's fixed operating costs and commercial terms were assumed. This majority of APA's Alpine High locations that Project Neptune found to have been non-economic all along allegedly included: (i) all of the thousands of potential monocline (*i.e.*, oil and gas) locations the Individual Defendants had touted; (ii) nine in ten of the hundreds of potential oil locations the Individual Defendants had touted; and (iii) nearly half of the hundreds of potential gas (dry and wet) locations the Individual Defendants had touted.

116.     Further, it is alleged that the Project Neptune team explicitly noted that actual Company data from Alpine High had at all times differed from (*i.e.*, fallen short of) primary phase type curves the Individual Defendants had caused the Company to publish, which purported to show data-driven projections for the economic viability of the play -- and were also at odds with the Individual Defendants' public assertions that Alpine High was "on track" to realize those projections.

117.     In sum, according to the sustained operative complaint in the Securities Action,

the secret internal investigation at APA demonstrated unequivocally that Alpine High did not produce, and had never produced, the oil and wet gas that the Individual Defendants had touted as the economic linchpin of the play. The Company's own data from throughout the life of Alpine High did not support, and had never supported, the Individual Defendants' repeated representations to stockholders about thousands of economic drilling locations, 75 trillion cubic feet of rich gas, and 3 billion barrels of oil that were in place at Alpine High. Instead, the Company's data directly undermined the Individual Defendants' public assertions.

118.    The Securities Action alleges that the Project Neptune team prepared a formal presentation on the data, the review, and its findings in September-October 2019. The team allegedly provided the presentation, including all of the foregoing conclusions, to senior management, including defendant Christmann, as part of an in-person meeting with defendant Christmann in mid-October 2019.

119.    Significantly, upon information and belief, the Individual Defendants have never publicly disclosed the existence or findings of Project Neptune. Reinforcing the key findings of Project Neptune as alleged in the Securities Action, including that APA's own data did not support, and had never supported, the Individual Defendants' overwhelmingly positive representations about Alpine High to stockholders, it is alleged that throughout the investigation conducted by the lead plaintiffs to the Securities Action, one former APA employee after another expressed a need to hold the Individual Defendants accountable. CW 4 is quoted as stating that "***these guys are crooks, and they need to go down for it, just like the Enron guys***." The confidential witness referred to in the Securities Action as "CW 7"[14] emphasized the "shareholders are investigating

---

[14]    According to the operative complaint in the Securities Action, "CW 7" was employed by the Company from June 2010 until September 2018. From June 2015 through September 2018, CW 7 allegedly served as Director, Exploration and Production Technology – Geoscience, and in this role managed a staff of 30 scientists ranging from petrophysics, geology, petroleum systems

something that needs to be investigated."  CW 6 is quoted as saying that "***internally, we were all originally shocked to hear them say that this was an oil play***", that APA is a "***crooked company***", and that "***somebody needs to go to jail***."  It is alleged that CW 5 quit working for APA in 2017 because it was apparent to CW 5 that Alpine High "***was a dumpster fire on a sinking ship***."

> ### J.   The Truth Gradually Emerges, Forcing the Company to Cease All Further Development at Alpine High, Take a $3 Billion Write-Down, <u>and Slash Its Dividend By 90%</u>

120.   Shortly after the Project Neptune findings were presented in-person to defendant Christmann and other members of senior management in mid-October 2019, media reports surfaced on October 25, 2019 that Mr. Keenan "resigned." APA's stock price immediately plummeted, falling as much as 11% for its largest intraday drop since January 2016.

121.   Analysts and the mainstream media easily linked Mr. Keenan's departure to troubles with Alpine High. For example, in reporting on Mr. Keenan's departure, on October 25, 2019, analysts at Credit Suisse described how Mr. Keenan "oversaw the discovery of the Alpine High play, which has been an economic disappointment for investors" and that since announcing the discovery at the start of the Relevant Period, "[the Company's] shares have underperformed global [exploration and production companies] by >30%, likely a cause for Mr. Keenan's resignation." Noting that "the outcome of results from Alpine High have not met high expectations," RBC Capital Markets likewise reported on October 25, 2019 that "[Mr.] Keenan was a major part to the team that discovered the Alpine High play" and his resignation "caused stock weakness." *Bloomberg* put it bluntly, issuing an article on October 27, 2019 that was titled "Apache Executive's Departure Sparks Worst Rout Since 2016." The next day, *Bloomberg* issued

---

and geophysics. During CW 7's tenure, it is alleged that CW 7 reported to executives one level below the CEO, including defendant Sullivan, Senior Vice President of Operations Grady Ables, and Senior Vice President of Operations W. Mark Meyer. CW 7 is alleged to hold a PhD in Geology and to have worked in the energy industry for 25 years.

another article linking Mr. Keenan's departure to the Alpine High play and continued decline in APA's stock price, reporting that "[t]he geologist credited with the Alpine High resigned last week, sending shares and bonds plummeting."

122.    Days later, during the Company's third quarter 2019 earnings conference call held on October 31, 2019, defendant Christmann revealed that drilling activity at Alpine High had been reduced to just two rigs, several well completions had been deferred into 2020, and, "[t]his lower activity set, combined with decreased production outlook on one our multi-well pads, has resulted in an approximately 5% reduction in our fourth quarter Alpine High guidance."

123.    On January 9, 2020, *Reuters* reported that the Company was forced to shutter its Alpine High San Antonio headquarters. According to *Reuters*, this would result in a loss of over 270 jobs and, together with an associated Company-wide reorganization, represent a 10% to 15% reduction in APA's global workforce.

124.    On February 26, 2020, the Individual Defendants caused the Company to issue a press release announcing its fourth quarter and full-year 2019 results, reporting a ***$3 billion*** impairment for Alpine High, a staggering amount that ***more than wiped out the Company's profits for the prior two years***, and resulted in the Company reporting ***a loss of $3 billion during the fourth quarter and $3.6 billion for the full-year 2019***. The Individual Defendants further announced that, as of the end of 2019, "there were no rigs drilling at Alpine High."

125.    Leading media outlets specifically highlighted how the massive $3 billion write down and cessation of all further exploration at Alpine High was "in stark contrast" with the Individual Defendants' statements during the Relevant Period "vehemently defending the play's prospects for about three years." *Bloomberg*, for example, issued a scathing article on February 27, 2020, titled "Apache Calls It Quits on Alpine High After $3 Billion Write down," which stated:

Apache Corp. is officially calling it quits on a highly publicized but disappointing shale discovery in West Texas after ***vehemently defending the play's prospects for about three years***. The Houston-based company posted a roughly $3 billion write down on its Alpine High project, a find from 2016 that fizzled when it turned out to hold more natural gas than oil…The discovery was announced in September 2016 to much fanfare and claims the field held 3 billion barrels of crude and 75 trillion cubic feet of gas…***Until recently, Apache executives defended the Alpine High, saying in May that investors didn't yet "have an appreciation for the potential cash flow generation from the liquids play at Alpine High."***

126.     That same day, February 27, 2020, the Company held its fourth quarter earnings webcast. At the outset, defendant Christmann acknowledged that 2019 was a year full of "challenges," the "most significant" one being "Alpine High." Defendant Christmann explained that APA was throwing in the towel on any further development of Alpine High, stating that "further testing is not warranted at this time" and the Company "dropped the remainder of our drilling rigs in the fourth quarter and chose to defer some previously planned completions." Where analysts previously viewed the capital allocation being committed to Alpine High as a reason for optimism, defendant Christmann highlighted the Alpine High failure, explaining that in "terms of capital allocation, Alpine High will receive minimal to no funding."

127.     After the February 27, 2020 webcast, *Bloomberg* updated its article from the prior evening, emphasizing that defendant Christmann's comments during the earnings call "***were in stark contrast to his past defense of [] Alpine High***," and noting that only two years ago, Christmann "***told analysts that the play would 'really hum' even with gas prices at $2***." Yet, when gas prices reached the level at which defendant Christmann had assured stockholders that Alpine High would "really hum," all drilling operations were shuttered and an immediate stop was put to virtually all future funding.

128.     The Alpine High debacle left APA in an incredibly weakened state and highly susceptible to a market downturn. As a result, just weeks later, on March 12, 2020, the Individual Defendants caused the Company to announce that it was forced to slash its vaunted dividend by a

53

staggering *90%*, "from $0.25 to $0.025." The announcement resulted in the price of the Company's stock falling by an additional 6%, to close at $7.76 per share on March 12, 2020.

129.    The full extent of the Individual Defendants' scheme would not be revealed until March 16, 2020, when *Seeking Alpha* published an article describing how Alpine High had left the Company hobbled and particularly challenged amongst its E&P peers. The *Seeking Alpha* article noted that the Company was "In A Tough Spot" with $8 billion of debt, which "***translates into a lofty debt-to-equity ratio of almost 250% -- the highest among all large-cap independent oil producers***."

130.    In response to this news, the Company's stock price fell by $3.61 per share over two trading days, or approximately 45%, to close at $4.46 per share on March 17, 2020.

131.    As stockholders fully digested the impact of the Alpine High boondoggle on the Company's financial condition and future prospects, and the extent of the Individual Defendants' misrepresentations, the price of the Company's stock dropped from a Relevant Period high of $69.00 per share on December 12, 2016, to close at just $4.46 per share on March 17, 2020, erasing ***over $24 billion*** in stockholder value.

## VI.    IN TRUTH, CONTRARY TO THE INDIVIDUAL DEFENDANTS' PUBLIC STATEMENTS, ALPINE HIGH WAS NEVER A VIABLE OIL OR WET GAS PLAY

132.    As set forth in detail above, based on the allegations in the sustained Securities Action, the Individual Defendants knew or recklessly disregarded that from before the start of the Relevant Period, they lacked an adequate factual basis to claim they had discovered a "transformational" and "world class" oil and wet gas play. In truth, per the Securities Action, not only had defendant Christmann himself twice rejected the Alpine High region as "too gassy," but the very San Antonio technical team brought in to delineate the play expressly warned defendant Christmann that he should not go forward with announcing Alpine High in September 2016

because the data did not support it. Indeed, as described further above, eventually, the Individual Defendants could no longer maintain their scheme, and in 2019 the secret internal investigation, Project Neptune, confirmed that the Individual Defendants' public claims about Alpine High had been utterly baseless.

133.    As set forth herein, the investigation of the lead plaintiffs and the accounts of knowledgeable former employees as set forth in the operative, sustained Securities Action complaint only further confirm that the Individual Defendants lacked any basis whatsoever for their claims of massive amounts of economically recoverable oil and wet gas at Alpine High. Moreover, as alleged in the operative Securities Action complaint, the lead plaintiffs' investigation has shown that, in order to prevent both stockholders and even the Company's own senior employees from discovering the truth, the Individual Defendants engaged in a far-reaching scheme to conceal the true data underlying Alpine High, walling the data off within the Company, eschewing all normal internal review processes, and limiting visibility to only the Individual Defendants and a handful of select employees in the San Antonio office.

> A.    **The Operative Complaint in the Securities Action, Based on the Lead Plaintiffs' Forensic Analysis and Confidential Witness Accounts, Confirms That Alpine High Produced Miniscule Amounts of Oil and Wet Gas, Many of Its "Successful" Wells Were Failures, and the Play <u>Was Ridden With Dry Holes</u>**

134.    Alpine High never produced quantities of oil and gas remotely close to what the Individual Defendants claimed it would.  As alleged in the Securities Action, it is confirmed by the lead plaintiffs' forensic analysis of production data from across Alpine High, based upon information that the Individual Defendants concealed, misrepresented and obscured during the Relevant Period, and which was not publicly available at the times of the Individual Defendants' alleged misrepresentations, the total amount of oil produced by the Company across the *entire* Alpine High field from September 2016 through March 2020 amounted to approximately *2.9*

*million barrels* -- a miniscule *0.8%* of the *455 million barrels* total that the Individual Defendants represented that they conservatively expected to recover from the Woodford and Barnett formations *alone*. As for oil production in the Woodford and Barnett formations, the total production was even lower -- *less than 1.8 million barrels*, representing only about *0.4%* of the total amount of oil the Individual Defendants told stockholders that they conservatively expected to recover from just those two formations. Even worse, the Wolfcamp formation, which the Individual Defendants touted as an "emerging oil play" with at least 500 economic drilling locations, produced just 1.1 million barrels of oil from the formation, and the Bone Springs formation produced almost nothing— just 2,500 barrels of oil.

135.    The Individual Defendants' representations regarding wet gas production were no more accurate or realistic than their oil representations. In fact, while the Individual Defendants told stockholders throughout the Relevant Period that there were 75 trillion cubic feet of "really rich [wet] gas" in the Barnett and Woodford formations, Alpine High never even produced a tiny fraction of this amount. As alleged in the Securities Action, from September 2016 through March 2020, the total amount of all gas produced by APA across the entire Alpine High play -- inclusive of both "wet gas" and "dry gas" -- amounted to a mere 0.3 Tcf, just 0.4% of the amount of wet gas the Individual Defendants claimed was in those formations.

136.    As the Individual Defendants caused the Company to desperately drill its way across Alpine High during the Relevant Period, the Individual Defendants touted the "strong" and "successful" results they were purportedly seeing from newly drilled oil and gas wells, insisting these wells were "confirming" their estimates of massive amounts of recoverable oil and gas at Alpine High. Indeed, in their announcement of Alpine High on September 7, 2016, the Individual Defendants presented bold, graphic slides touting seven different "Strong Well Results" and two

different "Successful Oil Tests." Throughout the Relevant Period, the Individual Defendants made a practice of taking what were by far the most successful wells and touting them as representative examples of the entire play that "confirmed" their outsized estimates. During the Company's 3Q 2016 earnings conference call, defendant Sullivan went so far as to assure stockholders that "*[e]very well we've drilled has confirmed our model*," and that the Individual Defendants had "*continue[d] to see excellent production performance across this play*." With production still ramping up, it was these purported well results that the Individual Defendants put forward to confirm Alpine High's promise to analysts and stockholders.

137.    Strikingly, however, even many of these "strong" and "successful" wells would turn out to be duds soon after, *or even before*, they were touted by the Individual Defendants. This is corroborated by the account in the Securities Action of the confidential witness referred to as "CW 13."[15]   According to CW 13, the Company would open wells at Alpine High, only to find that the wells would stop producing or drop off shortly thereafter. The Company was then forced to devote resources to "work over" the well in an effort to get back to the initial flow rate. In other words, many of the very wells the Individual Defendants said "confirmed" their bold claims about Alpine High did *exactly the opposite*.

138.    Moreover, in a pattern repeated throughout the Relevant Period, the Individual Defendants often touted initial production statistics from a "successful well test," when its production *already had plummeted*.[16] This is corroborated by the account in the Securities Action

---

[15]    According to the operative complaint in the Securities Action, "CW 13" was employed by APA as a Control Center Supervisor in the San Antonio office from 2017 until shortly before mid-March 2020, where CW 13 was responsible for overseeing the transport of fluids from Alpine High. CW 13 is alleged to have reported to several people, including Vice President of Operations Mr. Behl, who was one of the "Keenan six-pack."

[16]    It is alleged in the operative complaint in the Securities Action that the lead plaintiffs were only able to confirm this through a forensic analysis of well completion data, lease-level and well-

of the confidential witness referred to as "CW 14",[17] who specifically recalled noticing that "***what they showed at Barclays [the Alpine High announcement] was not consistent with production results at the time***," and that at least some of the wells highlighted were already "***bone dry***" and producing almost 100% gas by the time they were highlighted.

139.    Per the account in the Securities Action of CW 4, the Individual Defendants' practice of highlighting "successful" wells was a "***big game***," a "***Ponzi scheme***," and "***all arm waving***." Rather than admit wells were not productive, according to CW 4, the Individual Defendants just kept causing APA to drill and announce new wells, while failing to disclose that the wells they had previously touted to stockholders had turned out to be busts. As CW 4 is quoted in the Securities Action: "***[e]verything started getting bigger, the number of wells kept going up, but the quality of the wells was going down***", leaving CW 4 with the distinct impression that "***every time Christmann opened his mouth it was all of kind of a bluff***."

140.    As described in the Securities Action, the lead plaintiffs' forensic analysis only confirmed these confidential witness accounts and identified examples of purportedly representative "successful" wells whose production had already plunged by the time they were featured in slides for presentations to stockholders. For example, the Individual Defendants'

---

level production reports, acreage maps, plats, permits, completion reports, test data filings, and a variety of other data, much of which was not publicly available at the time the Individual Defendants made their alleged misrepresentations, which the lead plaintiffs accumulated, processed, and analyzed from painstaking searches of multiple regulatory and third-party databases. Indeed, as discussed herein and in the operative complaint in the Securities Action, the Individual Defendants engaged in a scheme to deliberately obfuscate production data that stockholders otherwise would have been able to access in public databases of regulatory filings.

[17]    According to the operative complaint in the Securities Action, "CW 14" worked as a Systems Engineer for the Company in Houston for several years before the Relevant Period, and then as an Alpine High Completions Engineer in San Antonio from March 2017 until the first quarter of 2020, in which role CW 14 is alleged to have overseen design execution of wells at Alpine High.

September 7, 2016 announcement of Alpine High included a large print, graphic slide announcing two "Successful Oil Tests" at wells known as the Redwood 1P and the Mont Blanc 2H. The slide reported the Mont Blanc 2H's 24-hour initial production ("IP") rate as an impressive 854 barrels of oil per day, and provided a similarly impressive rate of 700 barrels per day for the Redwood 1P. Moreover, defendant Christmann highlighted during his presentation that the Redwood 1P "flowed for over five days" during drilling, and that its production was "flat for over ten days" -- *i.e.*, produced at a consistent rate for that entire time period, a critical criterion for determining the production potential of a well, because in order for a well to be "successful" it must continue to produce at a high rate. An analyst report from MUFG Securities specifically highlighted these two wells as evidence that Alpine High really was a "world class resource."

141.    In reality, however, the Individual Defendants' statements about these wells were blatantly false.  Per the operative complaint in the Securities Action, data assembled by the lead plaintiffs -- including critical information that was concealed, obscured, and misrepresented from September 2016 through March 2020, and submitted years late in piecemeal regulatory filings -- shows that, by August 2016, shortly before the September 2016 presentation at the Barclays Conference, oil production at the Mont Blanc 2H was just 398 barrels a day, ***a decline of more than 53%***, and was averaging no more than 206 barrels per day by September 2016, ***a decline of more than 75%***. And, according to the Securities Action, the Redwood 1P was even worse -- following its initial test period reported at the Barclays Conference, the well ***never produced any further oil***. Indeed, this is corroborated by the Securities Action account of CW 9 (the drilling engineer who drilled the Redwood 1P well), who said that it produced 900 barrels of oil initially, and then stopped producing ***any*** oil within a few days.

142.    The Barclays Conference presentation also included wells known as the

59

Weissmies 1H and the Ortler 1H among a handful of examples of "strong well results." Yet, the operative complaint in the Securities Action alleges, based on the lead plaintiffs' *post hoc* forensic analysis, that each of these wells had ***already seen production plummet by the time of the Alpine High announcement***, again rendering the Individual Defendants' statements materially false or misleading when made. Specifically, the Weissmies 1H was drilled in May 2016 and first produced in June 2016. While the Individual Defendants' slides presented to stockholders on September 7, 2016 touted this well's "strong" initial production rate of 281 barrels of oil per day, undisclosed to stockholders, for the rest of June it averaged less than half of that, a mere 113 barrels per day. And by August 2016, the month before the well was touted as "strong," its oil production rate had fallen to a miniscule 54 barrels a day. By November 2016, its oil production had fallen to ***zero***, where it stayed for five straight months, and never again produced significant quantities of oil. The Weissmies 1H's gas production fared no better. While the Individual Defendants' September 7, 2016 presentation to stockholders touted its seemingly impressive initial production rate of 7.1 million cubic feet of natural gas per day, by August 2016, the month before the Alpine High announcement, it had fallen to averaging under 3 million cubic feet per day, and by November 2016 fell to ***zero***.

143.    Similarly, the Ortler 1H was first drilled in May 2016 and started producing in June 2016. The Individual Defendants' September 7, 2016 presentation to stockholders touted Ortler 1H's "strong well result" with an initial production rate of 1.75 million cubic feet of gas per day. Yet, as alleged in the Securities Action, what stockholders could not know was that, by August 2016, the month before the Alpine High announcement, the Ortler 1H was averaging less than half that amount, just 774,000 cubic feet of gas per day. Mere months later, its production fell off a cliff, and by January 2017 the Ortler 1H was producing ***no oil and no gas whatsoever***. Tellingly,

with no better wells to highlight, the Individual Defendants continued to use the same misleading initial production figures from the Weissmies 1H and Ortler 1H even as late as February 2017, by which time *both wells had stopped producing any oil or gas for several months straight*.

144.     Further, the Individual Defendants' multiple presentations to stockholders in May 2017 devoted an entire slide to a single new well called the Blackhawk 5H, which, the Individual Defendants claimed, had the "Highest Oil Yield To Date in Barnett," purportedly evidencing the growing strength of the oil play, with a 24-hour initial production rate of 742 barrels per day. However, as alleged in the Securities Action, the Blackhawk 5H's oil production had already fallen sharply throughout April 2017, averaging just 147 barrels per day, and had *fallen to zero by the time the Individual Defendants touted its "oil yield" in May 2017*. Similarly, the Individual Defendants' May 2017 presentations to stockholders devoted another entire slide to a well called the Chinook 101AH, which purportedly had the "[h]ighest oil yield to date for a Woodford target," with a 24-hour initial oil production rate of 620 barrels per day. However, as alleged in the Securities Action, by April 2017 the Chinook 101AH was averaging just 194 barrels of oil per day, and, like the Blackhawk 5H, *was producing no oil by the time the Individual Defendants touted it to stockholders in May 2017*.

145.     Moreover, per the operative complaint in the Securities Action, the lead plaintiffs' *post-hoc* forensic reconstruction of all wells drilled across Alpine High based on data the Individual Defendants had previously concealed, obscured, and misrepresented during the Relevant Period only demonstrates that drilling was anything but "successful" and in no way "confirmed" the Individual Defendants' outsized claims. Indeed, as alleged in the Securities Action, by November 2016, when the Individual Defendants claimed that "every well we've drilled has confirmed our model," the Company had drilled *a dozen dry holes -- wells that*

***produced no oil or gas whatsoever -- comprising the majority of wells drilled until that date***. As confidential witness accounts in the Securities Action corroborate, seven of these dry holes through November 2016 failed to produce any oil or gas despite being stimulated with millions of pounds of fracking fluid each, evidencing a desperate attempt to squeeze a viable oil and gas play out of unproductive land. As such, the only thing that the drilling ever "confirmed" was that Alpine High was anemic as an oil and wet gas play, and an economic black hole.

146.    Per the operative Securities Action complaint, in total, and corroborating the conclusions of Project Neptune, of the roughly 248 wells APA completed at Alpine High through January 2020, when all new drilling was completely shut down due to Alpine High's abysmal performance, ***67 wells -- 27% of all wells drilled -- were dry, i.e., produced no oil or gas whatsoever***. This was a virtually unheard-of failure rate for a Texas shale play, where dry holes are rare. As alleged in the Securities Action, more than half of those dry holes (or 14% of all wells drilled) produced ***nothing*** in spite of being stimulated with millions of pounds each of fracking fluid, meaning that, far from "economical," the Company was effectively pouring money into the ground and getting nothing back out.  APA's staggering failure rate was multiples higher than any of its competitors in the region, and was extraordinarily high for a North American shale play. In comparison, according to the lead plaintiffs' forensic analysis as described in the operative Securities Action complaint, when Mr. Keenan was drilling the successful Eagle Ford play (in the Gulf Coast Basin in East Texas) while he worked at APA's competitor, Enron Oil & Gas ("EOG"), the failure rate for stimulated wells was ***less than 1%***.

147.    Throughout the Relevant Period, the Individual Defendants also touted the "highly economic wet gas play" at Alpine High, assuring stockholders that the Company's wet gas wells would easily be profitable and would "really hum" even at historically low commodity prices. By

October 9, 2017, the Individual Defendants claimed to have identified 3,500 economic drilling locations in APA's wet gas play. Yet, as alleged in the Securities Action, corroborating the conclusions of Project Neptune, the lead plaintiffs' forensic analysis revealed that the assumptions underlying these claims had no basis in reality.

148.     Specifically, critical to the Individual Defendants' bold claims about this "highly economic" play was the amount of oil and/or wet gas recoverable from each well APA drilled. Because each well cost the Company millions of dollars to drill and operate, the total amount of oil and/or wet gas expected to be recovered over the life of each well -- the "Estimated Ultimate Recovery" ("EUR") -- had to be sufficient to justify the cost of drilling and maintaining the well and bringing the oil or gas to market.

149.     The Individual Defendants' presentations to stockholders repeatedly described a "typical well" on which assumptions about Alpine High's wet gas play were based. For example, in the Alpine High wet gas play, the Individual Defendants publicly claimed that a "typical well" would produce *at least* 9 billion cubic feet of gas equivalent ("BCFE") in total hydrocarbons over its lifetime, and that the range for a "typical well" was anywhere from 9 billion to 15 billion BCFE. At this "typical" production level, the Individual Defendants assured stockholders, Alpine High's wet gas wells would be profitable, and a significant number of "upper range" wells would be even more highly profitable, producing so much wet gas that "the rates of return [would] go off the charts."

150.     As alleged in the Securities Action, in reality APA never came anywhere close to meeting these curves before completely shutting down further drilling at Alpine High by March 2020. Indeed, per the operative complaint in the Securities Action, corroborating the conclusions of the internal Project Neptune analysis, the lead plaintiffs' forensic, *post-hoc* analysis of Company

data reveals that a staggering *70%* of the wet gas wells drilled throughout Alpine High were never on track to produce even the ***minimum*** amount needed to be a profitable "typical well," *i.e.*, produced less than 9 BCFE of hydrocarbons. As shown on the below type curve graph, the median well at Alpine High fell far below the production needed to be "economical" according to the Company's numbers, and far below the "upper range" numbers that would be required to be highly profitable.



151.     By mid-2018, the failure of Alpine High to produce any significant numbers of "highly economic" wells had created intense friction within the Company, per the account in the Securities Action of the confidential witness referred to as "CW 15",[18] who is alleged to have

---

[18]     According to the operative complaint in the Securities Action, "CW 15" is a former APA Performance Drilling Expert who worked for the Company from September 2017 to May 2020, and at the San Antonio office on Alpine High from September 2017 to September 2018.

witnessed this intense friction firsthand. According to the account of CW 15, the disparity between the Individual Defendants' public claims about Alpine High and what the Individual Defendants knew became so stark that, during a "tense" second quarter review meeting in July 2018, defendant Riney stood up in front of dozens of people, including Mr. Keenan and defendant Christmann, and bluntly asked "*When are we going to start producing economic wells*?"

B.    **As Alleged in the Securities Action, the Individual Defendants Walled Off Alpine High Data, Allowing Mr. Keenan to Operate Alpine High as a "Shadow Organization", and Silencing Dissent**

152.   Throughout the Relevant Period, the Individual Defendants engaged in a variety of tactics to conceal Alpine High's poor performance and remarkably weak prospects from internal scrutiny. Per the operative complaint in the Securities Action, before and throughout the Relevant Period, as described by a former Production Technology Manager at the San Antonio office, the Individual Defendants dropped a "cone of silence" over Alpine High, walling off critical data from internal review, including the longstanding Company practice of peer review. As a result, it is alleged that employees at all levels of the Company questioned the Individual Defendants' public and internal representations regarding Alpine High, but the Individual Defendants made clear that "you either line up or you're off the team." In other words, it is alleged that anyone within the Company that questioned the Individual Defendants on Alpine High were terminated or "run off." In furtherance of these tactics, the Securities Action alleges that defendant Christmann required Mr. Keenan to report all matters of importance concerning Alpine High directly to defendant Christmann, who, circumventing established Company practices and procedures, dictated who else at the Company could access Alpine High data, and what types of review and analyses they could perform.

153.   Specifically, defendant Christmann allegedly allowed the Alpine High data to be segregated from APA's normal data storage, analysis and internal review practices, which were

applicable to all of APA's other sites, and instead, kept apart in San Antonio. Per the Securities Action, defendant Christmann determined that Mr. Keenan and the San Antonio team would operate outside the standard processes and reporting and review practices applicable to other units of the Company. It is alleged that defendant Christmann decided, through at least early 2019, that senior executive oversight of Mr. Keenan and the Alpine High play would come only from defendant Christmann himself.

154.    Per the operative complaint in the Securities Action, CW 6 confirmed that executive management was "absolutely aware" and "in total agreement" with the Alpine High secrecy, stating in no uncertain terms, "the best way for people to hide fraud is to hide the information." CW 12 is quoted similarly, placing responsibility for the Alpine High secrecy directly on defendant Christmann: "Absolutely, the only way you get away with it is that it came from the most senior levels to allow them to work that way at Alpine High.  It is the CEO's responsibility." According to the account of CW 8, while Alpine High production data was available to defendants Christmann and Sullivan, there was a "concerted effort" to keep Alpine High data a secret from others, and CW 8 was specifically "instructed" to not share production data with anyone outside of San Antonio.

155.    As alleged in the Securities Action, the internal secrecy of Alpine High began almost immediately after Mr. Keenan's arrival at Alpine High and defendant Christmann's promotion to CEO.  Per the account of the confidential witness referred to in the Securities Action as "CW 16,"[19] once Mr. Keenan started drilling Alpine High, "***Alpine became a black box pretty***

---

[19]    According to the operative complaint in the Securities Action, "CW 16" was employed by the Company for over 15 years, through the fourth quarter of 2014. Between July 2012 and November 2014, CW 16 is alleged to have worked in the Midland office as an Exploitation Manager.

*quickly*." According to CW 7, Mr. Keenan did a masterful job keeping Alpine High seismic data within his inner circle. Defendant Christmann empowered the San Antonio office to operate largely as a clandestine operation throughout the Relevant Period. CW 6 is quoted in the Securities Action as follows: "***that was their M.O. from the beginning, keeping everything secret so they could keep the deal going as long as possible***."

156.     The Securities Action quotes CW 5 as follows: "there was no physical connection between the San Antonio office network and the rest of Apache. There was no way to tell what they had on their drives." According to the account of CW 6, Mr. Keenan went so far as to have the Company's IT department restrict access to the Alpine High data to certain individuals, greatly reducing the possibility of peer review of the Alpine High data. For example, the Alpine High WellView system, according to the confidential witness identified in the Securities Action as "CW 17,"[20] which tracked time, money, and equipment usage on a well-by-well basis through drilling, completions, and failure reporting, was available "only to those that are necessary," as determined at the CEO level.

157.     Per the operative complaint in the Securities Action, CW 14, a Completions Engineer at Alpine High, similarly reported that the San Antonio Reservoir Engineering Group did not permit review by "anyone outside" that group and operated as a "shadow organization." It is alleged that the San Antonio Reservoir Engineering Group used software called "Aries" for reservoir and reserve analysis, and that the group, led by Mr. Pieprzica, was responsible for reservoir modeling, production forecasting, well testing, well drilling, economic modeling, and

---

[20]     According to the operative complaint in the Securities Action, "CW 17" was employed by the Company as an Operations Applications Analyst in the Midland office from before the Relevant Period until March 2020, in which role CW 17 was responsible for, among other things, compiling daily reports from the APA WellView system, and failure reporting. CW 17 is alleged to have had access to WellView data from any area of APA's Permian region except Alpine High.

PVT analysis of reservoir fluids. Engineers in this group are alleged to have played a central role in the Alpine High field development planning, and in generating reserves estimates for use in financial and regulatory reporting. According to the Securities Action, the Aries data was vital to CW 14 as a Completions Engineer, as that data would provide, among other things, an assessment of well spacing on a given pad. However, the Reservoir Engineering Group was allegedly instructed not to share the Aries inputs with anyone else. As a result, it is alleged that CW 14 would only be provided with a screenshot of the Aries data, rather than giving CW 14 access to the system and underlying data. According to the account of CW 14, Mr. Keenan was "very intentional" in maintaining the reservoir data secret and there was "pressure from above" to not provide the data.

158.     Likewise, per the account in the Securities Action of CW 11, a geologist in the Corporate Reservoir Engineering ("CRE") Group in Houston, which was responsible for handling the APA reserves and reports to the SEC, the San Antonio office was extremely secretive with reservoir numbers coming out of Alpine High, as the office was "not willing to expose this data to people outside of their region." CW 11 is quoted as stating that "San Antonio were the problem kids that did not want to give access to the numbers," noting that if the CRE group wanted Alpine High reservoir data, they "***had to go to the executive level to demand those numbers***." According to the operative complaint in the Securities Action, CW 7 expressed shock that, as one of the Company's highest-ranking geologists, CW 7 did not have access to the reserve reporting from Alpine High.

159.     Still other confidential witnesses from the San Antonio office described in the operative complaint of the Securities Action how crucial Alpine High data necessary for their job performance was withheld. Noting that "even in the same office, there were silos," CW 8 explained that the San Antonio Reservoir Engineering Group and geologists operated under a "***cone of***

*silence*" and that the Reservoir Engineering Group maintained reservoir data as "***top secret***." It is alleged that such information was integral to CW 8, a production engineer who required well data in order to maximize well production. Nevertheless, the Reservoir Engineering Group withheld from CW 8 crucial PVT (Pressure Volume Temperature) data, which CW 8's group needed to forecast NGL production. As a result, CW 8's production team was allegedly forced to work backwards, which, as described below, led CW 8 to discover type curves were being inflated (explained above) for Alpine High. CW 8 repeatedly complained to supervisors about CW 8's inability to gather this data, and the supervisors allegedly reported the disputes to Mr. Keenan. According to the account of CW 8, Mr. Keenan's "six pack" member Mr. Behl ultimately quit because he grew tired of fighting battles over the sharing of data.

160.     The "cone of silence" at Alpine High became tighter as the Relevant Period progressed. The confidential witness referred to in the operative complaint in the Securities Action as "CW 18"[21] is alleged to have been in the small circle of employees that initially had access to Alpine High production data, and for a time participated in an hour-long Daily Operational Meeting at 7:15 a.m. each day that included Mr. Keenan and his inner circle. According to the account of CW 18, during these daily meetings, the San Antonio Region Operations Manager, Greg McDaniel, provided detailed metrics on the prior day's production. CW 18 is quoted as stating that "some of the production was falling short" and "[a]ny numbers that I ever heard from production were not very good." Per the account of CW 18, by 2018 Alpine High production data was no longer discussed in these daily meetings – "production was then kept quiet." The Daily Operational Meeting continued, but focused only on drilling and completions, not production.

---

[21]     According to the operative complaint in the Securities Action, "CW 18" was employed by APA as a Senior Drilling Engineer from August 2014 until March 2020, and originally worked in the Houston office but was reassigned to San Antonio where CW 18 was responsible for drilling new wells at Alpine High.

161.     According to the operative complaint in the Securities Action, former Company employees have rejected the notion that the internal secrecy surrounding Alpine High data was justified by concerns about competitors. For example, CW 4 is alleged to have emphatically rejected this purported justification for maintaining the secrecy of Alpine High data, stating it was "complete bull." Per the account of CW 4, the secrecy continued long after the Company had already leased all of the acreage required in the Alpine High play, with CW 4 noting that "they had the entire place all leased up. There was no chance for competition, or need for secrecy."

162.     The secrecy with which defendant Christmann is alleged to have shrouded Mr. Keenan's San Antonio office and its Alpine High data was completely antithetical to the Company's established practices and procedures. In internally walling-off Alpine High data, defendant Christmann circumvented numerous standard procedures at the Company and industrywide for evaluating any new play.

163.     *First*, it is alleged that the Individual Defendants refused to subject Alpine High to a "Rose Risk Analysis." APA, like most E&P companies, used a Rose Risk Analysis (named after Professor Peter R. Rose, who defined the analysis) early in the exploration process to determine the probability of success of a given project. According to the account of CW 10 in the Securities Action, under established Company policies, any exploration play at APA was supposed to go through a Rose Risk Analysis. During CW 10's tenure as the Chief of Staff to APA's former COO Mr. Eichler, CW 10 is alleged to have been involved in many Rose Risk Analyses. CW 10 is quoted in the Securities Action as stating that this "was always the process" and it typically began internally "whenever an asset team formulated an idea and they were looking for money." For example, when an asset team such as the San Antonio office needed money to acquire acreage for a play, the asset team would submit a Rose Risk Analysis, which involved the asset team

providing test, seismic and fluid data. CW 10 allegedly never saw a Rose Risk Analysis conducted on Alpine High, because executives "were worried about an objective assessment."[22] Per the account of CW 10, Rose Risk Analyses were normally performed regardless of any external confidentiality concerns about an exploration play, such that a desire to shield Alpine High from competitors would not have been a reason not to perform such an analysis. As a scientist, CW 10 is quoted as stating that the failure to subject Alpine High to the Rose Risk Analysis "*violated every step of the scientific method*."

164.    *Second*, the Individual Defendants refused to allow Alpine High to be subjected to customary peer review processes that all other oil and gas plays were required to be subjected to in the normal course of APA's operations. Specifically, as part of standard Company practice, after the Rose Review Analysis of a play, all exploration plays were subjected to internal peer review processes. Numerous confidential witnesses confirmed in the Securities Action that this was a critical Company practice.

165.    For example, according to the operative complaint in the Securities Action, CW 10 reported that the approximately ten APA business units from around the world each participated in a quarterly "peer review." The "peer review" consisted of the business unit executive, including development and exploration executives, presenting on all assets and financial information for the project for review by the other business units. The peer review process was intended to allow people within the Company to provide a "risk assessment" of each project. When a given peer review was complete, executives provided a green, yellow, or red light on the project. CW 10 is

---

[22]     Although CW 10 is alleged to have left the Company in 2015, before the Alpine High play was announced, CW 10 explained in the Securities Action that the play should have already been subject to a Rose Risk Analysis because the Company had already leased 182,000 acres by the second half of 2015. Indeed, according to the account of CW 10, the Rose Risk Analysis should have begun even before the Company started acquiring the acreage.

alleged to have recalled how, as a Vice President of Midland office prior to the Relevant Period, defendant Christmann himself hosted a number of peer reviews of Midland operations. According to the account of CW 4, regional offices ***other*** than San Antonio remained subject to peer reviews throughout the Relevant Period, but San Antonio ***did not***.

166.    Per the account in the Securities Action of CW 6, a peer review of Alpine High "***never happened***," and CW 8 is also alleged to have confirmed this.  CW 6 is quoted as stating that Mr. Keenan "refused to do any peer review or put their work before a group," but instead "***went directly to the CEO and the Board of Directors***." According to the account of CW 16, Mr. Keenan told defendant Christmann that there was nobody in the Company that was qualified to peer review Mr. Keenan, and, as a result Mr. Keenan was the only executive at APA that could withhold data and not get fired. CW 6 is alleged to have reported that Mr. Keenan threatened to quit if anyone within the Company conducted a peer review of his work. Accordingly, per CW 6's account, defendants Sullivan and Christmann "made that call" that Alpine High would not be subject to peer review.

167.    According to the account of CW 10, senior executives, including the CEO and COO, routinely attended the Rose Risk Analysis and peer review meetings. In the operative complaint in the Securities Action, CW 10 is alleged to have described the lack of internal review of Alpine High as unethical, and is quoted as stating that CW 10 and her staff had "no ability to provide objective, responsible, technical input on what they [meaning the San Antonio office] were doing. That environment led to a huge miscalculation about Alpine High, what it really was versus how it was represented."

168.    *Third*, after Mr. Keenan's arrival, the Individual Defendants are alleged to have abandoned other basic and fundamental information sharing and oversight practices for Alpine

High. For example, according to CW 11's account in the Securities Action of CW 11, CW 11's team of geological modelers in the Corporate Reservoir Engineering group would typically work on any asset within the Company. The geologic models CW 11's team created allegedly went to reservoir engineers to run flow simulations to predict flow capacity and movement of fluids in a reservoir, and as with a multitude of other former employees, CW 11's team was "not able to look at Alpine High's data at all or do any type of study on it."

169.     Per the account in the Securities Action of CW 10 -- APA's former Chief of Staff to the COO -- even CW 10 was denied access to Alpine High data, with CW 10 emphasizing that the Alpine High secrecy "was completely counter to how [Apache] operated." CW 5 similarly is quoted as stating that "everything they did from day one [of the opening of the San Antonio office] was completely off-limits to anyone else in the Company." Other than Alpine High, according to the account of CW 5, the Company "was very much open - there was a trust there" and as a result, the lockdown of the Alpine High data "*was a poison to the culture of Apache*."

170.     Further, Mr. Keenan's San Antonio team is alleged to have been accorded special treatment in regular internal meetings. For example, the Securities Action alleges that in quarterly business review meetings of APA's management from 2016 to early 2019, defendant Christmann routinely allowed Mr. Keenan and the San Antonio team to make presentations about Alpine High that included less information than the presentations of the other units. Where other units provided technically-vetted, data-intensive reports, Mr. Keenan's presentations were allegedly superficial, and did not include substantial supporting data. In one instance, in a July 2018 quarterly business review meeting, it is alleged that the leaders of APA's various corporate and regional divisions gathered, and presented results and projections regarding their respective business units. The operative complaint in the Securities Action alleges that Mr. Keenan's presentation regarding

Alpine High conspicuously did not provide the data or support that was supplied, as a rule, in the reports concerning other business units. Certain executives allegedly pressed Mr. Keenan in the meeting to substantiate and explain the assertions in his presentation, but he resisted and declined to do so. Defendant Christmann is alleged to have sat by during this exchange, and did not require Mr. Keenan to share the information and support that the other executives had pressed for, and that all other business units had provided. Defendant Christmann thus allegedly blessed a reporting and data-sharing structure at APA in which Alpine High data was accessible only to himself, Mr. Keenan, and Keenan's team, but was not subjected to the same peer review and vetting that data from all other parts of the Company underwent.

171.    The lack of internal transparency allegedly led employees to try to scrutinize every aspect of Alpine High, including the science employed and the Individual Defendants' bold public statements. This began even before the Relevant Period. For example, according to the Securities Action account of CW 7, APA's former Director of Exploration and Production Technology, defendant Christmann gave Mr. Keenan permission to use outdated seismic testing technology at Alpine High. CW 7 is quoted as stating that CW 7 "had some world class seismic acquisition guys on my team, and they could have gotten better data [at Alpine High] had they talked to my guys about it." "But Keenan was allowed to shoot seismic the way he wanted." The account of CW 5, a geologist, illuminates this point, with CW 5 allegedly explaining that when acquiring seismic data for Alpine High, Mr. Keenan insisted upon 24-fold for imaging quality. But that had not been the standard for a decade, as the true standard was 256-fold. In other words, Mr. Keenan could have had 10 times better data for the same or less money. These former employees suspected Mr. Keenan insisted upon lower quality technology so he could fudge the data. Per the Securities Action account of CW 6, the Reservoir Stimulation Lead, Mr. Keenan refused the service of the

Houston seismic team because Mr. Keenan did not want any outside review of his work.

172.     The Securities Action alleges that other employees questioned the models used by Mr. Keenan. Per the account of CW 4, a geologist responsible for the Woodford formation outside of Alpine High, "the Woodford does not have storage, it's all clay, it's too small," -- *i.e.*, it did not have the kind of porous rock that would hold oil, whereas a good oil play "should have rock like a sponge." CW 4's quote in the operative complaint in the Securities Action sums up what stockholders only found out too late; Alpine High was "***smaller than any other shale resource play out there***."

173.     Even high-ranking employees are alleged in the Securities Action to have questioned Alpine High and to have brought their concerns to Mr. Keenan. For example, per the account of CW 7, a PhD geophysicist and petrophysicist with 25 years of experience in the energy industry, and a senior director who is alleged to have reported directly to several of defendant Christmann's direct reports, CW 7 "felt there were a lot of technical issues at Alpine High" and was "***convinced that the [Alpine High reserves] data was distorted***." According to the account of CW 7, APA executives "were trying to make Christmann aware of these things. I had heard that there were some pretty fierce arguments on the 14th floor" -- the home of the Company's C-level executives' offices.

174.     Former Company employees, such as CW 11, the geologist in the CRE Group, reported in the operative complaint in the Securities Action that "it was always a question of what was going on Alpine High. ***No one could understand why we were spending so much money on the play***."

175.     Per the Securities Action account of CW 13, the San Antonio Control Center Supervisor, the Company was having trouble producing enough rich gas to meet its NGL minimum

volume commitments -- *i.e.*, agreements to furnish a certain amount of NGLs in exchange for access to takeaway infrastructure-delivering only about 50% of what the Company had committed to provide. In no uncertain terms, CW 13 is quoted as stating bluntly, "***I don't think that people were really reporting what was really happening operationally***." For example, according to CW 13's account, the monthly "field projection" for Alpine High total production was 500 MMBTU (million British Thermal Units), but the Company "never got close," instead most months producing "at best" 350 MMBTU.

176.     Per the account of CW 19 in the Securities Action, by early 2018, at the latest, it was obvious to everyone at Alpine High that the play did not have as much oil as had been projected to stockholders. According to CW 19, who is alleged to have been employed as a Drilling Supervisor in the San Antonio office from July 2015 until April 2020, to have drilled over 30 wells at Alpine High, and to have worked on well sites including Redwood, Blackhawk and Mont Blanc, "[Y]ou could tell from the equipment on the pads." For example, CW 19 is alleged to have highlighted how when CW 19 arrived, the rigs at Alpine High did not have any large tank batteries, which are tanks used to hold oil. Based on CW 19's experience in Alpine High, CW 19 is quoting as recalling that "***I never had an oil kick, but always had a gas kick***."

177.     As high-ranking APA executives allegedly "raised questions" about Alpine High, rather than address the questions and subject the play to scrutiny, the Individual Defendants simply eliminated any resistance. This led to an exodus of employees, both before and during the Relevant Period. According to the Securities Action account of CW 10, the Chief of Staff to the COO, in the 18-month period following Mr. Keenan's arrival, "***over a dozen Vice Presidents***" that "raised concerns" about Alpine High were either ***fired or asked to take an early retirement***. CW 6 similarly is alleged to have recounted that Mr. Keenan's arrival led to "***very talented people leaving***

*the Company in droves*."

178.    The operative complaint in the Securities Action alleges that one notable example was the firing of EVP and COO, International Tom Voytovich ("Mr. Voytovich") in November 2015. In mid-2015, it is alleged that Mr. Voytovich was building a case against Alpine High. According to the account of CW 7, Mr. Voytovich saw "the inside scoop" on Alpine High and was very frustrated. CW 6 was allegedly questioned as part of Mr. Voytovich's Alpine High review. Weeks later, during the Annual Technical Forum at the Houstonian hotel, it is alleged that Mr. Voytovich foreshadowed his termination, telling CW 5 "there were going to be some changes." The Securities Action alleges that multiple former APA employees confirmed that Mr. Voytovich was fired for confronting the Individual Defendants about Alpine High. According to the account of CW 5, in October 2015 Mr. Voytovich "called out [Mr.] Keenan" on Alpine High.   The confidential witness referred to in the operative Securities Action complaint as "CW 20"[23] is quoted as stating that Mr. Voytovich was "one of the first people to warn [defendant] Christmann about Alpine [High]."  The operative complaint in the Securities Action quotes CW 6 as explaining in simple terms, "*Tom started looking into it and just like everyone, he simply disappeared*."

179.    Indeed, as alleged in the Securities Action, 2015 saw incredible turnover within the ranks of APA's executive management. CW 6 is quoted in the operative Securities Action complaint as stating that the Company "*systematically…got rid of everyone*" who dared to question Mr. Keenan. CW 6 further is quoted as describing this turnover as "*carnage*," and is alleged to have cited two specific examples: former Vice President of Operations Tom Hallman being "*run off*" in 2015 for inquiring about Alpine High, and former EVP and Chief Technology Officer Mike Bahorich being pushed out in 2015 over a "*conflict of power*" with Mr. Keenan.

---

[23]    According to the operative complaint in the Securities Action, "CW 20" was employed by APA for over 20 years as a geologist in the Midland office, serving through 2019.

180.     The operative complaint in the Securities Action alleges that the Individual Defendants continued their intolerance of any dissent regarding Alpine High throughout the Relevant Period. Per the account of CW 20, people who voiced objections "*were told, you're either on the bus or you're off this bus*," and these threats were followed through. CW 7, the Director of Exploration and Production Technology, is alleged to have recounted that CW 7 and two other high-ranking employees had each tried to confront Mr. Keenan over Alpine High, and that CW 7 faced retaliation and ultimately termination for doing so. Specifically, it is alleged that during the Relevant Period, CW 7 (Director of Exploration and Production Technology), Senior Petrophysical Advisor Don Kilgore ("Mr. Kilgore"), and Vice President of Engineering Technical Services Lucian Wray ("Mr. Wray") each separately confronted Mr. Keenan over the assumptions Mr. Keenan employed at Alpine High. CW 7 is quoted in the Securities Action as describing that CW 7's relationship with Mr. Keenan turned "*pretty ugly*" after attempting to gather Alpine High information. It is alleged that by 2017, CW 7 and Mr. Kilgore tried to talk sense to Mr. Keenan and other executives about the Alpine High petrophysics.

181.     According to the account of the confidential witness referred to in the operative complaint in the Securities Action as "CW 21",[24] the meeting between Mr. Keenan, CW 7, and Mr. Kilgore took place in 2017, and Mr. Kilgore told Mr. Keenan he was "*spending money at Alpine High like a drunken fucking sailor and that we were drawing a lot of water*." Mr. Kilgore allegedly relayed these conversations to CW 21 but said that Mr. Keenan didn't want to listen. Following these confrontations, CW 7 was allegedly prohibited from stepping foot in the San Antonio office, and in September 2018, defendant Christmann and Mr. Keenan fired CW 7.

---

[24]     According to the operative complaint in the Securities Action, "CW 21" was employed by APA from June 2017 until March 2020 as a petrophysicist in the San Antonio office, where CW 21's office was allegedly next to Mr. Keenan's office.

182.    Per the account in the Securities Action of CW 20, Mr. Wray was responsible for getting answers from Alpine High and similarly faced retaliation for questioning Alpine High. According to the account of CW 20, within thirty minutes of confronting Mr. Keenan, Mr. Wray was chewed out in defendant Christmann's office. It is alleged that CW 7 and Mr. Wray were eventually pushed out of the Company on the same day in September 2018. The silencing of dissent reached every corner of the Company, and employees at all levels understood they were not to question Alpine High. CW 10 is quoted in the Securities Action as stating "***that was the culture -- you either line up or you are off the team***."

> **C.    As Alleged in the Securities Action, to Boost Production the San Antonio Office Secretly Manipulated Alpine High Data and Took Other Desperate Measures**

183.    Despite the internal secrecy surrounding Alpine High operations, APA employees gradually began to discover the truth, including the great lengths taken to manipulate Alpine High production results in order to give the appearance of a successful oil and wet gas operation.

184.    Internal questioning of Alpine High data, as well as the data obfuscation and manipulation, continued throughout the Relevant Period. For example, according to the Securities Action account of CW 13, who was tasked with ensuring well production, pipeline and market delivery optimization for Alpine High, the San Antonio office had a big scramble before earnings conference calls, the results presented to stockholders were "***absolutely***" doctored up, and when Alpine High results were provided, it was a case of "***here's the results, but they weren't [the real results]***."

185.    The Individual Defendants' scheme included obfuscating data from the CRE group.  Per the account in the Securities Action of CW 20, a longtime Company geologist, the San Antonio office was not giving accurate data to the CRE team. It is alleged, based on CW 20's conversations with members of the CRE group, including then-current Reservoir Technician

Melissa Radke, that CW 20 made clear that the San Antonio group was not only "obstructing the gathering of any information regarding well performance or reserves for Alpine High," but was also "covering up some stuff."

186.     The Securities Action alleges that former engineers from the Company's San Antonio office have confirmed that in fact "typical well" assumptions and type curves were deliberately inflated beyond any justifiable reality, and that a handful of select employees in San Antonio's Reservoir Engineer Group, who answered only to Mr. Keenan and defendant Christmann, were engaging in pervasive data manipulation.

187.     Per the account in the Securities Action of CW 14, who worked as a completions engineer in the San Antonio office beginning in March 2017, the San Antonio office systematically inflated the Alpine High type curves in order to support bold and unsupported claims about Alpine High. Specifically, it is alleged that a significant part of CW 14's role was to provide detailed well-level production data and future production estimates, once a well was completed, to the Reservoir Engineering Group within the San Antonio office, which was in turn tasked with creating type curves for Alpine High. However, per CW 14's account, the Reservoir Engineering Group would simply adjust the data upwards without clear justification, such that "***overnight***" the type curve "***shifted up by 30%***," in what CW 14 described as an across-the-board practice of "***enhancement***" of the completions data CW 14 and CW 14's colleagues provided to the group. This not only led to unrealistic assumptions about the amount wells would produce, but about how "economical" the wells would be as a result. CW 14 is alleged to have questioned where these "enhancements" were coming from, but per CW 14's account, Mr. Keenan and his group kept their data inputs "close to the chest," refusing to share them with anyone other than senior Company leadership.

188.     The operative complaint in the Securities Action alleges, per CW 14's account,

that the type curves at Alpine High were so blatantly and systematically inflated that even Alpine High's best performing wells could not come close to matching the type curve -- which was supposed to merely represent typical production. As CW 14 is quoted in the Securities Action, the "type curve would be better than the best performing wells." For example, in an area of Alpine High known as Redwood, CW 14 allegedly recalled that there were two well pads, each with 12 wells, or a total of 24 wells; yet the type curve created for Redwood was "better than all 24 wells [actually] performed." According to the account of CW 14, it was thus clear to CW 14 that "across the board" at Alpine High, production estimates were "***fudged upwards***." Consequently, CW 14 is alleged to have specifically recalled reviewing the Individual Defendants' September 7, 2016 presentation to stockholders announcing Alpine High and realizing that "***what they showed at Barclays was not consistent with the production results at the time***."

189.    Per the account in the Securities Action of CW 8, who worked as a production engineer in the San Antonio office, CW 8 similarly realized that the Alpine High type curves were inflated. As a production engineer, it is alleged that CW 8 was expected to make sure that actual production from wells matched the Company's type curves, but CW 8 is quoted as describing that CW 8 and other production engineers "were seeing that we couldn't hit (the type curves) most of the time," and that "it was rare" when one of the wells "performed up to the type curve." According to CW 8's account, CW 8's team attempted to get the type curve data from the San Antonio Reservoir Engineering team in order to understand where these seemingly unrealistic assumptions were coming from, but were denied access to the data. CW 8 is quoted in the Securities Action as stating that the San Antonio team was "***absolutely***" inflating the type curves.

190.    As the Relevant Period continued, and the Individual Defendants could not meet their brazenly manipulated production targets, the Individual Defendants became increasingly

desperate to boost production at any cost. As described in the operative complaint in the Securities

Action, one especially desperate measure was a $100 million scheme known as "Project Phoenix,"

which involved attempting to produce oil by injecting NGLs into the ground at the Company's

Blackfoot well pad.   According to the account of the confidential witness referred to in the

Securities Action as "CW 22,"[25] an engineering technician who worked on Alpine High,

immediately after the Company completed the Blackfoot well development in 2018, the well pad

was performing poorly. CW 22 is quoted in the Securities Action as describing that Mr. Keenan

"immediately saw that the production at the Blackfoot lease was not as expected and did not have

the gains that they expected with the cubed development." By mid-2018, "Project Phoenix" was

allegedly implemented, which was designed to improve production in certain reservoirs and wells

at Blackfoot. Despite "Project Phoenix" coming with an extraordinary $100 million price tag, CW

22 described in the Securities Action that the entire project as closely guarded, considered "hush

hush," and that permission was needed before anyone in the San Antonio office could access the

Project Phoenix database. Per the account of CW 22, "this was a case where only those who needed

to know could get access to the information" and CW 22 estimated that only 10-15% of the

employees in the San Antonio office were even aware of Project Phoenix.[26]

---

[25]     According to the operative complaint in the Securities Action, "CW 22" was employed by the Company as an Engineering Technician from February 2017 until March 2020.  CW 22 is alleged to have been based in the San Antonio office and to have worked on the Alpine High water management team.

[26]     For example, despite being a production specialist for San Antonio responsible for Alpine High well optimization, which would normally make Project Phoenix directly within CW 8's purview, CW 8 is alleged in the Securities Action to have only heard about the project. Per CW 8's account in the Securities Action, the Reservoir Group Manager Mr. Pieprzica was in charge of Project Phoenix, and the project required a production engineer. Mr. Pieprzica allegedly asked a production engineer within CW 8's group to work on Project Phoenix, but mandated that the production engineer sign a Non-Disclosure Agreement. The operative complaint in the Securities Action alleges that CW 8 was stunned by this request, which was allegedly refused, and as a result, Mr. Pieprzica was allegedly forced to employ a completions engineer in the role of production

191.    CW 13 was familiar with Project Phoenix, according to the operative complaint in the Securities Action, in which CW 13 is alleged to have described the project as an enhanced oil recovery project.  Per the account of CW 13, the project involved injecting NGL into a well at a high rate of pressure to aggravate the shale, in hopes it would produce oil. The Alpine High production superintendent is alleged to have complained to CW 13 that Project Phoenix was not successful and losing money because APA was not even able to recover the NGL injected into the well. Due to the high cost of Project Phoenix, the Individual Defendants were likely aware of the project and it is reasonable to infer the same.

192.    The operative complaint in the Securities Action alleges that CW 14, a Completions Engineer working in the field at Alpine High, similarly described Project Phoenix as a speculative process involving injecting NGLs *back* into the reservoir, through a completed well, in an effort to increase the well's productivity. Emphasizing the classified nature of Project Phoenix, per CW 14's account in the Securities Action, the Company employed guards 24 hours a day, 7 days a week, at the Blackfoot well-site and had set up gates and LNG tanks around the well pads to block the view of where the NGLs was being re-injected.

D.    **The Individual Defendants Concealed Alpine High's Horrendous Performance by Causing APA to Consistently Flout Regulatory Reporting Requirements**

193.    Throughout the Relevant Period, the Individual Defendants caused APA to persistently flout regulatory reporting requirements governing well permitting, completion, and production in order to hide the truth from stockholders about Alpine High. The deficient, chronically late (often by years) reporting for Alpine High was widespread, systemic, and pervasive, and resulted in dozens of warnings from the State of Texas.

---

engineer on Project Phoenix. CW 8 allegedly did not have access to the secretive Project Phoenix.

194.    The Texas Railroad Commission (the "RRC") is the primary oil and gas industry regulator in Texas, with regulatory authority encompassing the exploration, production, and transportation of oil, natural gas liquids, and natural gas. The RRC's rules provide a comprehensive regulatory framework for, *inter alia*, the issuance of drilling permits for oil and gas wells in Texas; the collection and maintenance of well completion and production reports, well maps, and other RRC required forms; field inspections, testing programs and monitoring industry activities in the field; and the enforcement of RRC rules.

195.    APA, like any other E&P company operating in Texas, was required to file a well completion report within 90 days of a well's completion. Upon completion, the Company was required to classify the well initially as either an oil well (reported on Form W-2) or a completed gas well (reported on Form G-1). Second, the Company was required to report monthly production from the well, with oil production reported in barrels (BBLs) and gas is reported in thousand cubic feet (MCF). For classification purposes, RRC rules required the Company to classify a well as an oil well if its Gas/Oil Ratio (GOR) ratio was 3,000 cf/bbl or less, and a gas well if its GOR was above 3,000 cf/bbl. For both types of wells, reporting is inclusive of NGLs or other wet gas components, which RRC rules do not require operators to separately break out.

196.    The initial classification of a well as an "oil" well or a "gas" well dictates how an operator reports production with the RRC. If a well is classified as an oil well, it is assigned to an existing lease number and its production statistics are combined with all other wells on the lease number, *i.e.*, a separate report is not required for each oil well. Accordingly, the RRC's reporting rules do not allow the public to verify the performance of individual oil wells. In contrast, RRC rules require operators to report production for each individual "gas" well using assigned wellbore numbers, *i.e.*, the well's name.

197.     Operators are, in extremely limited situations, permitted to file a separate type of monthly production report known as "pending reports." Specifically, RRC rules allow operators to file production on pending reports only if the lease on which the oil well is located has not yet been assigned an official RRC lease/ID number. These so-called "pending reports" are maintained by the RRC in a separate database, and locating such reports is extremely difficult for members of the public. However, once an RRC lease/ID number had been assigned, RRC rules require an operator to cease filing pending reports and contact the RRC to alert its Production Audit team of the need to move the production report from pending to accepted with a newly assigned ID. Similarly, for a gas well, once the well is completed, RRC rules require an operator to cease filing pending reports and contact the RRC to inform it of the need to move the production report from pending to accepted with a newly assigned wellbore number.

198.     Under the Individual Defendants' direction, each of these rules (and many more) were flagrantly violated and exploited as part of the Individual Defendants' scheme to conceal Alpine High's poor performance and prospects from regulators and stockholders. Consequently, during the Relevant Period, the Company received at least 65 "severance" letters -- notices of non-compliance -- from the RRC relating to deficient reporting for operations at Alpine High. First, the Individual Defendants caused Apache's failure to timely report dozens of wells that had been completed at various locations across Alpine High. These "ghost wells" were hidden by drilling wells to which a lease number was not assigned and for which a completion report was not filed with the RRC. Significantly, for nearly the first *two years* of the Relevant Period, under the Individual Defendants' direction, the Company did not report *a single completion report* for any of the over 150 wells completed by APA during that period to the RRC.

199.     By causing the Company to fail to report dozens of completed wells in violation

of regulatory requirements, dozens of dry holes and weak performing wells were hidden. One example of this is the Redwood 1P, which was not associated with its API number in any of APA's reports to the RRC, and was reported under a lease with two different names. Because a completion report for the Redwood 1P well was not filed with the RRC until October 2018 -- more than two years after its actual completion date -- its production was left on pending reports well into 2018.

200.    Similarly, the Mont Blanc 2H -- one of the two "Successful Oil Tests" announced by the Individual Defendants at the Barclays Conference in September 2016 -- was left on a "pending report" for nearly two years. The operative complaint in the Securities Action alleges that the lead plaintiffs' forensic analysis revealed that by June 2017, the purportedly "successful" Mont Blanc 2H (renamed the 401AH) had produced a total of 36,928 barrels of oil and 137,305 mcf of gas, an absolutely disastrous first 12 months' performance indicating that neither oil nor gas production were economic.

201.    The Individual Defendants also caused deliberate misclassification of numerous "gas" wells as "oil" wells by the Company, which allowed production to be commingled for all such wells on a given lease, deliberately obscuring the performance of individual wells. For example, Mont Blanc 3H was originally granted a five digit "oil lease number," which was later changed to a six digit "gas lease number." The same misclassification issue permeated the Mont Blanc pad, since all Mont Blanc wells were originally reported as "oil" wells under oil leases,  thus commingling their production (which, if disaggregated, would have showed production below the "low-end" total on a per-well basis). Subsequently these wells were either reclassified as "gas" wells or were left on oil leases but reported *zero* oil production.

202.    Per the operative complaint in the Securities Action, confidential witnesses have confirmed the pervasive failure to comply with basic RRC reporting requirements. For example,

according to the account of the confidential witness referred to as "CW 23",[27] CW 23's team had "a lot of problems" getting timely, complete, and accurate data from Alpine High's production team. As a result, the Securities Action alleges that CW 23's team was unable to timely file completion reports to the RRC, an issue CW 23 is quoted as stating was a "***huge problem***." Per the operative complaint in the Securities Action, CW 23 attributed this "huge problem" to the withholding of information by Alpine High's Reservoir group, which, as allegedly corroborated by other confidential witnesses, was siloed from the rest of the Company and required executive management's approval to release data from the San Antonio office to CW 23's regulatory compliance team. According to the account of CW 23, "***The regulatory team was at the mercy of the executives to be given data for regulatory filings. It was known and clear that we were lacking data and information***."

203.    According to the account in the Securities Action of the confidential witness referred to in the operative complaint as "CW 24",[28] CW 24 similarly described how CW 24 was "instructed" not to file anything with the RRC until told to do so. Consequently, CW 24 allegedly did not file any completion reports for Alpine High until approximately mid-2018, and even then CW 24 had difficulty accessing data necessary to file completion reports.

---

[27]    According to the operative complaint in the Securities Action, "CW 23" was employed by the Company from July 2017 until March 2019 as a Senior Oil and Gas Regulatory Analyst stationed in San Antonio. CW 23 was allegedly responsible for Alpine High regulatory reporting, including submitting Alpine High completion reports to the RRC, and reported to Regulatory Supervisor, Belinda Wolf ("Ms. Wolf"). Prior to joining APA, it is alleged that CW 23, Ms. Wolf, and their colleague James Roger Arbuckle all worked at the RRC.

[28]    According to the operative complaint in the Securities Action, "CW 24" was employed by the Company from late 2016 until the first quarter of 2020 as a Regulatory Technician. CW 24 is alleged to have worked in San Antonio with responsibility for, among other things, filing drilling permits and completion reports with the RRC. CW 24 allegedly reported to Regulatory Manager Randy Earley ("Mr. Earley") and later to Region Health, Safety, Environmental and Regulatory Manager, Marcus Bruton.

204.     The operative complaint in the Securities Action alleges that in addition to not receiving timely and accurate well completion data, CW 23 has described how it was always a challenge for the regulatory team to get production data for Alpine High.  Per CW 23's account, Mr. Earley, APA's former Regulatory Manager in San Antonio, who reported to VP of Operations Mr. Behl, was repeatedly stymied from getting production data from Alpine High's reservoir engineers.  CW 23 is quoted as stating that "It was an ongoing cycle where we could not get the information" and as a result of the lack of production data from the Reservoir Group, the Regulatory Team "*couldn't connect the dots*." CW 23 is also alleged to have recalled that CW 23's boss would talk to the Reservoir Group about the lack of data, "*but we never got a concrete response*."

205.     In the operative Securities Action complaint, CW 23 is alleged to have described how the regulatory team was forced to pull data from several different places and that data was often missing, including critical information concerning gas/oil ratios which, as discussed above, directly impacted how production data was reported to the RRC. CW 23 is quoted as commenting that "[s]ome of the data we received was questionable" and having pointed to the gas/oil ratio specifically as "*a huge point of contention*." CW 23 allegedly confirmed that "*some of the wells were labeled as oil when the ratio was showing that they were gas wells*." CW 23 also allegedly described a variety of factors indicating that wells labelled as oil by Alpine High's production team were, in fact, gas wells. For example, per the account of CW 23, the production team's interpretation of first flow was, in certain circumstances, diametrically opposed to that of the regulatory team. In this regard, CW 23 is alleged to have commented that CW 23's boss, who "had 30 years of experience" in the industry, met with the production team and provided them with evidence that their first flow dates were incorrect.

206.     After years of providing a dramatically false impression of Alpine High in public statements to stockholders, beginning about August 2018 and continuing through March 2020, the Individual Defendants began causing the Company to file some long-overdue completion reports. In addition, under the Individual Defendants' direction, the Company began reclassifying (or newly classifying) dozens of wells that were previously reported as "oil" wells to "gas" wells. For example, on August 21, 2018, APA was ordered by the RRC to reclassify four wells as gas wells -- all of which had been highlighted by the Individual Defendants at the Barclays Conference as "strong" or "successful" oil wells -- due to overproduction of gas beyond allowable levels, reflecting the shell game of misleading, improper, and severely delayed Company filings made during the Relevant Period, which left stockholders hopelessly unable to glean even basic information about production at Alpine High.  Stockholders, just like the professionals at APA who were kept from internal Alpine High data, were thus entirely dependent on the Individual Defendants' own announcements and statements in order to learn information about production, drilling activities and progress at Alpine High.

207.     In sum, the systematic flouting of basic RRC reporting requirements caused by the Individual Defendants prevented stockholders from conducting due diligence using public sources and was a key part of the Individual Defendants' ability to perpetuate their scheme.

## VII.   THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

208.     Throughout the Relevant Period, the Individual Defendants made a series of materially false and misleading statements to stockholders, and/or caused the Company to make such false and misleading statements, which presented an unrealistically positive assessment of the Company's prospects at Alpine High and thus its business prospects as a whole.

A.      **The September 7, 2016 Alpine High Announcement and Other Statements in September 2016**

209.    On September 7, 2016, the Individual Defendants caused the Company to issue a press release entitled, "Apache Corporation Discovers Significant New Resource Play in Southern Delaware Basin." In the press release, the Individual Defendants announced that "*after more than two years of extensive geologic and geophysical work*, methodical acreage accumulation, and strategic testing and delineation drilling, *the company can confirm the discovery of a significant new resource play, the 'Alpine High.'*" The press release touted Alpine High as an immense oil and wet gas field, holding an estimated "*3 billion barrels of oil*" and "*75 trillion cubic feet (Tcf) of rich gas" in the Barnett and Woodford formations alone, as well as "significant oil potential in the shallower Pennsylvanian, Bone Springs and Wolfcamp formations*." The Individual Defendants claimed there was a huge number of profitable future drilling sites, stating "*2,000 to more than 3,000 future drilling locations have been identified in the Woodford and Barnett formations alone*." Defendant Christmann hailed the Alpine High discovery as "*an immense resource that we believe will deliver significant value for our shareholders for many years*." Defendant Christmann further proclaimed that "[w]e are incredibly excited about the Alpine High play and its *large inventory of repeatable, high-value drilling opportunities*."

210.    That same day, the Company's presentation took place at the Barclays Conference, during which the Individual Defendants touted Alpine High as a "*world-class resource play*." Defendant Christmann again underscored that, for just two of Alpine High's five formations, the "conservative" estimates for the field's resources were massive, stating: "*The estimated resource in place for the Barnett and Woodford only, and this is a conservative number, is 75 Tcf of really rich gas, over 1,300 BTU and 3 billion barrels of oil*." Defendant Christmann then compared Alpine High to some of the largest and most profitable shale plays in

U.S. history: "***I've said it's world class.  This would compare it versus three – what other people would view as world-class resources, the Woodford SCOOP, the Marcellus, and the Eagle Ford…It stacks up as well as anything***."  Defendant Christmann stated that even "just one landing zone" (*i.e.*, layer of rock) would "***give you 2,000 to 3,000 plus [drilling] locations***."

211.    The Individual Defendants also caused repeated similar claims to be made in slides accompanying the Barclays Conference presentation, including an "Alpine High Key Highlights" slide that touted "***Estimated resource in place (Barnett and Woodford only): 75 Tcf of rich gas (~1,300 BTU) and 3 billion barrels of oil***," "***2,000-3,000+ Locations***," and "***low cost, highly economic locations in the wet gas play***."

212.    During the Barclays Conference, defendant Christmann further asserted that in addition to oil, Alpine High was a "highly economic" wet gas play as well, which would differentiate the play from its competition: "***What's going to make this play really stand out is the quality, the thickness and the cost structure, a very, very highly economic wet gas play***." Further, defendant Christmann represented to stockholders that the play would produce highly profitable results in oil and wet gas even at very low commodity prices. Indeed, defendant Christmann explained that, after factoring all possible costs ("fully burdened" economics), "***the rates of return…go off the charts***" -- and that even at $40/barrel oil and $2.50 gas, "***the returns are still significantly high***," which "***just gets back to how prolific [Alpine High] is***." Defendant Christmann stated that these "tremendous economics" made for a play where there was a "***very wet gas resource where you virtually get the [dry] gas for free***."

213.    The Individual Defendants' September 7, 2016 statements set forth above were materially false or misleading when made. *First*, as alleged herein, by the time of these statements, it had already ***been concluded not once but twice*** at the Company that Alpine High ***did not*** contain

meaningful quantities of economically recoverable oil (let alone billions of barrels), and that it was primarily an uneconomical *dry* gas play as opposed to more valuable "rich" (wet) gas. Indeed, the respective leaders of two different APA exploration teams who had each undertaken two separate, extensive explorations in the Alpine High region in 2012 and 2014 independently concluded that Alpine High was "all gas," "wasn't an oil play," "too gassy," and with "not enough yield," and *defendant Christmann himself rejected the play* as "too gassy." Further, as alleged herein, during the subsequent runup to the announcement of Alpine High during 2015 and 2016, Mr. Keenan's team repeatedly and expressly warned defendant Christmann *a third time* that the Company lacked the data to back up the Individual Defendants' planned announcement, and would need at least nine more months of data. Moreover, as alleged herein, the internal 2019 Project Neptune review of Alpine High confirmed that Alpine High's data had showed *from the outset* that essentially all of the wells drilled since 2016 severely underperformed the Individual Defendants' publicly announced descriptions, such that only a *small fraction* of the thousands of drilling locations the Individual Defendants publicly hyped were even *theoretically* viable, and even then only if highly unlikely pricing and contractual scenarios were assumed.

214.   *Second*, as alleged herein and in the operative complaint in the Securities Action, the Securities Action lead plaintiffs' forensic analysis shows that, from September 2016 through March 2020, the total amount of oil produced by the Company across the entire Alpine High play (*i.e.*, in all five of its formations) amounted to only approximately 2.9 million barrels -- *i.e.*, *less than 1%* of the 3 billion barrels of oil that the Individual Defendants told stockholders were "in place" in the Woodford and Barnett formations alone, and produced less than 1.8 million barrels of oil over that same timeframe, about *0.4%* of the amount the Individual Defendants told stockholders that they "conservative[ly]" expected to recover from those two formations. Indeed,

per the operative complaint in the sustained Securities Action, the lead plaintiffs' forensic analysis shows that **over 25%** of the total wells drilled at Alpine High were "dry holes" (unproductive wells), an extraordinarily high and almost unheard-of rate for any successful oil or wet gas play.

215.   Defendant Christmann further told stockholders during the Barclays Conference that Alpine High's reservoirs were "predictable" and "consisten[t]" across the entire play -- in other words, that stockholders should expect that Alpine High's early, yet misrepresented, well results would be predictive of the play's overall results. Specifically, defendant Christmann said that Alpine High had "***reservoir consistency, continuity, which is going to lead to very repeatable and predictable drilling results and targets***." These statements were materially false or misleading when made because: (i) extensive prior Company explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading defendant Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn defendant Christmann that there was insufficient data to back up the planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas the Individual Defendants claimed; and (iii) the internal 2019 Project Neptune investigation confirmed that the Individual Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic (or "repeatable and predictable") drilling locations.

216.   To reassure stockholders that Alpine High was indeed viable even though many of APA's competitors had written off the area as commercially unviable, defendant Christmann insisted that the play had been uncovered through intensive, "complex" and proprietary technical

work:

> [I]t is just geologically complex, and it took some unraveling and a lot of good unconventional technical work. You had to test perceptions. The perception was that this was uplifted and complex. The reality is it's a stable Paleo high, and ***it was always in the oil and wet gas window. It's not dry gas. So it's just a fantastic story, and it took a very unique team doing some very detailed work over a long time to uncover this prize.***

217.     Similarly, in response to an analyst's question asking, "How much do your peers know about this play?", defendant Christmann further insisted that "very detailed work" had enabled the Company to discover a "hidden diamond in the rough" which competitors had simply missed and knew "very little" about, stating that competitors "***know very little…the perception was wrong about this area geologically. And it took some very, very strong individuals working very detailed work over a couple of years to unravel what is a hidden diamond in the rough***." The Individual Defendants also caused similar statements to be included in an accompanying slide titled "Apache's Differentiated View" which claimed that the "Perception" in the industry was that Alpine High was "Dry Gas," whereas the "Reality" was "Wet Gas & Oil."

218.     The statements were materially false or misleading because in reality a "unique team" and extensive technical work had not revealed that Alpine High was a "prize" or a "hidden diamond in the rough" -- instead, the exact opposite was true. Specifically, by the time of these statements, the respective leaders of two different APA exploration teams who had undertaken two separate, extensive explorations of the Alpine High region each confirmed that they had independently concluded Alpine High was "all gas," "wasn't an oil play," "too gassy," and with "not enough yield," and ***defendant Christmann himself rejected the play*** as "too gassy." Similarly, in the months leading up to the announcement of Alpine High during 2015 and 2016, Mr. Keenan's "unique team" repeatedly and expressly warned defendant Christmann there was a lack of data to back up the planned announcement, and at least nine more months of data would

be needed to determine whether Alpine High was economically viable. Moreover, the internal 2019 Project Neptune review of Alpine High confirmed that Alpine High's data had showed ***from the outset*** that essentially all the wells drilled since 2016 severely underperformed the Individual Defendants' publicly announced descriptions, and that as a result it was an extraordinarily dubious proposition for Alpine High to ever be economically viable.

219.     In the Company's September 7, 2016 presentation at the Barclays Conference, the Individual Defendants also highlighted purported "***Strong Well Results***" and "***Successful Oil Tests***" from Alpine High that supposedly proved the Individual Defendants' claims about the Woodford and Barnett formations. Included on the "Strong Well Results" slide was the Weissmies 1H, for which the slide cited 24-hour initial production ("IP") rates of 281 barrels of oil per day and 7.1 million cubic feet of gas, and the Ortler 1H, for which the slide reported 24-hour IP rates of 1.7 million cubic feet of gas. The "Successful Oil Tests" slide featured two wells: the Mont Blanc 2H, for which the slide reported an IP rate of 854 barrels of oil per day, and the Redwood 1P, for which the slide reported a rate of 700 barrels of oil per day. Moreover, defendant Christmann highlighted during his presentation that the Redwood 1P "flowed for over five days" during drilling, and that its production was "flat for over ten days" -- *i.e.*, produced at a consistent rate for that entire time period.

220.     These statements were also materially false or misleading when made. *First*, as alleged herein, rather than exemplars of "Strong Well Results" in the Woodford and Barnett formations, by the time of the September 2016 presentation at the Barclays Conference, the Weissmies 1H's production had immediately declined to less than half of its initial production, averaging 113 barrels per day of oil for the rest of June, and by August 2016 -- the month before the Individual Defendants touted the well as "strong" -- it had fallen to a miniscule 54 barrels a

day. The Weissmies 1H's gas production had similarly already sharply fallen off by more than half of its initial production by this time, dropping from 7.1 million cubic feet to just 3 million per day by August 2016. Similarly, by August 2016, the Ortler 1H had begun to average just 774,000 cubic feet of gas per day, less than half of the 1.7 million cubic feet the Individual Defendants had touted. Second, as alleged herein, rather than being an exemplar of a "Successful Oil Test[]," by August 2016, production at the Mont Blanc 2H had already declined by *more than 53%* to just 398 barrels per day, and was averaging no more than 206 barrels per day by September 2016, a decline of *more than 75%*. And the Redwood 1P was even worse, as following its initial test period reported at the Barclays Conference, the well *never produced any further oil*. Indeed, as alleged in the Securities Action, CW 9, the drilling engineer who drilled the Redwood 1P well, said that it produced 900 barrels of oil initially, and then stopped producing any oil within a few days. CW 4's account in the Securities Action describes the public highlighting of initial successful well results as tantamount to a "Ponzi scheme." And, as CW 14 is quoted in the Securities Action, the information that was "shared at Barclays was not consistent with production results at the time," because a number of the wells the Individual Defendants highlighted during the Barclays Conference as high producers were in truth "bone dry."

221.    On September 21, 2016, the Individual Defendants caused the Company to give a presentation at the Johnson Rice Energy Conference, during which slides substantially identical to the "Alpine High Key Highlights" and "Apache's Differentiated View" slides described above from the Barclays Conference were presented. These statements were materially false or misleading when made for the same reasons the statements from the Barclays Conference presentation slides were materially false and misleading, as alleged herein.

222.    Additionally, the September 21, 2016 Johnson Rice Energy Conference

presentation contained slides identical to those from the September 7, 2016 Barclays Conference presentation concerning the "Successful Oil Tests" -- the Redwood 1P and Mont Blanc 2H -- and "Strong Well Results" including the Weissmies 1H and Ortler 1H, as described herein. These statements were materially false or misleading when made for the same reasons the statements from the Barclays Conference presentation slides were materially false and misleading, as alleged herein.

223.    On September 28, 2016, *Forbes* published an article titled "Apache Corp. Represents The Thorn That America's Oil Frackers Have Stuck In The Side Of OPEC." The *Forbes* article noted that "Christmann says the field, which they named Alpine High, contains some of the cheapest oil and gas to produce not just in the U.S., but in the world, economic to drill at prices as low as $40 a barrel," and quoted defendant Christmann as saying that "***Alpine High will be very difficult to compete with on an economic basis***." Defendant Christmann's September 28, 2016 statements were materially false or misleading when made for the same reasons the Individual Defendants' September 7, 2016 statements set forth above were materially false and misleading.

**B.     November 2016 Statements, Including the Announcement of the Company's Third Quarter 2016 Financial Results**

224.    On November 3, 2016, during a conference call with stockholders and analysts to discuss the Company's third quarter 2016 earnings, defendant Christmann highlighted that Alpine High was "***an immense resource and a transformational discovery for Apache***" that would "***drive incremental growth and returns for years to come***," and that "***[t]he Alpine High is an immense resource and a transformation discovery for Apache***." Defendant Christmann provided stockholders with a detailed explanation of the "5 distinct target formations" that comprised Alpine High, stating "***all of which, we believe, will be highly economic***." In reference to the Bone Springs

and Wolfcamp formations, the Individual Defendants stated that "*[t]wo early tests have demonstrated that these formations are oil-productive and offer significant potential at Alpine High*." Defendant Christmann also hyped Alpine High's other formations to stockholders, stating that "*[u]nderlying the Bone Springs and Wolfcamp and unique to the Alpine High is a true resource play in the Pennsylvanian Barnett and Woodford formations*," which he characterized as "a world-class source rock sequence, up to 1,500 feet thick across our acreage position," adding that, "*[b]ased on our appraisal program to date, we anticipate this will become a very large resource play with attractive rates of return and breakeven economics*."

225.    Defendant Sullivan made similar statements and went even further, stating that "*[a]s expected in a resource play, Alpine High is becoming more predictable. Every well we've drilled has confirmed our model…We continue to see excellent production performance across this play*."

226.    The Individual Defendants' November 3, 2016 statements above were materially false or misleading when made for the same reasons their September 2016 statements set forth above were materially false and misleading.

227.    Moreover, while the Individual Defendants claimed during the November 3, 2016 earnings conference call that massive amounts of additional oil would be found in the play's other three formations, as alleged in the operative complaint in the sustained Securities Action, the lead plaintiffs' forensic analysis found that from September 2016 through March 2020, APA produced only approximately 1.1 million barrels of oil from the Wolfcamp formation, 2,500 barrels of oil from the Bone Spring formation, and zero barrels of oil from the Pennsylvanian formation -- miniscule amounts that did not come close to supporting any claim of profitability.

228.    On November 18, 2016, the Individual Defendants caused Apache to make a

presentation to stockholders at the Bank of America/Merrill Lynch Global Energy Conference. The presentation included slides substantially identical to the "Alpine High Key Highlights" and "Apache's Differentiated View" slides described above in connection with the Individual Defendants' false and misleading statements in September 2016.  The presentation also included the "Strong Well Results" and "Successful Oil Tests" slides described above in connection with the Individual Defendants' false and misleading statements in September 2016, which repeated the same initial production statistics regarding the wells therein, which included the Mont Blanc 2H, Redwood 1P, Weissmies 1H, and Ortler 1H.

229.    In addition to being false and misleading for all of the same reasons these same slides were false and misleading in September 2016, as alleged herein and in the operative complaint in the sustained Securities Action, the lead plaintiffs' forensic analysis based upon information misrepresented, concealed, and obscured by the Individual Defendants during the Relevant Period has revealed that, by the time of the November 18, 2016 presentation at the Bank of America/Merrill Lynch Global Energy Conference, the Weissmies 1H's oil and gas production had fallen off to *zero*, and the Ortler 1H's oil and gas production had fallen to insignificant amounts, producing a mere 84 barrels of oil for the entire month of October 2016, thus directly contradicting the Individual Defendants' representations to stockholders.

## C.    The January 2017 Presentation to Stockholders

230.    On January 5, 2017, the Individual Defendants caused the Company to publish a presentation to stockholders entitled "January Investor Presentation." This presentation contained the same materially false or misleading statements the Individual Defendants made during the September 7, 2016 presentation for the Barclays Conference, contained in the "Alpine High Key Highlights," and "Apache's Differentiated View" slides as alleged above. In the January 5, 2017 presentation to stockholders, the Individual Defendants also made substantially identical

claims to those alleged above regarding the initial production rates of four previously reported wells: the Redwood 1P, Mont Blanc 2H, Weissmies 1H, and Ortler 1H.  These statements were materially false and misleading for the same reasons the Individual Defendants' September 2016 and November 2016 statements above were false and misleading.

### D.      The February 2017 Credit Suisse Energy Summit

231.     On February 14, 2017, the Individual Defendants caused the Company to make a presentation at the Credit Suisse Energy Summit (the "Summit"). At the Summit, defendant Christmann asserted that it had been "proven" and "confirmed" by the Company that Alpine High was flush with wet gas and oil, stating as follows:

> ***So what have we confirmed?*** We have a very extensive play fairway, 60 miles. We have 5 geologic formations, each with multiple targets across a 5,000-foot column. ***We've now proven that we have a segregated hydrocarbon column anywhere from dry gas to oil and we have it across this whole area. So all we have to do is put the rock in the right window and you're going to get anywhere from dry gas to wet gas to oil***.

232.     Further, defendant Christmann again "confirmed" that Alpine High was "***a highly economic wet gas play***," and concluded his prepared remarks by emphasizing: "***Alpine High is just an enormous hydrocarbon system. And we're still just scratching the surface as we work through this. Like most major discoveries, it's getting bigger with more data, which is a big thing and a great thing. We have a highly economic wet gas play…now confirmed across the 55-mile fairway***."

233.     The Individual Defendants' February 14, 2017 statements during the Summit set forth above were materially false or misleading when made because: (i) extensive prior Company explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading defendant Christmann to reject it twice, and leading APA's San Antonio team to

expressly warn defendant Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas the Individual Defendants claimed; and (iii) the internal 2019 Project Neptune investigation confirmed that the Individual Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations. In reality, Alpine High was never "confirmed," "validated," or "proven" as a "highly economical" oil or wet gas play, nor was there any "incremental data" which showed the play was "getting larger." To the contrary, the only thing which was "confirmed" was that Alpine High was a non-viable dry gas play that would never be commercially successful.

234.    During the Summit, an analyst asked defendant Christmann to provide "just a bit of color on when you expect [Alpine High] to hit free cash flow, et cetera?" In response, defendant Christmann reiterated that the play would be economic and prolific in short order: "The nice thing about this…it doesn't take long with the economics on these wells for them to turn. ***And what I've said in the past is we're not talking hundreds of millions of cubic feet a day, but we're talking multiple b[illion]s ultimately as you move into the future years***," adding that "***we'll get there quickly***."

235.    Analysts also sought assurances during the Summit that Alpine High was really an oil play, with one analyst asking, "I think the market wants to see this as an oil play…talk through how much data you think you're going to need before you can talk about maybe some--". Before the analyst could even finish the question, defendant Christmann responded, "***[w]ell, you're going to have a gigantic wet gas field here, okay? We've proven that***," and further added, "***we will get to the oil and we believe there is a lot there, because it's in the system. We validated it.***

*We have a proven column and it's in the right window*."

236.     Defendant Christmann's responses to questions from analysts at the Summit on February 14, 2017 were materially false and misleading when made for the same reasons the Individual Defendants' other February 14, 2017 statements set forth above were false and misleading.  In addition, these statements were false and misleading because, as alleged in the operative complaint in the sustained Securities Action, the lead plaintiffs' forensic analysis based upon information concealed, misrepresented and obscured by the Individual Defendants during the Relevant Period further confirmed that, from September 2016 through March 2020, the total amount of oil produced by APA across the entire Alpine High play (*i.e.*, in all five of its formations) amounted to only approximately 2.9 million barrels -- *i.e.*, *less than 1%* of the 3 billion barrels of oil in place that the Individual Defendants told stockholders were "in place" in the Woodford and Barnett formations alone. Indeed, the operative complaint in the Securities Action alleges that the lead plaintiffs' forensic analysis showed that *over 25%* of the total wells drilled at Alpine High were "dry holes" (unproductive wells) -- an extraordinarily high and almost unheard-of rate for any successful oil or wet gas play.

237.     The slide presentation which the Individual Defendants caused to be included in the Company's presentation during the Summit also repeated the Individual Defendants' prior claims made in connection with the September 2016 Barclays Conference regarding the initial production statistics at four previously disclosed wells: the Weissmies 1H, the Ortler 1H, the Mont Blanc 2H, and the Redwood 1P. These statements were materially false or misleading when made for the same reasons the Individual Defendants' September 2016 statements discussed above were materially false and misleading.

### E.    February 2017 Statements Announcing the Company's Fourth Quarter 2016 and Full Year 2016 Financial Results

238.    On February 23, 2017, the Individual Defendants caused APA to issue a press release, which was filed with the SEC, announcing the Company's fourth quarter 2016 and full-year 2016 financial results. Defendant Christmann was quoted in the press release as stating: "*We [] discovered and announced the Alpine High, a sizeable new resource play in the Delaware Basin, which brings significant drilling inventory and puts Apache in one of the most exciting and competitive positions in the industry*."

239.    That same day, the Individual Defendants held a conference call with stockholder and analysts to discuss the Company's financial performance in the fourth quarter of 2016 and full year 2016. During the call, in response to analysts' inquiries about "ultimate volumes over time" at Alpine High, defendant Christmann again emphasized the massive resource volumes the Individual Defendants touted for Alpine High, stating: "*we're not talking hundreds of millions of cubic feet of gas here a day, we're talking multiple Bcfs, a very rich gas, wet gas, NGLs, and we think there's going to be also a lot of oil to go with it*." Defendant Christmann further highlighted that Alpine High contained "3,000 confirmed locations" for wet gas, stating: "we gave you some location counts at Barclays. We've come back now and said *we've got a minimum of 3,000 confirmed locations in the wet gas window*," emphasizing that "*location count has increased significantly since last September*." Significantly, defendant Christmann reaffirmed that "*even in the lower commodity price environment, this play is going to be very economic*."

240.    Also on February 23, 2017, the Individual Defendants caused the Company to file its 2016 Annual Report on Form 10-K with the SEC (the "2016 10-K"). The 2016 10-K similarly claimed that the Individual Defendants now expected even more drilling locations at Alpine High than previously announced, stating, "*Apache now believes the drilling locations at Alpine High*

*will exceed the 2,000 to 3,000 previously announced*."

241.    The Individual Defendants' February 23, 2017 statements set forth above were materially false or misleading when made for the same reasons their September 2016, November 2016, January 2017, and February 14, 2017 statements set forth above were materially false and misleading.

### F.    The March 2017 Scotia Howard Weil Energy Conference

242.    On March 27, 2017, the Individual Defendants caused the Company to make a presentation at the Scotia Howard Weil 2017 Energy Conference, which included a slide entitled "What We Have Confirmed At Alpine High" which claimed it had been "confirmed" at APA that Alpine High was a "highly economic wet gas play with more than 3,000 locations," and that it had "excellent fully-burdened economics," *i.e.*, that it was profitable even when factoring in all infrastructure costs, including both drilling and transport costs.  These statements were materially false and misleading when made for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, and February 2017 statements set forth above were materially false and misleading.

### G.    May 2017 Statements Announcing the Company's First Quarter 2017 Financial Results

243.    On May 4, 2017, the Individual Defendants caused the Company to issue a press release, which was also filed with the SEC, announcing the Company's first quarter 2017 financial results. Defendant Christmann is quoted in the press release as stating: "***At Alpine High, testing and delineation have continued with strong results that reinforce our confidence in this world-class resource play***."

244.    Also on May 4, 2017, during a conference call with stockholders and analysts to discuss the Company's first quarter 2017 financial performance, defendant Christmann reiterated

the Individual Defendants' claims that test wells had "proven" the understanding of Alpine High as a "massive hydrocarbon resource," stating:

> *[t]he performance of our first batch of test wells at Alpine High was on par with or better than longer-lateral, fully optimized wells in analogous shale resource plays, such as the SCOOP and the Marcellus*…Since our original announcement, we have continued to delineate the play. *The test wells drilled to date have proven much of what we anticipated for Alpine High*.

245.     Defendant Christmann further asserted that "our progress since the initial announcement, 8 months ago, has been exceptional. *To date, we have confirmed a highly economic wet gas play with a minimum of 3,000 locations. The economics of the wet gas portion of Alpine High are greatly enhanced by its oil content and the high-quality NGLs demonstrated in many of our test wells to date*." Defendant Christmann also reiterated that the test wells the Individual Defendants had previously announced had only "confirmed" the Individual Defendants' bold claims: "When we announced Alpine High, *we released data on nine test wells. The results of these wells, coupled with the geologic and reservoir evaluation work completed at that time, confirmed a world-class resource with an estimated 75 Tcf of gas and 3 billion barrels of oil in place in the Woodford and Barnett formations alone*."

246.     Defendant Sullivan similarly touted the results from test wells at Alpine, stating that "*[t]he result[s] we see in our test wells at Alpine High continue to give us confidence that this will be one of the lowest cost wet gas plays in North America*."

247.     The Individual Defendants' May 4, 2017 statements discussed above were materially false and misleading when made for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, and March 2017 statements set forth above were materially false and misleading.

248.     Moreover, contrary to the Individual Defendants' assertions that "[t]he results of [their initial test] wells, coupled with the geologic and reservoir evaluation work completed at that

time" had "confirmed" their claims about the recoverable oil and gas at Alpine High, several of

those initial test wells had already plummeted in production by the time the Individual Defendants

touted them, including the Redwood 1P, Mont Blanc 2H, Weissmies 1H, and Ortler 1H, as set

forth herein.

249.    During the May 4, 2017 earnings conference call, the Individual Defendants also

reported findings from three new wells, two of which were the Chinook 101AH and Blackhawk

5H. Defendant Christmann claimed that the Chinook 101AH and Blackhawk 5H had "achieved

***higher 24-hour oil I[nitial] P[roduction] [rates] and higher oil cuts than any of the wells***

***drilled***," and stated that this "***further validates our geologic and thermal maturity models, which***

***predicted that the source rock would produce more oil and higher BTU gas at shallower depths***."

Defendant Sullivan similarly touted these wells, stating that the Chinook 101AH well had

"produced at a peak 24-hour rate of approximately . . . 620 barrels of oil," calling it "an excellent

result." Defendant Sullivan further highlighted that the Blackhawk 5H had "produced at a peak

24-hour rate of 742 barrels of oil."

250.    Also on May 4, 2017, the Individual Defendants caused the Company to release

stockholder presentation slides to accompany the earnings conference call.  An entire slide in the

presentation was devoted to the Blackhawk 5H, which purportedly had the "Highest Oil Yield To

Date in Barnett" with a 24-hour initial production rate of 742 barrels per day, while another slide

was devoted to the Chinook 101AH, which purportedly had the "[h]ighest oil yield to date for a

Woodford target," with 24-hour initial oil production rate of 620 barrels per day.

251.    The Individual Defendants' May 4, 2017 statements about the Blackhawk 5H and

Chinook 101AH wells were materially false or misleading when made because, as alleged herein,

by the time the Individual Defendants made these statements, the Blackhawk 5H's oil production

had already fallen sharply throughout April 2017, averaging just 147 barrels per month, and had fallen to zero by the time the Individual Defendants touted its "oil yield" in May 2017. Similarly, by April 2017, the Chinook 101AH was averaging just 194 barrels of oil per day and was producing no oil by the time the Individual Defendants touted it in May 2017.

252.    On May 5, 2017, the Individual Defendants caused the Company to file its Quarterly Report on SEC Form 10-Q for the first quarter of 2017 (the "1Q 2017 10-Q"). The 1Q 2017 10-Q reiterated the Individual Defendants' May 4, 2017 claims about the Blackhawk 5H and Chinook 101AH wells set forth above, and represented that the "drilling test results at Alpine High continue to validate the low-cost, wet gas value of the play." The Individual Defendants' statements about the Blackhawk 5H and Chinook 101AH were materially false or misleading when made for the same reasons their May 4, 2017 statements were materially false and misleading, and the Individual Defendants' statements about "drilling test results" continuing to "validate" the economics of the wet gas play were materially false or misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, and March 2017 statements set forth above were materially false and misleading.

253.    On May 11, 2017, the Company's Annual Shareholder Meeting was held, during which defendant Christmann highlighted the Company's purportedly "significant discovery at Alpine High," stating: "***It's a field that will deliver incredible value to Apache and its shareholders for many, many years to come***." Defendant Christmann further stated that "***Alpine High brings to us decades of inventory.  It puts Apache in one of the most exciting and competitive positions in the industry. Since our announcement last September, we have continued testing and delineation. We continue to see strong results that reinforce our confidence in this world-class resource play***."   The accompanying slides presented to

107

stockholders also again touted "**> 3,000 drilling locations**" in the Alpine High.

254.     The Individual Defendants' statements alleged above during the Company's May 11, 2017 Annual Shareholder Meeting were materially false and misleading when made for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 4, 2017, and May 5, 2017 statements set forth above were materially false and misleading.

255.     On May 15, 2017, the Individual Defendants caused the Company to make a presentation at a conference sponsored by Societe Generale. The presentation included slides identical to the ones presented on May 4, 2017 alleged above concerning production statistics for the Chinook 101AH and Blackhawk 5H. The Individual Defendants also repeated the slides presented on May 4, 2017 alleged above concerning wells including the Chinook 101AH and Blackhawk 5H in connection with a May 23, 2017 presentation at the UBS Global Oil and Gas Conference.

256.     The Individual Defendants' May 15, 2017 and May 23, 2017 statements concerning the Chinook 101AH and Blackhawk 5H were materially false or misleading when made for the same reasons their May 4, 2017 statements were materially false and misleading -- namely, that the oil production of these wells had already plummeted by the time the Individual Defendants touted them.

### H.     August 2017 Statements Announcing the Company's Second Quarter 2017 Financial Results

257.     On August 3, 2017, the Individual Defendants caused the Company to issue a press release, which was also filed with the SEC, announcing the Company's second quarter 2017 financial results. In the press release, the Individual Defendants noted that APA had "[c]ompleted its first appraisal wells in the oil window of the Wolfcamp formation at Alpine High, **providing**

*further confirmation of an oil play and supporting hundreds of additional drilling locations*."

258.     That same day, during a conference call with stockholders and analysts to discuss the Company's performance for the second quarter of 2017, defendant Christmann highlighted Alpine High, stating "*we continue to be very confident in our more than 3,000 wet gas well location count, which remains highly economic at current or even lower prices*." During the conference call, defendant Christmann also touted "*hundreds of locations in the Wolfcamp so that will be oil locations*."

259.     The Individual Defendants' August 3, 2017 statements alleged above were materially false and misleading when made for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, and May 2017 statements set forth above were materially false and misleading.

260.     Moreover, while the Individual Defendants specifically touted the Wolfcamp formation as having "hundreds" of oil locations, as alleged in the operative complaint in the sustained Securities Action, the lead plaintiffs' forensic analysis showed that APA produced only approximately 1.1 million barrels of oil from the Wolfcamp formation -- a meager amount that did not come close to supporting the Individual Defendants' claims. Moreover, when oil and gas prices did go "lower" in 2019 and 2020, contrary to the Individual Defendants' claims that the play would remain "highly economic," the Company was forced to shut down all further drilling and take a $3 billion write-down.

## I.      The October 2017 Alpine High Update

261.     On October 9, 2017, the Individual Defendants caused the Company to post a pre-recorded update call and web presentation to provide stockholders with the outlook for APA in 2017 and 2018 and an update of APA's progress at Alpine High. During the call, defendant Christmann highlighted the economic prospects at Alpine High, stating: "*We have an extremely*

*large wet gas play with over 3,500 highly economic locations,*" adding that "*The economics of this play are driven by the low cost and the tremendous volumes of oil and NGLs*."

262.     Defendant Sullivan similarly stated that the Alpine High was "*three separate hydrocarbon plays: an extremely large and highly economic wet gas play, a smaller but also economically compelling dry gas play, and an emerging oil play*." Defendant Sullivan also specifically claimed that there were "*455 million barrels*" of recoverable oil across the entire Alpine High play: "The weighted average typical Alpine High wet gas well is estimated to produce 13.3 Bcfe of hydrocarbons, of which 6% is oil. *The recoverable oil volume is 130,000 barrels per well and 455 million barrels of oil for the entire project based on 3,500 wet gas locations. This would yield a 13.4 [%] recovery factor on the 3 billion barrels of stated original oil in place*." Defendant Sullivan also again touted Alpine High's numerous oil drilling locations, stating that, in the Wolfcamp and Bone Springs formations, he could "*safely say that we have at least 500 economic [oil] well locations at this time*." Additionally, the slides accompanying the call repeatedly touted a newly increased "Current Location Count of 5,000+."

263.     The Individual Defendants' October 9, 2017 statements set forth above were materially false and misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 2017, and August 2017 statements set forth above were materially false and misleading, including that the internal 2019 Project Neptune investigation confirmed that the Individual Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations -- let alone the newly increased count of more than 5,000 locations that the Individual Defendants now claimed. Moreover, while the Individual Defendants specifically touted the purported hundreds of oil locations in the Wolfcamp and Bone Springs formations in

particular, as alleged in the operative complaint in the sustained Securities Action, the lead plaintiffs' forensic analysis showed that APA produced only approximately 1.1 million barrels of oil from the Wolfcamp formation, and a mere 2,500 barrels of oil from the Bone Springs formations -- meager amounts that did not come close to supporting the numbers the Individual Defendants were touting. Indeed, rather than having hundreds of viable oil drilling locations across those formations, as the Securities Action alleges the lead plaintiffs' forensic analysis confirmed, in truth, Alpine High consisted of an unprecedented number of "dry holes" that produced ***no*** reported oil or gas whatsoever -- indeed, these "dry holes" amounted to ***over one quarter*** of the total wells across the play.

264.    On the October 9, 2017 call, the Individual Defendants also introduced new, highly specific claims about the economics of a "typical well" in the "wet gas play" at Alpine High, and how highly profitable this "typical well" (also called a "midrange well") would be, as these wells would produce anywhere from 9 BCFE to 15 BCFE of hydrocarbons, including substantial amounts of both wet gas and oil.

265.    The Individual Defendants' "typical well" claims were materially false or misleading when made. As alleged in the operative complaint in the sustained Securities Action, the lead plaintiffs' forensic analysis based upon information intentionally obscured by the Individual Defendants from September 2016 through March 2020, a whopping 70% of all wells drilled at Alpine High fell ***below the low end*** of what a "typical well" at Alpine High was supposed to produce.

J.     **November 2017 Statements Announcing the Company's Third Quarter 2017 Results**

266.    On November 2, 2017, during a conference call with stockholders and analysts to discuss the Company's financial performance for the third quarter 2017, an analyst asked "how far

out do you see it when Alpine High [] become[s] self-sustaining?" In response, defendant Christmann insisted that it would be "less than two years" before cash flow at the play would be equal to or exceed costs: "*if we just take a single rig at Alpine High, it's less than 2 years before it's self-funding…And that's fully burdened with infrastructure and midstream spend*."

267.    Defendant Christmann's November 2, 2017 statements set forth above were materially false and misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 2017, August 2017, and October 2017 statements set forth above were materially false and misleading.

**K.    February 2018 and March 2018 Statements, Including the Announcement of the Company's Fourth Quarter 2017 and Full Year 2017 Results**

268.    On February 22, 2018, during a conference call with stockholders and analysts to discuss the Company's financial performance for the fourth quarter and full-year 2017, defendant Christmann reiterated his bold claims about Alpine High and its transformational nature for APA, stating: "*[A]t Alpine High, we are building out a world-class resource play that will change the course of Apache*. The expanse of the opportunity in terms of acreage and hydrocarbon column will drive capital investment, and very soon, *free cash flow for decades to come*." Defendant Christmann touted the Company's expected near future production and growth rate at Alpine High, stating that "*[b]y 2020, average daily production is expected to be between 160,000 and 180,000 BOEs a day, which represents a compound annual growth rate in excess of 150%*."

269.    Defendant Christmann's February 22, 2018 statements set forth in the preceding paragraph were materially false and misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 2017, August 2017, October 2017, and November 2017 statements set forth above were materially false and misleading, including that the internal 2019 Project Neptune investigation confirmed that

the Individual Defendants never had any basis for their claims about the "economics" of Alpine High -- let alone "free cash flow for decades to come" – nor for their claims of thousands of economic drilling locations.

270.    In light of flagging oil and gas prices at the time, during the February 22, 2018 earnings conference call, the Individual Defendants again reassured stockholders that Alpine High would be profitable and successful even at extremely low commodity prices. For example, defendant Christmann stated that "[i]n the context of today's commodity price, we acknowledge that funding a wet gas play is a bit contrarian, but *it is justified by the long-term scale and return potential even at lower gas prices*." Similarly, in response to an analyst's question seeking further reassurances as to whether APA had "looked at…some of the downside cases" involving low gas prices, defendant Christmann unequivocally assured stockholders that there was nothing to worry about, because Alpine High "*is going to really hum below $2 [prices] on the gas side*."  Defendant Christmann further assured stockholders that planned infrastructure spending at Alpine High was evidence that the Company stood behind its claims about the play: "*we've run many cases on the downside. We would not be making this type of investment on the midstream or the upstream side if we thought there was a sensitivity that was close to anything that would come into making it not work under very, very low gas and NGL and oil prices*."

271.    Defendant Christmann's February 22, 2018 statements set forth above were false and misleading because, as the Individual Defendants knew from the outset, and as alleged in the operative complaint in the Securities Action based on Project Neptune and the lead plaintiffs' forensic analysis, Alpine High was never "*justified by the long-term scale and return potential even at lower gas prices*" -- the opposite was true. Indeed, the Individual Defendants' own 2019 Project Neptune investigation of Alpine High confirmed that Alpine High's data had showed *from*

*the outset* that essentially all of the wells drilled since 2016 severely underperformed the Individual Defendants' publicly announced descriptions, and that as a result it was an extraordinarily dubious proposition for Alpine High to ever be economically viable under any energy pricing scenarios.  According to the operative, sustained Securities Action complaint, the lead plaintiffs' forensic analysis confirmed that from September 2016 through March 2020, the total amount of oil produced across the entire Alpine High field amounted to ***less than 1%*** of the 3 billion barrels of oil in place that the Individual Defendants told stockholders were "in place" in the Woodford and Barnett formations alone. Similarly, during the same timeframe, the total amount of gas produced by APA across Alpine High -- inclusive of both "wet gas" and "dry gas" -- amounted to a mere 0.3 Tcf of the 75 Tcf (or a mere ***0.4%***) of the "really rich gas" that the Individual Defendants told stockholders was in place at the Barnett and Woodford formations alone. Per the operative complaint in the Securities Action, the lead plaintiffs' forensic analysis further showed that ***over 25%*** of the total wells drilled at Alpine High were "dry holes" (unproductive wells) -- an extraordinarily high and almost unheard-of rate for any successful oil or wet gas play. Thus, while the Individual Defendants claimed Alpine High would thrive under "very, very low" commodity prices, in fact all new oil and gas exploration at the site was shut down by APA in early 2020 just when those same prices were reached.

272.    On February 23, 2018, the Individual Defendants caused the Company to file with the SEC its 2017 Annual Report on Form 10-K (the "2017 Form 10-K"). The 2017 Form 10-K touted Alpine High, stating that "***Apache has identified over 3,500 economic drilling locations in a wet gas play and over 1,000 locations in a dry gas play at Alpine High.*** The Company is also working to delineate ***an emerging oil play at Alpine High, with at least 500 locations already identified***."   The Form 10-K also stated that "Combined with multi-well pad drilling and revenue

uplift expected from oil and NGLs present in the wet gas play, ***Alpine High is anticipated to generate strong cash margins and a competitive recycle ratio [a measure of profitability per unit of oil or gas] when compared to other Permian operations***."

273.     On February 26, 2018, during the DUG Executive Conference, the Individual Defendants again caused APA to tout its purported "***5,000+ locations identified to date***," "highly economic wet gas play," and "proven oil upside" at Alpine High. An identical statement was also included in the Company's March/April 2018 presentation to stockholders on March 26, 2018.

274.     The Individual Defendants' February 26, 2018 and March 26, 2018 statements set forth in the preceding paragraph were materially false and misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 2017, August 2017, October 2017, and November 2017 statements set forth above were materially false and misleading.

**L.     May 2018 and June 2018 Statements, Including the Announcement of the Company's First Quarter 2018 Results**

275.     On May 3, 2018, during a conference call with stockholders and analysts to discuss the Company's financial performance in the first quarter of 2018, in light of the Individual Defendants' ongoing claims about Alpine High's massive oil potential, an analyst asked defendant Christmann for more specifics on when the oil play at Alpine High might finally materialize. Specifically, the analyst asked, "as you kind of think through the three-year plan, just trying to get a sense of whether or not you start to see more of a shift to oil. Is that more of a 2019 move at Alpine High? Or is it more 2020? What can you sort of say about the way you progress the development in terms of phase?" In response, defendant Christmann assured the analyst that "***there's a lot of proven oil, we've shown that***."

276.     During the same conference call, defendant Christmann not only reiterated the

Individual Defendants' impressive claim of 5,000+ identified drilling locations in Alpine High, but suggested Alpine High's location count would only grow further. Specifically, defendant Christmann stated that "in terms of drilling inventory, ***recall that we increased our risked location count to more than 5,000 locations at our October webcast update***," and noted that "[a]t the time, we characterized this as a conservative view" based on assumptions of "6 landing zones" and widely spaced wells. Defendant Christmann then stated that assumptions had been updated and would afford even more locations, stating that APA now had "confirmed hydrocarbon production from 11 distinct landing zones," and had seen good results from spacing wells closer together.   As such, defendant Christmann told stockholders that "***we are confident that as field delineation and development progresses, the risk[ed] location count [i.e., number of economic well sites] will increase substantially over the next several years***."

277.   On May 30, 2018, during the 34th Annual Bernstein Strategic Decisions Conference, the Individual Defendants caused the Company to reiterate that it had "***5,000+ locations identified to date***," a "highly economic wet gas play," and "proven oil upside," at Alpine High. The Individual Defendants subsequently caused the Company to include an identical statement in APA's June 2018 Marketing Presentation on June 5, 2018.

278.   The Individual Defendants' May 3, 2018, May 30, 2018, and June 5, 2018 statements set forth above were materially false and misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 2017, August 2017, October 2017, November 2017, February 2018, and March 2018 statements set forth above were materially false and misleading.

    **M.  August 2018 and September 2018 Statements, Including the <u>Announcement of the Company's Second Quarter 2018 Results</u>**

279.   On August 2, 2018, during a conference call with stockholders and analysts to

discuss the Company's performance for the second quarter of 2018, defendant Christmann again reiterated the Individual Defendants' claims of more than 5,000 viable drilling locations identified at Alpine High, stating that "in terms of drilling inventory, *our location count today stands at more than 5,000 wells*," and further told stockholders that this count would only increase, stating that "[l]anding zone and spacing tests thus far have *confirmed that this inventory count is conservative, based on original assumptions*."

280.    On August 8, 2018, during a conference call with stockholders and analysts, defendant Christmann also assured stockholders that "*Alpine High is on a tremendous growth path*," and reaffirmed the Individual Defendants' claims, made from the outset of the Relevant Period, that the play contained an "*estimated resource in place of 75 Tcf of gas and 3 billion barrels of oil in just 2 of the 5 proven hydrocarbon-bearing formations*," and "more than 5,000 identified drilling locations."

281.    On September 21, 2018, defendant Christmann gave an interview on "Bloomberg Commodities Edge", a television show broadcast on *Bloomberg TV*. During the interview, defendant Christmann discussed Alpine High, stating "*[t]here is a very large wet gas play and there will be a lot of rich gas but there will also be a lot of oil*," and that, "*[w]e've proven there's oil…a lot of rich gas*."

282.    Defendant Christmann's August 2, 2018, August 8, 2018, and September 21, 2018 statements set forth above were materially false and misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 2017, August 2017, October 2017, November 2017, February 2018, March 2018, May 2018, and June 2018 statements set forth above were materially false and misleading, including that the internal 2019 Project Neptune investigation confirmed that the Individual Defendants

never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations -- let alone their claim that their "confirmed" inventory of 5,000+ locations was a "conservative" estimate.

283.    Moreover, as alleged in the operative complaint in the sustained Securities Action, based on the lead plaintiffs' forensic analysis, the true production data from Alpine High's test wells -- which the Individual Defendants concealed from stockholders -- had made clear that the Individual Defendants had never "proven" that there was "a lot of oil" or "a lot of rich gas." Rather, the opposite was true, as this data had in fact only confirmed that the purported "successful" wells often plummeted in production shortly after being completed, and that Alpine High contained an unprecedented number of "dry holes" that produced *no* oil or gas whatsoever, amounting to over *one quarter* of the total wells at Alpine High.

## N.    February 2019 Statements Announcing the Company's Fourth Quarter 2018 and Full Year 2018 Results

284.    On February 28, 2019, the Individual Defendants caused the Company to file its Annual Report on Form 10-K for the full year 2018 (the "2018 10-K"). The 2018 10-K reiterated past claims about Alpine High location counts, stating that "***Apache has identified over 3,500 economic drilling locations in a wet gas play and over 1,000 locations in a dry gas play at Alpine High***." Additionally, the 2018 10-K highlighted the purported 96% "success rate" APA had experienced in drilling wells at Alpine High (meaning purportedly only 4% of wells had failed to produce meaningful quantities of oil or gas):

> During 2018, Apache drilled 100 wells at Alpine High with a ***96 percent success rate***, including many concept test wells drilled to verify its understanding of the play. Using data collected from strategic testing and delineation drilling, the Company is now optimizing wells drilled in Alpine High and focusing on economic rich gas development in 2019.

285.    The Individual Defendants' February 29, 2019 statements in the 2018 10-K set

forth above were materially false and misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 2017, August 2017, October 2017, November 2017, February 2018, March 2018, May 2018, June 2018, August 2018, and September 2018 statements set forth above were materially false and misleading.

286.   Moreover, the Individual Defendants' statement in the 2018 10-K concerning the Alpine High well "success rate" was materially false or misleading when made because, as alleged in the operative complaint in the sustained Securities Action based on the lead plaintiffs' forensic analysis, ***the 2018 well failure rate was, at a minimum, five times as high as the Individual Defendants claimed, i.e., at least 20%***. Specifically, it is alleged in the Securities Action that the lead Plaintiffs' investigation identified at least 19 wells drilled at Alpine High during 2018 that apparently produced ***no oil or gas whatsoever***.

### O.   May 2019 Statements, Including the Announcement of the Company's First Quarter 2019 Results

287.   On May 2, 2019, the Individual Defendants caused the Company to issue a press release, which was also filed with the SEC, announcing the Company's first quarter 2019 financial results. In spite of APA having just "temporarily" deferred gas production at Alpine High, in the press release, defendant Christmann now promised that Alpine High would be significantly increasing the Company's profitability in the near future, stating: "***In the Permian, we are poised to deliver attractive oil growth and a substantial cash flow uplift at Alpine High in the second half of the year***."

288.   Also on May 2, 2019, during a conference call with stockholders and analysts to discuss the Company's performance for the first quarter of 2019, defendant Christmann claimed that APA was having success by spacing its wells further out on certain well pads, meaning fewer

wells per pad. Based on these claims, an analyst asked whether drilling fewer wells per pad would change either the number of locations or the type curve for APA's wells. In response, defendant Christmann assured that the Company's drilling location count not only would not be reduced, but would likely increase, stating that "the last location count we put out was fall of '17, I think, October of '17. *And we're still in a position where location count would go up* given the assumptions we've got in place," and adding "*we're very confident in those numbers. And you're seeing strong performance*."

289.    On May 15, 2019, *Bloomberg* published a story titled, "Apache bets big on Permian gas liquids." A corporate spokesperson for APA was quoted in the article as stating "*Investors do not yet have an appreciation for the potential cash flow generation from the liquids play at Alpine High*," and that "[e]valuation of the oil play at Alpine High will continue to evolve, *but our view of 3 billion bbl of associated oil in place in just the Woodford and Barnett remains unchanged*."

290.    The Individual Defendants' May 2, 2019 and May 15, 2019 statements set forth above were materially false and misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 2017, August 2017, October 2017, November 2017, February 2018, March 2018, May 2018, June 2018, August 2018, September 2018, and February 2019 statements set forth above were materially false and misleading.

291.    Indeed, by the time the Individual Defendants made the above statements in May 2019, poor production from Alpine High wells and a lack of economic drilling locations had made abundantly clear that Alpine High would *never* deliver "attractive oil growth," or a "substantial cash flow uplift," let alone in the second half of 2019 -- in fact, a mere three months later, it was

disclosed that APA's daily energy production for Alpine High during the second quarter of 2019 had been an anemic 49,000 BOE per day -- far below the previous guidance of 85-90,000 BOE per day.

**P.     August 2019 Statements Announcing the Company's Second Quarter 2019 Results**

292.     On August 1, 2019, the Individual Defendants caused the Company to issue a press release, which was also filed with the SEC, announcing the Company's financial results for the second quarter of 2019. In the press release, the Individual Defendants noted that Alpine High's production had been disappointing, purportedly due to "delays" in bringing wells online, but assured stockholders that this was only a temporary situation and things would soon improve. Specifically, defendant Christmann was quoted as saying: "*We will catch up in the second half of 2019 and exit the year with oil production on plan and with strong momentum heading into 2020*."

293.     Also on August 1, 2019, during a conference call with stockholders and analysts to discuss the Company's performance for the second quarter of 2019, defendant Christmann continued to tout Alpine High, stating "*we like the asset. It's a large resource as we've proven. There is tremendous rich-gas potential*."

294.     The Individual Defendants' August 1, 2019 statements set forth above were materially false and misleading for the same reasons that the Individual Defendants' September 2016, November 2016, January 2017, February 2017, March 2017, May 2017, August 2017, October 2017, November 2017, February 2018, March 2018, May 2018, June 2018, August 2018, September 2018, February 2019, and August 2019 statements set forth above were materially false and misleading.

295.     Moreover, as alleged in the operative complaint in the sustained Securities Action,

by the time the Individual Defendants made their August 1, 2019 statements set forth above, Project Neptune had already been launched. Project Neptune, an internal investigation based on Alpine High's complete data from inception, confirmed that the Individual Defendants lacked any scientific or factual basis for their highly positive statements about Alpine High's recoverable oil and wet gas and the field's purportedly favorable economics. Indeed, by the time of the Individual Defendants' August 1, 2019 statements set forth above, consistently poor production from Alpine High wells had made abundantly clear that the reason oil volumes "trailed guidance" was not "timing delays," but rather that Alpine High was never a viable oil play and never had the potential to produce even a small fraction of the oil or wet gas the Individual Defendants publicly claimed to stockholders was recoverable. For the same reasons, by this time, the Individual Defendants knew it was not possible to "catch up in the second half of 2019 and exit the year with oil production on plan and with strong momentum heading into 2020." Tellingly, as a result of the Project Neptune investigation and the utter failure of Alpine High, Mr. Keenan was forced out of the Company a mere few months later, and all further drilling of the play was entirely shut down within six months.

## VIII.   THE INDIVIDUAL DEFENDANTS REAPED MILLIONS OF DOLLARS IN UNWARRANTED, OUTSIZED EXECUTIVE COMPENSATION AS A RESULT OF THEIR SCHEME

296.   The Individual Defendants were strongly incentivized to perpetrate their illicit scheme, together reaping more than $92 million in total executive compensation from 2016 through 2019, the vast majority of which was incentive-based and tied to "goals" that largely related either directly or indirectly to Alpine High. Under the executive compensation structures in place at APA for the Individual Defendants from 2016 through 2019, approximately **85%** of their total combined compensation during that timeframe, or ***$78 million*** -- including $50.1 million for defendant Christmann alone -- was tied to personal and corporate performance goals that were

largely linked, directly or indirectly, to Alpine High.

297.     Specifically, from 2016 through 2019: (a) defendant Christmann collected a total of approximately $57.3 million in executive compensation, $50.1 million of which was incentive-based; (b) defendant Riney collected a total of approximately $23.3 million in executive compensation, $19.4 million of which was incentive-based; and (c) defendant Sullivan collected a total of $11.7 million in executive compensation, $8.9 million of which was incentive-based.

298.     For example, in 2016, the year Alpine High was announced, 40% of the Individual Defendants' performance-based executive compensation was tied to qualitative "Strategic Goals." These goals were set in order "to continue to shift the focus of Apache's portfolio to North America." According to the Company's 2017 annual proxy statement, these strategic goals included "[a]chieve exploration success by finding and validating a commercial discovery with future development potential of 100 MBOE," (*i.e.*, Alpine High), and "[c]onsolidate, build, and expand our quality of prospects, which will deliver high rates of return on a fully burdened economic basis" (again seemingly referring to Alpine High), and were achieved through the "announce[ment] of Alpine High discovery," and "identified 4.9 Billion BOE of risked inventory, of which 3.2 Billion BOE is economic at $50 per barrel flat pricing," again referring to Alpine High.

299.     Similarly, in 2017, strategic goals from which executive compensation was derived included "[f]ormulate a robust development model for Alpine High to optimize long-term project economics while addressing product variation throughout the play, which requires: progressing geographic and stratigraphic delineation phase to an advanced stage identifying the areal extent of individual target intervals, conducting strategic testing to design pad and batch development operations, addressing leasehold retention requirements, and defining marketing

alternatives," as well as "Return Permian Basin oil production to a growth trajectory" (which the Individual Defendants aimed to do via Alpine High).

300.     The Individual Defendants again claimed that APA met these goals by achieving specific targets at Alpine High, resulting in millions of dollars in unwarranted, outsized incentive compensation to the Individual Defendants. 2018 "strategic goals" similarly included highly specific Alpine High-related goals, as well as goals relating to replacing production with production from "exploration and development adds" -- the primary example of which was Alpine High.

301.     Additionally, throughout this same 2016 to 2019 timeframe, a significant part of the Individual Defendants' executive compensation was based on APA's stock price return compared to peer companies, further strongly incentivizing the Individual Defendants to inflate the Company's stock price by hyping Alpine High.

## IX.     THE SUSTAINED SECURITIES ACTION

302.     As discussed herein, by March 17, 2020, following the February 26, 2020 announcement of the Company's *$3 billion write-down* and the March 12, 2020 announcement that APA's dividend would be slashed by *90%*, the Company's stock price had declined by *over 93%* from its Relevant Period high, wiping out *$24 billion* in stockholder value.

303.     Accordingly, APA investors subsequently initiated the Securities Action against APA and each of the Individual Defendants. The Securities Action was originally filed on February 23, 2021, and alleged that the Company and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act in a systemic fraud during the "Class Period" (defined as September 7, 2016 through March 13, 2020) via the Company's SEC filings and other public statements concerning Alpine High.

304.     Following the lead plaintiffs' filing of the operative consolidated complaint in the

Securities Action, the Company and the Individual Defendants filed a motion to dismiss the operative Securities Action complaint. As discussed herein, the operative Securities Action complaint was based in part on the accounts of 24 former employees of APA who possessed first-hand information regarding the Alpine High oilfield, senior management's knowledge of its shortcomings, and the financial fraud alleged in the Securities Action. The Individual Defendants' materially false and misleading statements alleged in the operative complaint in the Securities Action to have been made as part of their scheme to defraud APA investors during the Class Period are the ***same exact statements*** challenged herein.

305. On September 15, 2022, Judge Edison issued the R&R concluding that the defendants' motion to dismiss the Securities Action should be ***denied***. Notably, Judge Edison's R&R contains an explanation of just how extraordinary the allegations regarding the fraud at APA were. As Judge Edison stated:

> Over my career, both as a lawyer and as a judge, I have had the opportunity to review a vast number of securities class action lawsuits. Despite their usual length, many of those filings are cut-and-paste jobs that unquestionably fail to properly allege a false or misleading statement. ***This is not one of those complaints. The Consolidated Class Action Complaint provides a detailed discussion of the alleged misrepresentations at issue and explains the reasons why Defendants allegedly knew at the time they spoke publicly that those statements were materially false.*** For that reason, I conclude that Lead Plaintiffs have sufficiently alleged that Defendants made materially false or misleading statements, a necessary prerequisite to stating a § 10(b) and Rule 10b–5 claim.

306. With respect to scienter, Judge Edison's R&R stated: "[v]iewing Lead Plaintiffs' allegations as true and evaluating the facts as a whole, I conclude that Consolidated Class Action Complaint's allegations are sufficient to support ***a strong inference of scienter*** by Defendants." Given his findings of falsity and scienter – both required elements of securities fraud – Judge Edison concluded that the Securities Action defendants' motion to dismiss should be denied ***in its entirety***.

307.     On November 29, 2022, Judge Hanks issued an Order in the Securities Action approving and adopting Judge Edison's R&R *in full* as the holding of the Southern District of Texas and denying the defendants' motion to dismiss the Securities Action in its entirety.  Notably, after objections to the R&R were filed by the defendants to the Securities Action on October 13, 2022, Judge Hanks entered this Order following a *de novo* review of Judge Edison's R&R.

308.     Accordingly, APA and each of the Individual Defendants are now staring down the barrel of federal securities fraud claims sustained against them under the Exchange Act, as the Securities Action proceeds towards trial.

## X.     DAMAGES TO APA

309.     As alleged above, the statements and events described herein gave rise to the Securities Action being initiated against the Company.  The Securities Action against APA has been sustained in its entirety.  In this regard, Judge Edison's R&R and Judge Hanks' Order approving and adopting the R&R presage great damages to APA's assets, goodwill, and reputation.

310.     APA has suffered additional damages as well.  For example, APA is suffering, and will continue to suffer, from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that APA's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Further, as the Securities Action and other related litigation continues to unfold, APA will be continue to be damaged by the professional fees, costs and expenses incurred because of those matters, not to mention the decline in productivity associated with the distractions that come with exposure to litigation.

311.     The Individual Defendants have not fared nearly so badly, however.  As alleged herein, on the contrary, the Individual Defendants pocketed millions of dollars in incentive-based executive compensation not justified by the Company's performance while under their

stewardship.  The Company has also incurred costs in connection with benefits paid to the Individual Defendants.

### XI.   PLAINTIFF'S DEMAND HAS BEEN CONSTRUCTIVELY REFUSED AND IGNORED BASED ON THE BOARD'S FAILURE TO TIMELY SECURE TOLLING AGREEMENTS FROM THE INDIVIDUAL DEFENDANTS, AND THIS DERIVATIVE ACTION SHOULD PROCEED

312.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

313.    Plaintiff is a current stockholder of the Company, has continuously held shares of the Company's stock since January 2016, and was a stockholder of the Company at all times relevant to the Individual Defendants' wrongdoing alleged herein.

314.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

315.    APA is a Delaware corporation.  The directors of a Delaware corporation owe the corporation and its stockholders the affirmative duty to protect the interests of the corporation at all times.  Moreover, corporate directors have an obligation to refrain from conduct that would injure the corporation and its stockholders.

316.    Very shortly after Judge Edison issued the R&R on September 15, 2022, Plaintiff sent his a formal, written pre-suit Demand dated September 23, 2022 to the Board in accordance with Delaware law.  *See* Exhibit A. Therein, Plaintiff demanded that the Board initiate an independent, reasonable, good faith investigation regarding the allegations therein and take all necessary actions, including filing a lawsuit on the Company's behalf against its wayward "fiduciaries," in order to protect the Company's interests and recover the serious damages caused to APA by their misconduct.

317.    In addition, Plaintiff's Demand noted that the three year statute of limitations for

breach of fiduciary duty claims under Delaware law arguably would expire on February 26, 2023 (based on the February 26, 2020 announcement that APA would be forced take a $3 billion write-down on its Alpine High assets).  To the extent that the Board might not have been able to complete an investigation regarding the allegations raised in the Demand prior to the expiration of the applicable statute of limitations, Plaintiff demanded that the Board timely secure tolling agreements from each of the individuals that were implicated or potentially could be implicated in the alleged wrongdoing, including but not limited to the Individual Defendants.

318.    On November 1, 2022, S&S, counsel for a purportedly "independent committee" of the Board, sent a letter to Plaintiff's counsel.  *See* Exhibit B.  The letter from S&S represented that an "investigation in this matter is already underway" but did not indicate whether any tolling agreements had been secured by the Board or its "independent committee" or whether the Board or its "independent committee" intended to secure such tolling agreements prior to the expiration of the statute of limitations.

319.    On November 29, 2022, Judge Hanks issued an Order in the Securities Action approving and adopting Judge Edison's R&R in full as the holding of the Southern District of Texas and denying the defendants' motion to dismiss the Securities Action in its entirety.  Notably, Judge Hanks entered this Order following a *de novo* review of Judge Edison's R&R after objections to the R&R were filed by the Securities Action defendants on October 13, 2022.  Accordingly, the fully sustained Securities Action is currently proceeding towards trial.

320.    Having not heard from S&S since receiving its letter dated November 1, 2022, on January 27, 2023, counsel for Plaintiff sent an email to Mr. Cooper, a true and correct copy of which is attached hereto at Exhibit C.  Therein, Plaintiff's counsel specifically referenced the upcoming expiration of the statute of limitations for Delaware breach of fiduciary claims, as

previously stated in the Demand, and requested confirmation as to whether tolling agreements had been secured with all directors and senior officers identified as wrongdoers or potential wrongdoers in the Demand.

321.    On January 30, 2023, Mr. Cooper sent a letter to counsel for Plaintiff in response to the January 27, 2023 email, a true and correct copy of which is attached hereto at Exhibit D. Therein, Mr. Cooper represented that an investigation was being conducted by a so-called "Special Committee" which purportedly "is currently completing its work and plans to report to the Board of Directors in due course."  While Mr. Cooper's letter stated that "[t]he Board of Directors and Special Committee will consider all appropriate actions in light of the findings of the investigation", Mr. Cooper conspicuously ignored Plaintiff's inquiry as to whether tolling agreements had been timely secured or would be timely secured.  Indeed, Mr. Cooper's January 30, 2023 letter to Plaintiff's counsel, like his earlier November 1, 2022 letter, did not even mention tolling agreements or the applicable statute of limitations for breach of fiduciary duty claims under Delaware law.

322.    Upon receipt of a pre-suit demand from a shareholder, directors of Delaware corporations are duty-bound to investigate independently and in good faith and to evaluate the charges in order to discharge their fiduciary duties to stockholders and manage corporate affairs responsibly.  Directors of Delaware corporations are likewise obligated to take steps to reasonably inform themselves of all material information available to them for purposes of determining how to proceed in response to a stockholder demand.  Of course, any reasonable, good faith evaluation of the charges in the Demand in this instance by APA's directors, and any reasonable effort to inform themselves as to how to proceed, would necessarily include (among other things) an assessment of the applicable statute of limitations for the Company's claims.

323.     Claims for relief belonging to the Company are, of course, valuable corporate assets.   Directors of Delaware corporations are duty-bound to protect and preserve the corporation's assets.

324.     Inexplicably, the Special Committee and the Board have ignored the Demand to the extent that it states that securing tolling agreements is a necessary, fundamental step based on the expiration date of the statute of limitations for breach of fiduciary duty claims under Delaware law, as well as subsequent correspondence from counsel for Plaintiff regarding this same critical issue.  Based on the record, especially Mr. Cooper's January 30, 2023 letter ignoring Plaintiff's Counsel's January 27, 2023 inquiry as to the status of tolling agreements, there is no indication that the Special Committee and/or the Board have taken action to secure tolling agreements with the Individual Defendants.  Accordingly, it is now readily apparent that the Special Committee and/or the Board either acted recklessly by failing to take reasonable, basic steps to ensure that APA can timely assert its valuable claims, or worse, that the Special Committee and/or the Board deliberately chose to "run out the clock."

325.     In either case, by this late point in time, the Special Committee's and/or Board's failure to secure tolling agreements despite Plaintiff's explicit demands for tolling agreements -- as the statute of limitations for APA's breach of fiduciary duty claims is at least arguably set to expire shortly -- amounts to functionally ignoring and wrongfully refusing the Demand and failing to protect and preserve APA's corporate assets, in violation of the Board's fiduciary duties to APA and its stockholders.

326.     The Board's clear and wrongful derelictions of duty have left Plaintiff with no choice but to initiate this derivative action at this time on behalf of the Company against the Individual Defendants, to ensure that the Company's valuable claims for relief based on the

allegations in the Demand are properly and timely asserted.

327.     The fact remains that, but for the Individual Defendants' serious misconduct, including their false and misleading statements set forth at length above, the Company would not have been named as a primary defendant in the Securities Action.  A Delaware corporation is a legal entity and, therefore, it can only act through its officers and/or directors -- here, the Individual Defendants.  Under these circumstances, the Board's and/or the Special Committee's clear disdain and disregard for the Demand and their own duties in connection with the Demand constitutes a constructive, wrongful refusal of the Demand.  By this derivative action, Plaintiff seeks to vindicate the Company's rights against its wayward fiduciaries -- the Individual Defendants -- since the Special Committee and/or the Company's current directors either cannot or will not discharge their fiduciary duties to protect and preserve APA's corporate assets.

328.     The Board's and/or the Special Committee's conduct is antithetical to their affirmative duties to protect the interests of APA and to refrain from conduct that would injure the corporation.  By failing to act upon the Demand by timely securing tolling agreements from the Individual Defendants, the Special Committee and/or the Board failed in their fundamental duty and obligation to protect the corporate enterprise.  Therefore, by virtue of their own actions (or, to be more precise, their own inactions), the Special Committee and/or the Board has constructively and wrongfully refused the Demand.  Accordingly, Plaintiff may proceed with this derivative action which is designed to protect the interests of APA by, among other things, perfecting the Company's claims for relief against the Individual Defendants.

## COUNT I

**For Contribution and Indemnification Under the Securities Exchange Act of 1934 Against the Individual Defendants**

329.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

330.     The Individual Defendants named in this Count are named as individual defendants in the related Securities Action against APA that is currently pending before this Court. The conduct of these individuals has exposed the Company to significant liability under the federal securities laws by their disloyal acts.

331.     In the Securities Action, which has been sustained in its entirety, the Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If APA is found liable in the Securities Action for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.

332.     The Company is entitled to contribution and indemnification from these individuals in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

333.     As officers and directors of APA, the Individual Defendants had the power and ability to, and did, control or influence, either directly or indirectly, the Company's general affairs, including the content of its public statements, and had the power and ability to directly or indirectly control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act, SEC Rule 10b-5, and other securities laws.

334.     The Individual Defendants are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

335.     The Individual Defendants accordingly have damaged the Company and are liable

to the Company for contribution and/or indemnification.

336.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT II

### Breach of Fiduciary Duty Against the Individual Defendants

337.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

338.     The Individual Defendants, as current or former APA officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

339.     By virtue of their positions as APA directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

340.     Each Individual Defendant was required to: (a) use his or her ability to control and manage APA in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of APA rather than his or her own interests.

341.     By their acts alleged herein, including but not limited to causing APA to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

342.     The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

343.     APA has been injured as a direct and proximate result of the Individual

Defendants' wrongful conduct.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

344.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

345.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of APA.

27.     Plaintiff, as a shareholder and representative of APA, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits, and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing APA to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and

develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

      C.      Awarding to APA restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

      D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

      E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: February 21, 2023

**SPONSEL MILLER GREENBERG PLLC**

_/s/ Thane T. Sponsel III_
Thane Tyler Sponsel III  (Texas SBN 24056361)
Federal ID No 690068
Roger B. Greenberg  (Texas SBN 08390000)
Federal ID No. 3932
50 Briar Hollow Lane, Suite 370 W
Houston, TX 77027
Telephone: (713) 892-5400
sponsel@smglawgroup.com
roger@smglawgroup.com

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

135

**KASKELA LAW, LLC**
D. Seamus Kaskela
18 Campus Blvd., Suite 110
Newtown Square, PA 19073
(484) 258-1585
skaskela@kaskelalaw.com

**LAW OFFICE OF ALFRED G. YATES JR., P.C.**
Alfred G. Yates, Jr.
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
(412) 391-5164
yateslaw@aol.com

*Counsel for Plaintiff Steve Silverman*

**APA Corporation Verification**

I, Steve Silverman, hereby verify that I am familiar with the allegations in the Verified Stockholder Derivative Complaint and that I have authorized the filing of the Verified Stockholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 2/8/23

STEVE SILVERMAN